JACOBS LEGAL, PLLC

BRUCE JACOBS 116203 (FL), 2791036 (NY)
Alfred I. Dupont Building
169 East Flagler Street, Suite 1620
Miami, Florida 33131
Telephone: (305) 358-7991
Email: efile@jakelegal.com
(Pro Hac Vice Application Pending)

THE LAW OFFICE OF FREDERICK J. ARENSMEYER, LLLC

FREDERICK J. ARENSMEYER 8471
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2920
Honolulu, Hawaii 96813
Telephone: (808) 888-7444
Email: fja@arensmeyerlaw.com

Attorneys for Plaintiffs
Nathan Earl Aiwohi, Toby Alamoana
Keohokapu, Jr., Susan DeShaw,
Darlene K. Ebos, as the successive Personal
Representative of The Estate of Barbara Anita
Baliguat, Thomas Johnson, Maria K. Williams- James,
Lazara Rodriguez, and Julie Nicolas

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| NATHAN EARL AIWOHI, | ) | NO. 1:22-cv-00312 |
| Individually, and on behalf of others | ) | |
| similarly situated, | ) | CLASS ACTION COMPLAINT |
| | ) | FOR DAMAGES, INJUNCTIVE, |
| TOBY ALAMOANA KEOHOKAPU, | ) | AND EQUITABLE  RELIEF, |
| JR., individually, and on behalf of | ) | RACKETEER INFLUENCED |
| others similarly situated, | ) | AND CORRUPT ORGANIZATIONS |
| | ) | ACT (RICO), FILED PURSUANT |

| | |
|---|---|
| DARLENE K. EBOS, as successive PERSONAL REPRESENTATIVE of THE ESTATE OF BARBARA ANITA BALIGUAT, individually, and on behalf of others similarly situated, | ) ) ) ) ) ) ) |
| | ) |
| SUSAN DESHAW, individually, and on behalf of others similarly situated, | ) ) ) |
| | ) |
| THOMAS JOHNSON, individually, and on behalf of others similarly situated, | ) ) ) |
| | ) |
| MARIA K. WILLIAMS JAMES, individually, and on behalf of others similarly situated, | ) ) ) |
| | ) |
| LAZARA A. RODRIGUEZ, individually, and on behalf of others similarly situated, | ) ) ) |
| | ) |
| JULIE NICOLAS, individually, and on behalf of others similarly situated, | ) ) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| BANK OF AMERICA, N.A., and | ) |
| | ) |
| THE BANK OF NEW YORK MELLON, | ) ) |
| | ) |
| Defendants. | ) |

TO 18 U.S.C. §§ 1962 (c),
18 U.S.C. §§ 1964 (a)(c),
18 U.S.C. §§ 1341, 1343; and THE
FAIR HOUSING ACT, 42 U.S.C.
§ 3601, et seq.;
DEMAND FOR TRIAL BY JURY;
EXHIBITS 1 THROUGH 43;
SUMMONS IN A CIVIL ACTION.

**2**

**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE, AND EQUITABLE  RELIEF, RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), FILED PURSUANT TO 18 U.S.C. §§ 1962(c), 18 U.S.C. §§ 1964 (a)(c), 18 U.S.C. §§ 1341, 1343; and THE FAIR HOUSING ACT, 42 U.S.C. § 3601, et seq.**

_____

COMES NOW, Nathan Earl Aiwohi, Toby Alamoana Keohokapu, Jr., Darlene K. Ebos, as Representative for the Estate of Barbara Baliguat, Susan DeShaw, Thomas Johnson, Maria K. Williams-James, Lazara A. Rodriguez, and Julie Nicolas, individually, and on behalf of others similarly situated [hereinafter "Class Plaintiffs" or "Plaintiffs"], and files this Class Action Complaint for Damages, Injunctive, and Equitable Relief, Racketeer Influenced and Corrupt Organizations Act ("RICO"), Filed  Pursuant to 18 U.S.C. §§ 1962(c), 18 U.S.C. §§ 1964 (a), (c), 18 U.S.C. §§ 1341, 1343; and The Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq., against Bank of America National Association ("BANA"), and The Bank of New York Mellon ("BONYM") [hereinafter "Class Action Complaint"], by and through the undersigned attorneys, and states:

**NATURE OF CAUSE OF ACTION AND INTRODUCTION**

1. When Hawaii became a state in 1959, Dr. Martin Luther King Jr. addressed the very first Hawaii state legislature, and said, "you can never know what it means to those of us caught for the moment in the tragic and often dark midnight of man's inhumanity to man, to come to a place where we see the glowing

3

daybreak of freedom and dignity and racial justice."

2. In 1965, Hawaii's beloved Reverend Abraham Akaka of the Kawaiahoa Church, who famously called for Hawaii to be called the Aloha state, sent Hawaiian leis hand-sewn by kupuna (elders) in his congregation to Dr. King and the civil rights leaders to wear during their historic march from Montgomery to Selma Alabama.

3. Here, Hawaii Class Representatives, Nathan Earl Aiwohi, Toby Alamoana Keohokapu, Jr., The Estate of Barbara Anita Baliguat, Susan DeShaw, and Thomas Johnson, join hands across the Pacific and the continental U.S. with Miami Class Representatives, Maria Williams-James, Ana Lazara Rodriguez, and Julie Nicolas, and continue that historic march to economic and racial justice for all Americans. ("Class Plaintiffs")

4. Class Plaintiffs, on behalf of themselves and all similarly situated homeowners, see this lawsuit as "the glowing daybreak of freedom" for homeowners still suffering from BANA's "inhumanity", having all been victimized by the same discriminatory, unlawful, and oppressive violations of the Fair Housing Act and the Racketeer Influenced and Corrupt Organizations Act, regarding the terms, conditions and servicing of mortgage loans, and wrongful foreclosure schemes to defraud homeowners in this District, in Miami, and

nationally.

**HAWAII CLASS PLAINTIFFS:**

**Class Plaintiff, Nathan Earl Aiwohi ("Aiwohi")-**

5. Nathan Earl Aiwohi is of Hawaiian descent and was a teacher for 8 years and has now been a school administrator for 24 years. Aiwohi is a member of Unit 6 of the Hawaii Government Employees Association. A concerned citizen, Aiwohi served on the leadership team for Ohana Christian Fellowship for 10 years.

6. On January 5, 2006, Aiwohi was sold a 120 month interest only predatory Countrywide loan, requiring Aiwohi to pay $438,750 over ten years, before amortized principal and interest payments kicked in for the following 240 months. Aiwohi is amid a wrongful foreclosure action filed by BONYM that has been ongoing since 2013.

7. Aiwohi is being prosecuted in foreclosure by BONYM using: a.) a forged Countrywide mortgage note rubber-stamped endorsement in blank that is undated; b.) a false and fraudulent Mortgage Electronic Registration Systems, Inc. ("MERS") mortgage note assignment; c.) through use of sworn Affidavits containing false statements of fact, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence; and d.) through use of sworn Affidavits omitting material negative facts,

relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence.

8. On September 20, 2018, BONYM obtained a final judgment of foreclosure against Aiwohi that was recently reversed by the Intermediate Court of Appeals for the State of Hawaii on March 24, 2022, in Case No. CAAP-18-0000736, because BONYM did not prove it had the right to foreclose on Aiwohi's home.

9. Nathan Earl Aiwohi's individualized statement of facts are continued in ¶¶ 371-417, *infra*.

**Toby Alamoana Keohokapu, Jr. ("Keohokapu")-**

10. Toby Alamoana Keohokapu, Jr. is of Hawaiian descent and employed as a construction foreman at Insight Builders, and is married to Kelly with five children. Keohokapu also serves on the board of trustees of the Wahiawa Church of Christ. His wife, Kelly Keohokapu, is a Shop Steward and employee of Kaiser Permanente, who is also a UNITE HERE Local 5 Shop Steward that represents and defends the interests of her fellow employees at Kaiser Permanente. Both are gainfully employed.

11. On November 17, 2006, Keohokapu was sold an interest only predatory loan, later purchased by Countrywide, requiring Keohokapu to pay $486,000 over

ten years, before amortized principal and interest payments kicked in for the following 240 months. Kelly and Toby were first time home buyers that endeavored to obtain a loan modification several times over the years that kept being denied. Keohokapu is amid a wrongful foreclosure action filed by BONYM that has been ongoing since 2012.

12. Keohokapu is being prosecuted in foreclosure by BONYM using: a.) a forged Countrywide mortgage note rubber-stamped endorsement in blank that is undated; b.) a false and fraudulent Mortgage Electronic Registration Systems, Inc. ("MERS") mortgage note assignment; c.) through use of sworn Affidavits containing false statements of fact, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence; and d.) through use of sworn Affidavits omitting material negative facts, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence.

13. Toby Alamoana Keohokapu, Jr.'s individualized statement of facts are continued in ¶¶ 418-506, *infra.*

**Class Plaintiff, Barbara Anita Baliguat ("Baliguat" or "Ebos")-**

14. Barbara Anita Baliguat (deceased) was of Hawaiian-Portuguese decent. She was a housewife, then worked at a 7-11 for many years, and then worked at

her last job at Zippy's Restaurant. Baliguat retired from Zippy's in 2005, due to major health problems that resulted in both her legs being amputated in 2008. She passed away on February 29, 2012. Baliguat's wrongful foreclosure case is now being defended by Darlene Ebos, her daughter, and substitute Class Representative herein.

15. On January 10, 2006, Baliguat was sold a predatory 40 year balloon predatory loan by Countrywide, that was a 115% reverse amortization note, initially calling for a $1,121.62 monthly payment at the rate of 1.25% interest, changing to an adjustable rate note after one year, with a maximum interest rate increase from 1.25% up to 9.95%, where principal could never exceed 115% of the loan amount. Baliguat also had the equivalent of a six month interest prepayment penalty.

16. Baliguat is being prosecuted in foreclosure by BONYM using: a.) a forged Countrywide mortgage note rubberstamped endorsement in blank that is undated; b.) a false and fraudulent Mortgage Electronic Registration Systems, Inc. ("MERS") mortgage note assignment; c.) through use of sworn Affidavits containing false statements of fact, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence; and d.) through use of sworn Affidavits omitting material negative facts,

**8**

relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence.

17. Baliguat's predatory mortgage loan violates the Fair Housing Act, that is now being wrongfully foreclosed upon by BONYM, and her daughter Darlene Ebos is amid defending that wrongful foreclosure action that has been ongoing since 2013.

18. Barbara Anita Baliguat's individualized statement of facts are continued in ¶¶ 507-544, *infra.*

**Class Plaintiff, Susan DeShaw ("DeShaw")-**

19. Susan DeShaw is a member of the International Brotherhood of Electrical Workers union, and made an early career out of providing electrical contracting services for military homes that took her all over the country. She and her husband are both gainfully employed electricians today, however, during the housing market crash in 2008 DeShaw was laid off by her employer.

20. DeShaw has attempted to apply for several loan modifications, and for a lower interest rate charged, but her applications were rejected. DeShaw is amid an ongoing wrongful foreclosure action in this District filed by BONYM that has been ongoing since 2016.

21. DeShaw is being prosecuted in foreclosure by BONYM using: a.) a

forged Countrywide mortgage note rubber-stamped endorsement in blank that is undated; b.) a false and fraudulent Mortgage Electronic Registration Systems, Inc. ("MERS") mortgage note assignment; c.) through use of sworn Affidavits containing false statements of fact, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence; and d.) through use of sworn Affidavits omitting material negative facts, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence.

22. Susan DeShaw's individualized statement of facts are continued in ¶¶ 545-590, *infra.*

**Class Plaintiff, Thomas Johnson ("Johnson")-**

23. Thomas Johnson is a retired Army Colonel who proudly served his country for 27 years in the United States Army. Johnson is a combat veteran with multiple deployments to Afghanistan and Iraq. Johnson is 100% disabled because of injuries sustained from his military service. Johnson is married and he and his wife care for his son diagnosed with leukemia.

24. On April 18, 2006, Johnson was sold a predatory 7.875% interest only mortgage loan by Countrywide, calling for the payment of $233,296.80 interest only over the first five years, followed by a payment to be calculated after the first

five years for amortized principal and interest, adjustable from 7.875% up to 12.875% for the remaining 25 years of the loan.

25. Johnson is likewise amid a wrongful foreclosure action now being prosecuted in this District by Wilmington Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust V-E ("Wilmington Trust").

26. Johnson is being prosecuted in foreclosure by Wilmington Trust using: a.) a forged Countrywide mortgage note rubberstamped endorsement in blank that is undated; b.) a false and fraudulent Countrywide mortgage note assignment; c.) through use of sworn Affidavits containing false statements of fact, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence; and d.) through use of sworn Affidavits omitting material negative facts, relevant to the trial court's determination of reliability, credibility and trustworthiness of business records entered into evidence.

27. Thomas Johnson's individualized statement of facts are continued in ¶¶ 591-644, *infra.*

**FLORIDA CLASS PLAINTIFFS:**

**Class Plaintiff, Maria Williams-James ("Williams-James")-**

28. Maria Williams-James is an African-American retired inner city school teacher, a former "Teacher of the Year," and a member of United Teachers of Dade

Union. On June 2, 2004 Williams-James signed a Countrywide mortgage note for $51,700 and commenced making regular monthly mortgage payments when due. When Countrywide was purchased by BANA, Williams-James continued making regular monthly mortgage payments when due to BANA. Then in 2010 William-James' BANA nightmare started.

29. In 2010 BANA filed a foreclosure complaint against Williams-James alleging payment default. ("first foreclosure") In the first foreclosure case, BANA presented a forged rubber stamped mortgage note endorsement, a false mortgage assignment, and a false payment history to obtain a foreclosure judgment in 2013 that said Williams-James had not made a single mortgage payment to BANA since 2010.

30. In 2010, NBC News reported that BANA had a problem with "a new species of homeowner getting pushed into foreclosure" that never defaulted on their loans.[1]

31. In 2013, BANA obtained a foreclosure judgment against Williams-James using a forged note endorsement, a false mortgage assignment, and a payment history that failed to document years of payments on Williams-James $51,700 mortgage.

---

[1] https://www.nbcnews.com/id/wbna40571573

32. On December 16, 2013, Williams-James' filed a Motion to Vacate (first foreclosure) Judgement *due to fraud,* that a Miami judge Granted by written Order signed on May 6, 2014. However, the judge imposed no sanctions or made any findings of fraud before re-setting the case for trial. Just before trial, BANA voluntarily dismissed the 2010 foreclosure case. Then her counsel was disbarred and there was no follow up about the years of wrongful foreclosure she endured or the substantial attorneys fees Ms. Williams James had paid to protect her home.

33. Thereafter, while Williams-James continued to make mortgage payments, that were accepted and kept by BANA, Fannie Mae sold the Williams-James' mortgage loan to VRMTG Asset Trust ("VRMTG"), but the mortgage payments made by Williams-James to BANA were not forwarded by BANA to VRMTG.

34. On July 18, 2019, Green Tree Servicing, LLC aka Ditech Financial LLC, as servicer for VRMTG Asset Trust ("VRMTG"), filed a second foreclosure complaint ("second foreclosure") against Williams-James, using the same forged mortgage note endorsement, false mortgage assignment, and false payment history, that BANA used to sue Williams-James in 2010.

35. Again, Williams-James had cancelled check to prove that she made all her mortgage payments timely to BANA and was not in default. In the 2021 trial of

Williams-James second foreclosure, VRMTG presented the same false evidence that falsely stated Williams-James had not paid her mortgage since 2010.

36. VRMTG's trial witness gave sworn testimony about a loan boarding process that verified BANA's prior payment history was accurate. This was perjury. It was never accurate for BANA's payment history to show Williams-James had not paid her mortgage since 2010. Again, Williams-James presented cancelled checks showing she paid her mortgage and BANA admitted receiving all her payments.

37. Williams-James testified at her foreclosure trial about how this nightmare went on for over a decade, and cost her over $30,000 in attorney's fees to prove that she paid her mortgage payments timely, and that she believed her Miami judge was not fair or impartial, and discriminated against her on account of her race.

38. Williams-James eventually won the second foreclosure case trial that lasted 2 days, but only on a technicality, not because she made her payments or because BANA's evidence was forged, false or fraudulent. The trial judge refused to consider any of that evidence of payment or fraud but did accept the argument VRMTG failed to introduce evidence the prior foreclosure judgment was vacated, which would have revived the promissory note that had been marked cancelled.

39. Later, the trial court permitted BANA to re-open the foreclosure trial to present evidence the prior judgment was vacated. In that hearing, the trial court reviewed the Motion to Vacate Judgment from the 2011 case which set forth that Ms. Williams James made all her payments and BANA admitted she made her payments. The trial judge stated she had serious reservations about reopening the case to reinstate a judgment already vacated because the loan was not in default.

40. Thereafter, the judge decided to recuse herself from all cases defended by Williams-James' counsel admitting on the record to an overriding personal bias that made her unconstitutionally unacceptable to act as a fair and impartial judge. After recusing herself from some cases, and before recusing herself in Williams-James' case, the judge issued a final judgment of foreclosure finding, without analysis, that Williams James had not paid her mortgage since January of 2010. This essentially reinstated the same judgment vacated due to fraud in 2014.

41. That 2021 final judgment of foreclosure caused Ms. Williams James' home to be sold at auction for $238,000 with almost all of that money going to VRMTG Asset Trust. Class Plaintiff Williams-James lost her home to a $51,700 mortgage that had been paid down for years, losing almost $200,000 in equity as a result.

42. After learning what had transpired in her fraudulent foreclosures, the

company that purchased her home at the foreclosure sale demanded its money back, calling the sale a "blood diamond" that offended the constitution. The trial judge eventually recused herself and a new judge is considering a motion to vacate judgment due to fraud and for sanctions and contempt.

43.   Class Plaintiffs allege BANA's accepting monthly payments from Williams James for years while VRMTG prosecuted a fraudulent foreclosure using forged and false evidence BANA prepared and gave to VRMTG resulted in a wrongful foreclosure and sale of the home, constitutes a violation(s) of the Fair Housing Act as unlawful and discriminatory mortgage loan services rendered to Williams-James who is in a protected class under the Act.

44. Maria James-Williams' individualized statement of facts are continued in ¶¶ 645-687, *infra.*

**Class Plaintiff, Julie Nicolas ("Nicolas")-**

45. Julie Nicolas is a Haitian American single mother who fell into foreclosure after a 3-month gap in income due to an audit of the company that employed her as a nurse temporarily withholding her salary. Nicolas raised three sons in her home.

46. The Nicolas mortgage note[2], as were all other Class Plaintiff's

---

[2]   On October 11, 2006, Julie Nicolas was sold a predatory mortgage loan, subsequently purchased by Countrywide, calling for fixed interest at the rate of

Countrywide mortgage notes, placed the entire mortgage loan in default, if any one monthly payment was one day late, at the option of the note holder, which could not be waived, even after late payment.

47. After a short time, Nicolas recovered her back pay, and even got a raise, but could not resume paying her mortgage because the bank would not let her. BANA insisted she did not qualify for a modification loan to save her home. BANA refused to modify Nicolas' mortgage loan. Nicolas made more money that when she stopped making payments for 3 months due to the audit and was still denied a modification. Nicolas lost her home in a wrongful foreclosure action by BANA and BONYM in 2021, but still lives in her home today pending eviction.

48. After the final judgment of foreclosure and sale in 2021, Nicolas filed a Motion to Vacate Judgment Due to Fraud before the Honorable Miami-Dade Associate Administrative Circuit Judge, Beatrice Butchko ("Judge Butchko"). Judge Butchko ordered the motion fully briefed and then conducted an evidentiary hearing regarding the frauds alleged by Nicolas.

49. During the evidentiary hearing, Judge Butchko sustained a hearsay objection claiming BANA's admissions were admissions of the Plaintiff, BONYM,

---

8.9% for two years, then becoming an adjustable interest rate note for the remaining 28 years of the note with interest never exceeding 16.9%. Nicolas also had the equivalent of a six month interest prepayment penalty if her loan was paid off in less than 24 months.

after BONYM's counsel, Nathaniel Callahan, Esquire ("Callahan"), a partner at Akerman, LLP ("Akerman") presented a BONYM witness who swore BANA was not BONYM's agent. Judge Butchko stopped the evidentiary hearing in frustration and ordered BANA and BONYM to sit for deposition to testify as to five separate areas of fraud identified in Julie Nicolas' case, to wit:

a.   the rubber stamped blank endorsement is a forgery;

b.   the MERS Assignment is false and fictitious;

c.   the mortgage loan schedule in evidence is a fraud;

d.   the loan boarding testimony about checking the accuracy of the prior servicers' payment history is perjury;

e.   Defendant, BONYM committed perjury in denying that Defendant, BANA was its Agent.

50. BANA and BONYM both defied Judge Butchko's order and refused to appear for deposition. In June, 2021, Nicolas filed a Motion for Order to Show Cause and attached an affidavit of a nationally recognized certified fraud examiner, Jay Patterson, who reviewed BONYM's own website which contained a settlement agreement showing BANA is, and always was, the Master Servicer for BONYM. Judge Butchko found the Patterson affidavit set forth probable cause Mr. Callahan offered perjured testimony at the evidentiary hearing conducted for fraud on the

court alleged by Class Plaintiff Julie Nicolas. Pursuant to Fla. R. Crim. P. 3.840, Judge Butchko initiated criminal contempt proceedings against Defendants, BANA, and BONYM, and their counsel, and then set their criminal arraignments.

51. Defendants, BANA and BONYM, and Callahan, all filed emergency appeals with Florida's Third DCA to derail the criminal contempt proceedings, evidencing the power and control that Defendants possess in Florida. Akerman demanded that Judge Butchko and Julie Nicolas' attorney be "urgently held accountable" and falsely accused Judge Butchko of "rubber stamping" the contempt order "without any factual basis", in a pot-calling-the-kettle-black-moment.

52. Florida's Third DCA rejected Akerman's argument Judge Butchko falsely accused Callahan, BANA, and BONYM of perjury during the evidentiary hearing on fraud. Akerman accused Judge Butchko of dishonestly collaborating with Nicolas' counsel and not ethically upholding the rule of law in her courtroom. Akerman alleged Nicolas' counsel had an "improper" and "special influence" over Judge Butchko based on her rulings during the evidentiary hearing on the Motion to Vacate Judgment due to Fraud.

53. The Third DCA held it is only possible for an appellate court to intervene and stop criminal contempt proceedings in the "rare" case when the acts

cited for contempt could not constitute contempt. *Carrington Mortg. Servs., LLC v. Nicolas*, No. 3D21-1300, 2021 WL 5499732, at *3 (Fla. 3d DCA Nov. 24, 2021). Then, the Third DCA found "there can be no finding of criminal contempt … simply because they are maintaining that Bank of America transferred the servicing rights to Carrington."

54. The Third DCA quashed Judge Butchko's criminal contempt proceedings and removed her from the case finding she was biased against BONYM and BANA because they "… asserted Bank of America was not the Master Servicer for this Trust, and that Carrington Mortgage Services is in fact the Master Servicer." The Patterson affidavit established probable cause BANA was the Master Servicer for this Trust according to BONYM's own website.

55. After Judge Butchko was removed, the Nicolas case was transferred to a different circuit judge who refused to take any action against BANA, BONYM, or Callahan for their defiance of Judge Butchko's order to appear for deposition which led to the criminal contempt proceedings. Nicolas then moved to disqualify the new trial court judge on grounds of bias, after the trial court judge refused to set any hearings regarding sanctions or other contempt proceedings.

56. Nicolas' 2021 final judgment of foreclosure was not overturned, notwithstanding that contempt proceedings were in process for that very purpose,

and then contempt proceedings were stayed by the new trial judge. The Banks and their counsel remain in violation of the order to appear for deposition since 2021.

57. The Julie Nicolas wrongful foreclosure case is representative of just how Defendants attacked the judiciary, with actual or apparent impunity, regardless that their frauds are committed in an open and notorious manner, as delineated in the Complaint *sub judice.* At this time, Nicolas remains in her home pending eviction.

58. Julie Nicolas' individualized statement of facts are continued in ¶¶ 725-757, *infra.*

**Class Plaintiff, Ana Lazara Rodriguez ("Rodriguez")-**

59. Ana Lazara Rodriguez spent 19 years in a Cuban prison for women, as a political prisoner of Fidel Castro, and was frequently tortured while imprisoned. Rodriguez was humiliated, beaten, starved, and denied water for a quarter of her life. Rodriguez, who speaks fluent English, came to Miami and worked in the medical field well into her 70s. In Miami, Rodriguez also cared for two other former political prisoners of the Castro regime in her home, one who was dying from cancer and the other who was dying from Alzheimer's disease.

60. On July 1, 2006, Rodriguez was sold a discriminatory and predatory loan, later purchased by Countrywide, that was a 115% negative amortization note, initially calling for a $1,599.61 monthly payment at the rate of 1.25% interest,

changing to an adjustable rate note after one year, with a maximum interest rate increase from 1.25% up to 9.95%, where principal could never exceed 115% of the loan amount. Rodriguez told the loan officer that she could not afford to pay a $480,000 loan, that included a .5% commission for the broker. The loan officer fixed the paperwork so Rodriguez would qualify, effectively predetermining foreclosure from the start.

61. On September 23, 2013, BANA filed a foreclosure complaint against Rodriguez, who hired counsel to defend the foreclosure. During the pendency of foreclosure litigation, Rodriguez's prior attorney, unilaterally and without Rodriguez's knowledge, or consent, signed a consent judgment in favor of BANA.

62. Thereafter, in 2016, Rodriguez hired new counsel who presented a prima facie case to the trial court that Rodriguez had no knowledge of the consent judgment unilaterally signed by her former attorney without authority. Rodriguez's new counsel, who also represented Williams James and Nicolas, again presented evidence BANA forged the endorsement, recorded a false mortgage assignment, committed perjury, ordered the destruction of evidence, backdated records, destroyed the backdated records, defied subpoenas and court orders, and obstructed justice to continue this systemic fraud on the court in foreclosures.

63. Instead of ruling on the frauds alleged by Rodriguez's new counsel, the

trial court found that Rodriguez's first attorney signed a consent judgment that waived all of Rodriguez's rights, even though the record clearly showed that Rodriguez's prior counsel consented to the judgment without Rodriguez knowledge or consent, acted *ex parte* against the interests of Rodriguez, and that the operative consent judgment did not bear Rodriguez signature.

64. In 2021, the trial court ordered Rodriguez's eviction, notwithstanding claimed frauds, obstruction of justice, BANA's failure to turn over discovery documents ordered by the trial court, and lack of candor to the trial court, established by Rodriguez's second defense counsel on the record in open court.

65. Although Rodriguez raised the same frauds claimed in *Pino v. Bank of N.Y.*, 121 So. 3d 23 (Fla. 2013)(e.g. false and fraudulent mortgage assignment used to show standing to foreclose), with the trial court and appellate court, Florida's Third DCA still permitted BANA to argue that it enjoyed a "*litigation privilege*" that granted immunity for any fraud conducted during the course of litigation. The Third DCA also held a statute limited Rodriguez to a claim for money damages even if she was deprived of her property without due process. Then, Florida's Third DCA denied an emergency motion filed by Rodriguez to stop her 2021 eviction ordered by the trial court.

**Florida Politicians Fought to Rescue Ana Lazara Rodriguez -**

23

66. As a beloved member of the Cuban exile community, Rodriguez garnered much support from the Miami community and its leaders, during and after, her foreclosure that continues to this day. Miami-Dade County's Mayor, Daniella Levine Cava, with Florida State Senators Ileana Garcia (R), Annette Taddeo (D), Jason Pizzo (D), and Miami City Commissioner Alex Diaz De La Portilla (R) all publicly fought for Ana Lazara Rodriguez, and against her eviction.

67. Mayor Levine Cava repeatedly ordered the Miami-Dade County Sheriff to stand down on the eviction. Finally, a successful businessman from the Cuban exile community following Rodriguez's plight, arranged to buy Rodriguez a new home, and to help her move in after the Third DCA summarily dismissed her appeal challenged the unconstitutionality of the statute that deprived her of her property without due process by a fraudulent foreclosure and limited her to a claim for money damages.

68. The Third DCA also found Rodriguez's case set forth "intrinsic fraud" by deemed systemic fraud that violated the $25 Billion National Mortgage Settlement assisted by officers of the court did amount to "extrinsic fraud" that would be actionable after a year from the judgment. Rodriguez continues to wait for a hearing to present her evidence of fraud.

69. Ana Lazara Rodriguez's individualized statement of facts are continued

in ¶¶ 688-724, *infra.*

**Bank of America Control over United States Foreclosure Case Systems and Media-**

70. These three women of color, Miami Class Plaintiffs Nicolas, Rodriguez, and Williams-James, all fall squarely within a protected class of individuals under Fair Housing Act that prohibits discrimination in the terms, conditions, and servicing of mortgage loans on the basis of race.  During the pendency of their cases, all three women joined together to publicly tell their stories, and to plead for help from the media, politicians, and non-profit advocacy organizations charged with protecting their rights, including constitutional rights to a fair and honest Florida judiciary.

71. In September 2021, Nicolas, Rodriguez, and Williams-James held a joint press conference that resulted in their stories being broadcast on CBS 4 Miami, with an online news link[3], before the link was subsequently deleted by CBS 4, because BANA threatened to sue the news organization if it wasn't deleted.

72. Although BANA's attempt to silence Nicolas, Rodriguez, and Williams-James worked with CBS 4, the original CBS 4 news story was copied before it was

---

[3] The CBS 4 Link was originally published here before it was deleted: https://miami.cbslocal.com/2021/09/13/former-cuban-political-prisoner- ana-lazara-rodriguez-fight-eviction-south-florida-home/

deleted and appears on either of the links that follow:

A.  OneDrive Link:

https://1drv.ms/v/s!ArkF9IUrcChRrmkBr6SBV-KF6iH7?e=hj4gEc

B.  Dropbox Link:

https://www.dropbox.com/s/8atmxei9qzdppvq/Ana%20Lazara%20Ro
driguez%2C%20Julie%20Nicolas%20%26%20Maria%20Williams-
James%20CBS%20Miami%209-13-21.mp4?dl=0

73. At the end of the CBS 4 video Williams-James called for an investigation into frauds perpetrated by BANA, BONYM and their counsel, along with those certain Miami judges who allowed foreclosure frauds to be perpetrated in their courtrooms in flagrant disregard of the rule of law, and in an open and notorious, beyond reproach, manner. BANA pressured CBS 4 to kill the story.

74. BANA also pressured the Financial Times to kill the story of the racketeering case brought by native Hawaiians to hold BANA accountable for a $150 Million Commitment to fund FHA-247 loans that BANA made to federal banking regulators in response to credible accusations of illegal and discriminatory redlining practices. The Financial Times had been offered an exclusive on certain aspects of the story which it had planned to publish the day the lawsuit was filed on May 31, 2022.

**Mainland Foreclosure Frauds Travel Across the Pacific-**

75. In many respects Hawaii remains an outpost and testing ground for historical BANA foreclosure frauds, tried, tested, and failed, in Miami, and in other Districts nationally. Some of the frauds alleged immediately below are still alive and well in Hawaii right now, for which trial court judges continue to manifest reliance.

76. Prior to 2005, BANA directed the filing of foreclosure complaints, to be filed by Mortgage Electronic Registration Systems Inc, ("MERS"), as plaintiff, presenting that MERS was both owner and holder of the mortgage notes being foreclosed upon. [Exhibit 1], *See also infra,* ¶¶ e.g A Miami Circuit Judge named Jon Gordon exposed the systemic fraud and struck all the MERS foreclosure cases in his courtroom as *sham pleadings*. *Id.* Fannie Mae's retained lawyers called Judge Gordon's ruling "the Florida MERS Embarrassment", because lawyers were routinely lying to judges in Florida and other states across the nation in these MERS foreclosures. (aka "Hostetler Report")[Exhibit 2]

77. By 2008, BANA acquired Countrywide and the servicing rights to prosecute millions of foreclosures filed across the nation filed with complaints alleging the note was lost by securitized trusts or mortgage servicers. This was part of the next wave of fraudulent foreclosures where foreclosure mills like the Law Offices of David J. Stern and Marshall C. Watson were using rubber-stamp to

forge endorsements for Countrywide and preparing false MERS mortgage assignments to record in the public records and present as false and fraudulent evidence of standing.

78. BANA kept meticulous records that documented Countrywide had images of notes years after origination that showed the notes were not endorsed. The records showed Countrywide, and later BANA, then sent those original notes to law firms like the David J. Stern law firm who routinely filed lost note count cases when the note was not lost. At some point those firms would affix a rubber-stamped endorsement to the note and record a false mortgage assignment.

79. In 2010, the Florida Attorney General's Office, and many other State Attorneys General, exposed the BANA "Robo-Signing Scandal", whereby BANA was caught presenting false, fraudulent, and fabricated evidence regarding mortgage ownership within CHL and BANA-BAC business records, to falsify a plaintiff 's standing to file foreclosure cases and to prosecute them through disposition. [Exhibit 3]  BANA engaged in widespread Robo-signing of mortgage assignments in an effort to unlawfully fix trust chain of title deficiencies as its forged endorsements onto Countrywide notes .

80. The FBI investigated the robo-signing scandal and described millions of false and fictitious mortgage assignments being recorded in public records to

corrupt millions of foreclosures across the nation in one of the largest white collar crimes in the nation's history. [Exhibit 4]

81. The Office of the Comptroller of the Currency ("the OCC") forced BANA into a Consent Order in March, 2011 that found BANA was litigating notes without proper endorsements or assignments. [Exhibit 6] The OCC Ordered BANA to submit to an "Independent Foreclosure Review" and identify every foreclosure filed without a proper endorsement or assignment pending across the nation in 2009 and 2010 to compensate the homeowners for the fraud. [Exhibit 7][Exhibit 8][Exhibit 9]

82. BANA reacted by creating a clandestine "Delinquent Note Endorsement Process" as evidenced by contract with its vendor, Sourecorp, to defy the federal investigations into its systemic frauds on the court. Law firms returned original notes to BANA's vault to centralize the forgery operation. Under the process, BANA's vault employees then pulled notes on delinquent loans, endorsed them, and faxed them to Sourcecorp. Then Sourcecorp uploaded images of the endorsed note to BANA's Document Management Portal and entered the date BANA received the endorsed note in the AS-400 system that tracked BANA's loans.

83. This unlawful forgery operation was then followed by senior BANA executives giving perjured testimony to swear Countrywide had a routine practice

29

to image and endorse notes using rubber-stamp without days of origination. However, BANA executed its coverup poorly.

84. First, in 2009, Linda De Martini, a senior team BAC leader testified in *Kemp v. Countrywide* before Federal Bankruptcy Judge Judith Wizmur that she had never seen any Countrywide notes with rubber-stamped endorsements during her tenure between 2006 and 2009. [Exhibit 5]

85. Second, BANA's testimony presented in state and federal courts that Countrywide imaged and endorsed notes within days of origination proved false as Countrywide had no images of notes from the time of origination. Moreover, Countrywide made images of notes years after origination showed there was no endorsement. Finally, BANA's AS-400 system had entries showing receipt of the endorsed original note years after origination and years after 2008, when Countrywide ceased operations.

86. As recently as July 5-6, 2022, BANA and BONYM prosecuted a foreclosure using the same forged rubberstamped Countrywide endorsement and false MERS assignment originally filed by David J. Stern in a 2008 foreclosure of the loan in *Bank of New York Mellon v. Harry Persaud* in Orange County Circuit Case Number 2019 CA-891-O. BONYM's counsel, Mr. Callahan from Akerman, was the same counsel that Judge Butchko initiated criminal contempt proceedings

against in Class Plaintiff Nicolas' Miami foreclosure case, *supra*.

87. At the conclusion of the evidence, BANA was forced to testify and concede its own records showed the note was not endorsed before the David Stern law firm filed the first foreclosure falsely alleging the note was lost. Years later, the lawyers submitted a false MERS mortgage assignment and the original note which now had a rubber-stamped blank endorsement of Countrywide that was added by the law firm after the fact. BANA had no image of the endorsed note until after the lawyers filed it in court. Those same lawyers went to trial and lost the first foreclosure case, because the Judge found they could not prove the endorsement, or assignment, were made before the case was filed in 2008.

88. As the Persaud trial continued, BANA admitted its "Delinquent Note Endorsement Process" established only days after the 2011 OCC Consent Order had Sourcecorp upload images of notes and make entries in the AS-400 system documenting the date of the endorsements for the notes. Sourcecorp later admitted BANA ordered it destroy nearly 2 billion records in a "Fastrieve Purge" which is why it had no records to produce in response to subpoenas for its records. [*See* Exhibit 10]

89. BANA's counsel turned over evidence the AS400 screenshots were being backdated to falsely suggest Countrywide received endorsed notes near the

time of origination of the loan. BANA admitted it destroyed AS400 screenshots subpoenaed in several cases. BANA produced the archived data from those destroyed screenshots that showed some of the destroyed records proved the fraud showing the notes first received endorsed in 2011.

90. BANA also produced archived data from other destroyed records that showed the AS400 screenshots were backdated to show the endorsed note was received twice between July 19, 2005 and July 21, 2005. However, those records also showed the endorsed note went from the closing table in Florida on July 19, 2005 to Countrywide's document custodian who received the note for the first time on July 26, 2005. It was impossible for the note to be endorsed before the document custodian received the note to start the endorsement process.

91. At the conclusion of the Persaud trial, BANA admitted it had no evidence to contradict its own records that proved the rubber-stamped endorsements were forgeries. These forgeries continue to be used by BANA, BONYM and other foreclosure plaintiffs, alleging note holder status in this District and nationally.

92. Class Plaintiff's allege that forged note endorsements have independent legal significance to them, because forged note endorsements were not created, kept, or maintained in the normal course of business operations, and cannot be

presented as such within declarations filed with a foreclosure trial court, *per se.*

93. Class Plaintiffs allege that all of their Countrywide mortgage notes contain robo-signed, undated, forged blank note endorsements. Commencing in November of 2015, BANA ordered the destruction of nearly 1.9 billion records and datafiles related to documentation of robo-signed and forged note endorsement activities, originally uploaded, stored, and being maintained by BANA third party vendor, Sourcecorp. [Exhibit 10], *See also infra,* ¶¶  259-267.

94. Post, 2011, BANA has and continues to draft and record mortgage assignments for Countrywide originated loans in public records that falsely claim MERS sold the mortgage, together with the mortgage note, to the foreclosing plaintiff, when MERS never owned or possessed the note or the rights thereto, as a false or fraudulent pretense to falsely present plaintiff's standing to foreclose to a trial court judge. Alternatively, BANA recorded MERS assignments claiming to assign the mortgage without the note, which is a legal nullity, since a mortgage always follows the note by operation of law.

95. The false MERS mortgage note assignment is an ongoing bright-line mortgage foreclosure standing requirement fraud, not subject to reasonable dispute, in this District and nationally effecting hundreds of thousands of foreclosure cases. Seven out of eight Class Plaintiffs have underlying false and fraudulent MERS

note assignments filed in their respective foreclosure cases, upon which trial court judges manifest reliance, for purposes of standing determination.  See *infra,* ¶¶ 292-336

96. Specifically, trial courts in this District and nationally continue to manifest reliance upon the truthfulness and veracity of MERS note assignments filed in the public record, to find a plaintiff's standing to foreclose.

97. Class Plaintiffs allege these MERS note assignments are a sham, and that hundreds of thousands, if not millions, of such false MERS note assignments have been filed by Defendants in public land conveyance records nationally, for which Class Plaintiff's also seek equitable and injunctive relief from this Court. [Exhibit 1], *See also infra,* ¶¶ 292-336

98. Post 2018, BANA has utilized the services of multiple third party chain of title document companies, to fix chain of title deficiencies in the public record by any means necessary, including fixing note endorsements, as Attorneys In Fact of Countrywide. [Exhibit 31], *See also infra,* ¶¶ 635-644

99. BANA's use of Meridian Asset Services, LLC in this District, one such document fixing company alleged, has resulted in the filing of a false and fraudulent mortgage and mortgage note assignment, as delineated in Class Plaintiff Thomas Johnson's statement of facts. [Exhibit 31][Exhibit 32][Exhibit 33], *See*

34

*infra,* ¶¶ 635-644

**Nature Of Class Action Claims-**

**Claim 1: Class Action Racketeering 6 Class Certifications Requested-**

100. Defendants BANA and BONYM devised a scheme or artifice to defraud, that involves the use of many sub-schemes, for the purpose of filing and prosecuting, or causing the filing and prosecution of, thousands of unlawful foreclosures complaints, in this District and nationally.

101. To implement and carry out Defendants' schemes to defraud in order to obtain money or property, Defendants utilize United States mail and wire services to transmit false and fraudulent statements, material misrepresentations, forged mortgage note endorsements, false or fraudulent mortgage assignments, false or fraudulent Affidavits, Affidavits containing material omissions of fact, and other false declarations, in interstate commerce.

102. Defendants' predicate acts also constitute violations of the FHA, as discrimination against African Americans, Cuban Americans, Haitian Americans, native Hawaiians, Filipino Americans, Chinese Americans, Japanese Americans, and other minorities, based on race, ethnicity, or national origin, regarding discrimination in the servicing of mortgage loans sold to persons of color by others, as a subset of racketeering violations effecting all Countrywide mortgagors.

**Claim 2: Class Action Fair Housing Act Violations 2 Class Certifications Requested-**

103. Defendants have engaged in acts and omissions that violate FHA Class Plaintiffs' rights afforded under the Fair Housing Act, related to discriminatory practices in the terms, conditions, and privileges of residential purchases, and in the provisions of loan servicing in connection therewith, because of race, color, religion, sex, familial status, or national origin.

**Defendants Fair Housing Act Violations, 42 U.S.C. §§3604(a)(b), 3605(a)-**

104. Class Plaintiffs allege that the predatory and discriminatory loans sold to the Class Plaintiffs, Aiwohi, Keohokapu, Baliguat (Ebos), Williams-James, Rodriguez, and Nicolas ("FHA Class Plaintiffs"), as people of color-within the Fair Housing Act protected class of individuals, are actionable against BANA and BONYM, notwithstanding that neither of those Defendants originated the loans sold to FHA Class Plaintiffs, because of discriminatory loan servicing that still implicates the Act.

105. For purposes of the Class Action Complaint *sub judice* it is irrelevant that Defendants did not originate loans claimed to be predatory loans that are actionable pursuant to the Fair Housing Act, because Defendants took those predatory and discriminatory loans and thereafter engaged in mortgage loan

servicing practices that Class Plaintiffs claim are still actionable pursuant to the Fair Housing Act.

106. FHA Class Action Plaintiffs allege that Defendants violated 42 U.S.C. § 3604, *Discrimination in the sale or rental of housing and other prohibited practices*, regarding mortgage loan services regarding refusals to grant loan modifications to effected FHA Class Plaintiffs, and by engaging in schemes to defraud during foreclosure processes effecting FHA Class Plaintiffs, on and after July 1, 2008.

107. Class Plaintiffs allege that while Bank of America did not originate any of the mortgage loans that are the *sine qua non* of this Complaint, that the predatory and discriminatory loans originated by Countrywide and others (e.g. reverse redlining, *infra*), fit right into Bank of America's historical mode of discriminatory loan servicing policies, practices and procedures, like a hand in a glove (e.g. redlining, *infra*).

108. Bank of America routinely puts its financial interests ahead of its customers in order to maximize profits. The same holds true for Defendant, BONYM, which routinely puts the financial interests of Certificateholders ahead of FHA Class Plaintiffs rights afforded under the Fair Housing Act, regarding its discriminatory foreclosure policies, practices and procedures in place, to the

detriment of FHA Class Plaintiffs, in order to maximize profits for its Certificateholders.

**Nā Poʻe Kōkua v. Bank of America Corporation, No.: 1:22-cv-00238 (D HI) (Related Action)-**

109. On May 31, 2022, marking the twenty-eight year anniversary of Bank of America Corporation's ("BAC") 1994 $150 Million FHA-247 Mortgage Loan Commitment, Nā Poʻe Kōkua, on behalf of native Hawaiians, filed a Complaint for damages, equitable and injunctive relief claiming that BAC violated the racketeer influenced and corrupt organizations act ("RICO"), and The KKK Act of 1871, regarding clearly established civil rights violations, related to the failure of BAC to fund the $150 Million commitment made to native Hawaiian.

110. Nā Poʻe Kōkua claims that BAC's activities, statements, commentaries, correspondences, letters, and financial spreadsheet details, reveal a pattern of racketeering activity engaged by BAC and others, as a scheme or artifice to defraud native Hawaiians utilizing United States mail and wire services, for the purpose of obtaining great wealth derived from multiple bank acquisitions.

111. Nā Poʻe Kōkua further claims that BAC's commitment created legitimate property rights for native Hawaiians that cannot be unilaterally revoked by Defendant, BAC, without violating constitutional rights of native Hawaiians, under color of State of Hawaii law.

112. Lastly, Nā Po'e Kōkua claims that BAC's original commitment represents the Res of an enforceable trust that remains unfunded by BAC, pursuant to Hawaii law, and that a *constructive trust* should be forced by the Court to be titled: "Native Hawaiians $150 Million FHA-247 Commitment Trust".

**The Banking Practice Of Redlining-**

113. The 1968 Fair Housing Act (FHA), an expansion of the Civil Rights Act of 1964, made it illegal to deny a mortgage loan or a real estate transaction to a borrower on basis of race or ethnic background. Yet following enactment, minorities were still excluded from home ownership, primarily due to strict credit and down payment requirements, and affordability underwriting concerns. Homes are expensive. A conventional 30-year fixed-rate mortgage requires either a large down payment or like existing equity, typically 20% or more, as the only options available for home ownership.

114. After enactment, the FHA had little measurable effect on the overall discriminatory practices that existed in the financial industry. In order to avoid the mandates of the FHA, Banks and lenders created latent discriminatory lending practices to get around mandates imposed by the FHA of 1968 targeting minority neighborhoods and communities on the basis of race.

115. One such practice used to circumvent FHA lending mandates is known

as redlining, or the refusal to extend credit to geographical locations that are historically and predominately minority communities, as a general business policy or practice. Economists and historians have pointed to redlining as a significant cause of urban decay and disinvestment.

116. In the mid 1990s, specifically considering ways to implement the Community Reinvestment Act of 1977[4] ("COA"), intended to bridge the financial and credit worthiness gap for minority home ownership, it was believed that a viable solution was to establish *niche loan industry* that focused primarily on minority borrowers, where loan qualification standards could be reduced, and the terms and conditions more varied to "increased" affordability. The subprime mortgage loan industry was born, selling what became known as alternative mortgage products ("AMPs"). These AMPs were mortgage loans with greatly altered repayment terms and conditions that gave an appearance of affordability that turned out to be *Trojan* horses for the secondary mortgage market. ("unconventional loans")

117. This was the same time period, 1994, that BAC made a $150 Million FHA-247 Loan Origination Commitment to native Hawaiians that is the subject of

---

[4] The Community Reinvestment Act ("CRA"), enacted in 1977, requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income ("LMI") neighborhoods.

a separately filed Complaint filed by Nā Po'e Kōkua against BAC, *supra.* BAC's 1994 loan commitment gave the outward appearance that BAC was complying with the Community Reinvestment Act of 1977 that was in vogue during the onset of the subprime mortgage loan industry, and fit the parameters thereof. BAC looked like a good citizen for making that $150 Million FHA-247 Loan Commitment in 1994, that also gave the appearance that BAC was making an effort to change historical redlining practices. That too was a Trojan horse.

118. No one envisioned that the parameters of the CRA would become a Petrie dish for fostering color-blind racism through widespread use of debilitating loan terms, thereby eviscerating the benefits of making home ownership initially possible for minorities and other disadvantaged groups, by later taking homes away while destroying credit worthiness to boot. ("reverse redlining")

**Bank Of America's Historical Redlining Practices-**

119. BANA has historically engaged in redlining, by refusing to extend mortgage credit to minority borrowers on equal terms as to non-minority borrowers, meaning that otherwise qualified minority borrowers were steered away from conventional mortgage loans with more favorable terms than the loans actually sold to them.

120. BANA's refusal to fund the $150 Million FHA-247 Mortgage

Origination Commitment made to native Hawaiians also fits its historical redlining pattern and practice, because native Hawaiians were denied mortgage loans that would have been guaranteed by the United States had they been originated by BANA.

121. Since the 1990's BANA and BONYM have continuously engaged in a pattern and practice of servicing and prosecuting predatory and discriminatory mortgage loans sold to minority borrowers and non-minority borrowers.

122. The pattern and practice of lending discrimination engaged in by Bank of America includes traditional redlining, the practice of denying credit to particular neighborhoods based on race, and reverse redlining, the practice of flooding a minority community with exploitative loan products; both of which have been deemed to violate the FHA by federal courts throughout the country.

123. In 2013, the City of Miami brought a lawsuit in federal court:

"The City of Miami claims that two banks, Bank of America and Wells Fargo, intentionally issued riskier mortgages on less favorable terms to African–American and Latino customers than they issued to similarly situated white, non-Latino customers, in violation of §§ 3604(b) and 3605(a)." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1301 (2017).

124. The City of Miami charged that those banks discriminatorily imposed more onerous, and indeed "predatory," conditions on loans made to minority borrowers than to similarly situated non-minority borrowers under the Fair

Housing Act.

125. The City of Miami's complaint also charged that the Banks intentionally targeted predatory practices toward African-American and Latino residents and neighborhoods, by lending to minority borrowers on worse terms than equally creditworthy non-minority borrowers; and further, by inducing defaults by failing to extend re-financing and loan modifications to minority borrowers on fair terms.

126. On May 1, 2017, the U.S. Supreme Court agreed that the City of Miami was an "aggrieved person" authorized to bring suit under the Fair Housing Act. *Bank of Am. Corp. v. City of Miami*, Fla., 137 S. Ct. 1296, 1298, 197 L. Ed. 2d 678 (2017).

### Defendant, BANA's and Defendant, BONYM's Post July 1, 2008 Discrimination in the Denial of Loan Modifications and in the Terms of Services Following Predatory-Discriminatory Countrywide Originated, or Purchased, Subprime Mortgage Loans-

127. Countrywide was a mortgage bank that funded sub prime home loans, or by borrowing short term money on this commercial paper from major U.S. banks, including, from Bank of America, J.P. Morgan Chase and Bank of New York Mellon. Countrywide's business model was short term origination and sale of sub prime loans to multiple third party investors, oftentimes within 30-45 days. In so doing, Countrywide had no financial risk from originating mortgage loans that did

not comply with industry origination standards; that quickly became someone else's problem.

128. Countywide biggest buyers were Fannie Mae, Freddie Mac, and Ginnie Mae. Countrywide continued to act as master servicer for all sub prime mortgage loans that it sold and sold millions of sub prime loans from 2004-2007, estimated to represent a servicing portfolio of approximately $1.5 trillion, as of July 1, 2008.

129. Although Countrywide's business model outwardly portrayed the absence of redlining and full compliance with the CRA, its real business practices were much more sinister, as Countrywide embedded a variety of racially discriminatory terms and conditions into its subprime loans that created a new array of timed default trigger points, while qualifying subprime mortgagors for loans they did not legitimately qualify for. Again, this was done for massive short term profits with no business risk from writing *liar loans*, e.g. knowingly qualifying, writing, and selling subprime mortgage loans that fail industry loan origination requirements and underwriting standards. ("liar loans")

130. In 2008, Bank of America, with its historical reputation of redlining, purchased the pariah of discriminatory and predatory lending, Countrywide Home Loans, Inc., a master, and possibly the creator of, reverse redlining.

131. Countrywide's business model can be viewed as *mortgage laundering*[5], defined as selling liar loans to third party purchasers for value, because third party purchasers believed that the loans they purchased met industry underwriting standards for subprime loans originated.

132. All of Class Plaintiffs mortgage notes were originally short term sales by Countrywide to third party purchasers for value, where Countrywide, contractually, retained loan servicing for those same loans sold. The servicing contracts alone were worth a fortune.

133. When Bank of America Corporation purchased Countrywide's entire business operations on or about July 1, 2008, BAC also purchased the loans servicing rights, or contractually succeeded into the loan servicing rights of Countrywide, to continue servicing of mortgage loans either originated directly by Countrywide Home Loan, Inc., or originated by a third party lender, subsequently purchased by Countywide Bank, N.A. and transferred to Countrywide Home Loans, Inc., prior to its purchase of Countrywide.

134. The predatory and discriminatory nature of FHA Class Plaintiffs' mortgage loans has, and continues to be, embedded into the foundation of

---

[5] Ginnie Mae currently refers to these loans in its portfolio as "non performing loans" that belies the fact that Class Plaintiff's allege they were fraudulent and predatory as originated in violation of the Fair Housing Act sold to people of color.

45

discriminatory mortgage loan servicing practices by BANA and BONYM that form the *sine qua non* of Class Plaintiffs and FHA Class Plaintiffs Fair Housing Act violations alleged against Defendants in this Complaint.

135. BAC succeeded into the rights to service FHA Class Plaintiffs predatory and discriminatory loans originated and/or purchased by Countrywide going forward from July 1, 2008, while BONYM continued as Trustee for hundreds of thousands of those loans then serviced by BANA.

136. At this point the predatory and discriminatory nature of mortgage loans sold to FHA Class Plaintiffs has become a cancerous tumor for Defendant, BONYM and current loan servicers, because they must first pretend that these loans did not violate federal law when issued for people of color, and then fashion a way to foreclose upon them without raising any eyebrows, claiming that prior loan servicer records are reliable, credible and trustworthy under Oath.

137. In that regard, all racketeering predicate acts alleged against Defendant, BANA, are likewise inextricably intertwined with violations of the Fair Housing Act 42 U.S.C. § 3604, as those *discriminatory loan servicing practices* alleged are "because of race, color, religion, sex, familial status, or national origin." *Id.*

138. The same holds true for Defendant, BONYM, as Trustee, filing and prosecuting wrongful foreclosure cases against Class Plaintiffs, while being still

endowed with the responsibility of maximizing profits for Certificateholders, considering that pooled loans within those Trusts are composed of predatory and discriminatory Countrywide loans sold to FHA Class Plaintiffs.

139. While BONYM is charged with the responsibility of maximizing profits for Certificateholders and filing foreclosure actions on behalf of Certificateholders, it cannot foreclose unlawfully on behalf of Certificateholders. That is precisely what Class Plaintiffs allege. Moreover, BONYM cannot file or prosecute a foreclosure action that simultaneously violates FHA Class Plaintiffs' rights under the Fair Housing Act as a result of said prosecutions, through lack of candor, sham pleadings, or fraud on the court.

140. FHA Class Plaintiffs allege that it is Defendant, BONYM's servicing policies, practices and procedures, that violate FHA Class Plaintiffs rights guaranteed by the Fair Housing Act, notwithstanding that BONYM did not originate their predatory and discriminatory mortgage loans, or relies upon third party loan servicing agents for documentation and Affidavits necessary to prosecute foreclosures wrongfully, through lack of candor, sham pleadings, or fraud on the court.

141. All racketeering predicate acts alleged against Defendant, BONYM, are likewise inextricably intertwined with violations of the Fair Housing Act 42 U.S.C.

§ 3604 for FHA Class Plaintiffs, as those same discriminatory loan servicing practices alleged are "because of race, color, religion, sex, familial status, or national origin" during loan origination processes, and regardless of whether those discriminatory loan servicing practices were instituted by another entity and carried out with knowledge by Defendant, BONYM, for the mutual benefit of BONYM, its Certificateholders, or BANA.

**Wrongful Foreclosures Already on the Hawaii Supreme Court's Radar-**

142. Class Plaintiffs below allege systemic foreclosure frauds being committed by BANA and BONYM utilizing a variety of separate schemes, to wrongfully take homes from Countrywide mortgagors in courts of equity, in open defiance to the rule of law that has existed for hundreds of years.

143. The Hawaii Supreme Court has started to address wrongful foreclosure actions that violate the rule of law, and has held, *inter alia*, that wrongful foreclosures present independent causes of action for injured homeowners in the State of Hawaii, and that a foreclosure plaintiff must prove standing to foreclose at the time a foreclosure complaint is filed.  *Bank of Am., N.A. v. Reyes-Toledo,* 139 Hawai'i 361, 390 P.3d 1248 (2017); *See also Bank of Am., N.A. v. Reyes-Toledo II,* 143 Hawai'i 249, 428 P.3d 761 (2018), as corrected (Oct. 15, 2018).

144. Class Action Plaintiffs allege that BANA and BONYM use forged

Countrywide *blank* endorsements, false and fraudulent MERS Note Assignments, and multiple false Affidavits filed in support of Motions for Summary Judgment, that are relied upon by trial court judges in this District and nationally, in order to unlawfully take people's houses away from them in violation of the RICO Act, for all Class Plaintiffs, and the FHA, for FHA Class Plaintiffs.

145. Although there have been dozens of lawsuits regarding Countrywide originated, or purchased, mortgages over the years, protecting the interests of, BONYM Certificateholders, The United States, private corporations operated by The United States Department of Housing and Urban Development ("HUD"), State governments, other banks, investment funds, retirement funds, other Certificateholders, mortgage-backed securities Trusts, their Trustees, their insurance companies, and the like, there has never before been a Class Action lawsuit protecting the interests of Americans of all colors, races, and economic backgrounds victimized by fraudulent foreclosures on predatory subprime mortgages, regarding the theories of prosecution presented below.

**RELATED ACTIONS IN THIS DISTRICT:**

**BANA v. County of Maui, No.: 1:20-cv-00310-JMS-WRP (D. HI) (Related Action)-**

146. The instant Class Action is also related to a DEC Action filed by BANA in this District in 2020. BANA representatives filed a false and frivolous

lawsuit in Hawaii District Court in an effort to convince the Court to enter an Order that BANA could not be sued by the County of Maui and/or native Hawaiians. This Court dismissed the lawsuit with strong words for BANA and their attorneys.

147. BANA's frivolous preemptive suit was filed for the purpose of hindering native Hawaiians' efforts to hold BANA accountable: a.) it delayed the instant action for almost three years; b.) it derailed the County's efforts to hold BANA accountable for Fair Housing Act injustices and exposure for wrongful foreclosures; c.) it drained and wasted over half the $200,000 that Maui County taxpayers allocated for the legal battle to hold BANA accountable; and d.) it prevented undersigned counsel from BANA prosecuting for the fraud.

## THE PARTIES

148. Plaintiff, Nathan Earl Aiwohi ("Aiwohi") is a resident of Hawaii, is over the age of 21, and is otherwise *sui juris*. Aiwohi purchased real property in Hawaii on January 5, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. Aiwohi has a pending foreclosure case in this District being prosecuted by Defendants.

149. Plaintiff, Toby Alamoana Keohokapu, Jr. ("Keohokapu") is a resident of Hawaii, is over the age of 21, and is otherwise *sui juris.* Keohokapu purchased

real property in Hawaii on November 17, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. Keohokapu has a pending foreclosure case in this District being prosecuted by Defendants.

150. Plaintiff, Darlene K. Ebos, as Representative for the Estate of Barbara Baliguat ("Baliguat" or "Ebos"), is a resident of Hawaii, is over the age of 21, and is otherwise *sui juris.* Barbara Baliguat was as resident of Hawaii ("Baliguat") that purchases real property in Hawaii on January 10, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. Ebos has a pending foreclosure case in this District being prosecuted by Defendants.

151. Plaintiff, Susan DeShaw ("DeShaw") is a resident of Hawaii, is over the age of 21, and is otherwise *sui juris*. DeShaw purchased real property in Hawaii on July 27, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. DeShaw has a pending foreclosure case in this District being prosecuted by Defendants.

152. Plaintiff, Thomas Johnson ("Johnson") is a resident of Hawaii, is over the age of 21, and is otherwise *sui juris*. Johnson purchased real property in Hawaii on April 18, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. Johnson has a pending foreclosure case in this District being prosecuted Wilmington Trust, with assistance from Defendant,

BANA.

153. Plaintiff, Maria K. Williams James ("Williams-James") is a resident of Florida, is over the age of 21 and is otherwise *sui juris.* Williams-James purchased real property in Miami-Dade County, Florida, on October 11, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. Williams has a closed foreclosure case from the Southern District of Florida that was prosecuted by Defendants, but has not yet been officially evicted from her home.

154. Plaintiff, Lazara A. Rodriguez ("Rodriguez") is a resident of Florida, is over the age of 21, and is otherwise *sui juris.* Rodriguez purchases real property in Miami-Dade County, Florida, on May 17, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. Rodriguez has a closed foreclosure case from the Southern District of Florida that was prosecuted by Defendants, and was moved to a new home while challenging her deprivation of property without due process in violation of her constitutional rights.

155. Plaintiff, Julie Nicolas ("Nicolas") is a resident of Florida, is over the age of 21, and is otherwise *sui juris.* Nicolas purchased her real property in Miami-Dade County, Florida, on October 11, 2006, and made an initial cash, or equity investment, at that time in the home purchased, or refinanced. Nicolas has a closed

foreclosure case from the Southern District of Florida that was prosecuted by Defendants, but has not yet been officially evicted from her home.

156. Defendant, Bank of America National Association [hereinafter "BANA"] is a national banking association organized and existing under the laws of the United States with principal place of business in Charlotte, NC, and is otherwise *sui juris*.

157. Defendant, The Bank of New York Mellon [hereinafter "BONYM"] is a national banking association organized and existing under the laws of the United States with principal place of business in New York, New York.

158. Interested Parties, Countrywide Financial Corporation, Countrywide Bank, N.A., Countrywide Home Loans, Inc., referred to collectively as: "Countrywide".

159. Countrywide Bank, N.A. ("CWB") was originally chartered as a national bank subject to supervision by the Office of the Comptroller of the Currency, and was a subsidiary of financial holding company Countrywide Financial Corporation ("CFC"). CWB was headquartered in Alexandria, Virginia, until February, 2009. As a financial holding company, CFC, together with its subsidiary Countrywide Home Loans, Inc., ("CHL") was supervised by the Board of Governors of the Federal Reserve System. On or about March 12, 2007, CWB

changed its charter to that of a federal savings association, and CFC became a savings and loan holding company. Those changes caused CWB, CFC, and CHL to become subject to supervision by the Office of Thrift Supervision.

160. During 2006, CFC began the process of transitioning the funding of its residential loan originations from CHL to CWB. For those loans funded through CWB under the Countrywide name, CWB was the named lender on the promissory notes for those loans. As of January 1, 2008, CWB funded substantially all nationwide residential loan origination activity using the Countrywide name. For those loans funded by either CHL or CWB, CFC used the same loan origination policies and procedures that it had created, authorized, or ratified, and the same employees and mortgage brokers. Throughout this Complaint, CFC, CWB, and CHL are referred to collectively as "Countrywide", or individually by their own names, or acronyms. Additionally CHL #1 is used to designate Countrywide's business operations on or before July 1, 2008, where CHL #2 is used to designate Countrywide's business operations after July 1, 2008, after Countrywide became a BAC wholly owned subsidiary.

## JURISDICTION AND VENUE

161. Plaintiffs' claims for relief arise under the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 (1)(B), 18 U.S.C. §§

1962(c); 18 U.S.C. §§ 1964 (a) and (c); 18 U.S.C. §§ 1341 and 1343; and The Fair Housing Act ("FHA" or "Act"), 42 U.S.C. §§ 3604(b), 3613(a)(1)(A), 3613(c)(1). This Court has original subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

162. For all times material hereto, Defendants conducted business operations and activities in the District of Hawaii related to filed foreclosure cases for mortgage loans originated, or purchased by Countrywide Bank, N.A. and/or Countrywide Home Loans, Inc. ("Countrywide loans" or "CHL")

163. Defendant, BANA purchased Countrywide's entire existing operations, on or about, July 1, 2008, and Defendant, BONYM is the Trustee responsible for servicing tens of thousands of mortgage loans originated, or purchased, by Countrywide prior to July 1, 2008.

164. Defendants continue to have substantial business involvement regarding the filing, prosecution, and disposition of, thousands of foreclosure cases filed in this District and nationally, spawned from historical Countrywide originated, or purchased mortgages.

165. For all times material hereto, Defendants forged thousands of fraudulent endorsements across the nation, from Miami to this District, filed, or caused to be filed, thousands of assignments, and other documents, in the Bureau

of Land Conveyances for the State of Hawaii, and in other Public Records depositories nationwide, regarding chain of title conveyances made regarding CHL originated, or purchased, mortgage loans sold to homeowners in this District and nationally.

166. Venue is proper under 28 U.S.C. § 1391 (b)(1)(2), because Defendants conduct substantial business activities in the District of Hawaii, and because a substantial part of the acts or omissions giving rise to the claims raised below occurred in the District of Hawaii.

## ARTICLE III. § 2 STANDING

167. To have standing under Article III. Section 2 of the United States Constitution, a plaintiff must satisfy these elements and has the affirmative burden to do so.

168. First, plaintiff must have suffered an "injury in fact", as an invasion of a legally protected interest that is (a) a concrete and particularized and (b) actual or imminent, rather that conjectural or hypothetical. *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548 (2016); *Lujan v. Defenders Of Wildlife,* 504 U.S. 555, 560 (1992).

169. Here Class Plaintiffs have each suffered an injury in fact regarding the actual or imminent:  a) loss of their initial cash, or equity investments, or both  (e.g. cash due from buyer at closing, or equity brought in to the closing, or both);  b) the

actual or imminent loss of their residences; c) outlays of attorney's fees and costs defending frivolous foreclosure actions for extended time periods; d) injuries suffered from violations of Defendants' discriminatory practices under the Fair Housing Act, both as to Defendants lending and servicing practices; e.) unlawful seizure of property, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution[6], from final judgments of foreclosure issued by unwitting Circuit Court Judges manifesting reliance upon the reliability, trustworthiness, and accuracy of note endorsements, and mortgage assignments, and the truthfulness loan servicer declarations, and attachments; f.) violations of rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution to both procedural and substantive due process of law, during the pendency of foreclosure proceedings, based upon submission of forged, false and fraudulent documents and declarations by Defendants to Circuit Court Judges manifesting reliance upon the reliability, trustworthiness, and accuracy of note endorsements, and mortgage assignments, and the truthfulness loan servicer declarations, and attachments; g.) injuries to intangible property interests related to

---

[6] Class Plaintiffs allege related constitutional violations as real injuries for purposes of Article II, Section 3 Standing purposes, notwithstanding that Class Plaintiffs do not bring a civil right claim in the Complaint *sub judice*, pursuant to 18 U.S.C. § 1983, *per se.* For purposes of the instant Complaint, trial court judges in this District, and nationally, are alleged to be innocent instrumentalities of Defendants.

the prosecution of wrongful foreclosure actions by Defendants; and h.) injuries to business interests by virtue of "legal entitlement to business relations (e.g. mortgage loan lending and servicing practices by Defendants) unhampered by schemes prohibited by the RICO predicate statutes" on Hawaiian homelands, and nationally, committed by Defendants. *Mendoza v. Zirkle Fruit Co*., 301 F.3d 1163 (9th Cir. 2002).

170. Second, there must be a causal connection between the injury and the conduct complained of; that is, the injury must be fairly traceable to the challenged action of the defendant rather than the result of independent action of a third party. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

171. Based on the nature of unlawful foreclosures alleged, Class Plaintiffs' injuries were not caused by their mortgage loan defaults, *per se*, but rather, from violations of the Fair Housing Act and unlawful foreclosures filed and prosecuted by Defendants, because Class Plaintiffs' allege those foreclosure cases were unlawfully filed and prosecuted, *ab initio.*

172. Class Action Plaintiffs' injuries are directly traceable to original actions of Countrywide Home Loans, Inc., and Countrywide Home Loans Servicing, LP, pre-July 1, 2008 [hereinafter "CHL #1"], and to Countrywide Home Loans, Inc., BAC Home Loans Servicing L.P., and BANA, post July 1, 2008 [hereinafter "CHL

#2] and to parent BANA, as prosecuted by Defendant, BONYM, and others.

173. Class Action Plaintiffs' injuries are directly traceable to Defendant, BONYM, as Trustee, for most of Class Plaintiffs loans, including from unlawful loan servicing practices orchestrated.

174. Third, it must be likely, rather than merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

175. A favorable court decision will mandate that Defendants use candor with trial courts going forward, including full historical disclosures related to specific mortgage loan files being prosecuted, ceasing continued use of false, fraudulent, and forged documents and instruments filed in the public record, and materially false or fraudulent loan servicer declarations regarding credibility, accuracy and trustworthiness of prior loan servicer business records, for the purposes of falsely and fraudulently entering loan servicer records into evidence.

176. Additionally, a favorable court decision will mandate that Class Plaintiffs be entitled to financial damages for themselves and others so similarly situated, and that Defendants' aberrant conduct ceases-forever.

177. Class Plaintiffs do not seek overruling any prior State Court Judgements or Orders regarding their individual foreclosure cases, or for those of

other putative Class Members.

178. Fourth, to establish standing when injunctive relief is sought, the "injury in fact" element requires an additional showing: In addition to past injury, the plaintiff must demonstrate a "sufficient likelihood" of being affected by the unlawful conduct in the future. *Wooden v. Bd. of Regents of Univ. Sys. of Ga,* 247 F. 3d 1262, 1284 (11th Cir. 2001).

179. The conduct complained of by Class Plaintiffs has been ongoing since at least 2008, and will continue into perpetuity unless and until this Court grants injunctive relief. This is a case of first impression in the United States.

180. The nature of Countrywide originated, or purchased, mortgages is that they have become the false and fraudulent gift that keeps on giving, and as such, regardless of when a new Countrywide Mortgagor- putative Class Member is foreclosed upon, the same frauds that represent the *sine qua non* of this Complaint will be repeated by Defendants until they are stopped by Court Order. BONYM and BANA will continue to retain counsel with unlimited resources willing to foster frauds perpetrated on the court and putative Class Members in order to obtain money or property through multiple unlawful means.

181. Class Plaintiffs either have pending state court foreclosure actions, or have received final judgments of foreclosure, pending appeal or final. Class

Plaintiffs do not seek to overturn any prior state court foreclosure judgments or orders, but rather, are seeking prospective relief and financial damages for injuries sustained from Defendants' unlawful conduct.

## DEFINITIONS

182. As used in the Complaint *sub judice* the term "false" shall have its common meaning, not true, and "forged" shall have its common meaning, made falsely.

183. As used in the Complaint *sub judice* the term "fraudulent" shall mean the same as that term is defined in Black's Law Dictionary (5th Ed. 1979):

> "..done, made or effected with a purpose or design to carry out a fraud. A statement, or claim or document is "fraudulent" if it was falsely made, or caused to be made, with the intent to deceive." *See Kawaihae v. Hawaiian Insurance Companies,* 1 Haw. App. 355, 359 (Haw. Ct. App. 1980)

184. As used int the Complaint *sub judice* the term "fraud" means the same as that term is defined in Black's Law Dictionary (5th Ed. 1979):

> "A false representation of a matter of fact . . . which deceives and is intended to deceive another so that he shall act upon it to his legal injury. . . . Bad faith and fraud are synonymous." *Id.* At 360

185. Regarding Class Plaintiffs' allegations that false and fraudulent MERS note assignments were filed in public land conveyance records in this District and nationally, by way of example here, the document is false, as memorializing a note

sales transaction that never occurred and was impossible; the document is fraudulent, as falsely made, and filed in the public record, with intent to deceive another into believing that a UCC note sales transaction took place; and the document also evidences fraud, as a false representation of material fact upon which others manifested reliance, including trial court judges, and resulting in injury to homeowners.

186. As used in the Complaint *sub judice* a "fraud" on the court exists where "a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." *Cox v. Burke*, 706 So. 2d 43, 46 (Fla. 5th DCA 1998).

187. As used in the Complaint *sub judice* the term predatory lending[7] shall mean the same as the Government Accounting Office definition stating: "..the term "predatory lending" is used to characterize a range of practices, including deception, fraud, or manipulation, that a mortgage broker or lender may use to make a loan with terms that are disadvantageous to the borrower."

---

[7] Source: https://www.gao.gov/products/gao-04-280

## THE COUNTRYWIDE LOAN CLEANUP ENTERPRISE

188. At all  times material hereto, Defendant, BANA, and Defendant, BONYM, Countrywide Financial Corporation, Countrywide Bank, N.A., Countrywide Home Loans, Inc., Countrywide Home Loans Servicing, L.P., the Trusts related to Class Plaintiffs' mortgages, BAC  Home Loans Servicing  L.P., Mortgage Electronic Registration Systems, Inc. ("MERS"), Bayview Loan Servicing, LLC ("Bayview"), Selene Finance, L.P., Ditech Financial LLC f/k/a Green Tree Servicing LLC ("Green Tree"), U.S. Bank Trust National Association ("USBTNA"), Wilmington Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust V-E ("Wilmington Trust"), Meridian Asset Services, LLC ("Meridian"), Carrington Mortgage Services, LLC ("Carrington"), NEWREZ LLC d/b/a Shellpoint Mortgage Servicing, f/k/a New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint"), and other individuals and entities known and unknown, constituted an association in fact "enterprise" as defined by Title 18, United States Code §1961(4) [hereinafter collectively "Countrywide Cleanup Enterprise"].

189. Class Plaintiffs, on behalf of themselves and others similarly situated, allege that at all times material hereto from 2004 to the present time, that Defendant, Bank of America, N.A., Defendant, The Bank of New York Mellon,

have conducted the affairs of the Enterprise through a pattern of racketeering activity, as defined by Title 18, United States Code §§ 1961(5), 1341 and 1343.

**GENERAL ALLEGATIONS ALL CLASS ACTION PLAINTIFFS**

190.  Class Plaintiffs allege that following the 2001 amendments to Uniform Commercial Code ("UCC"), Article 9, there was only one legitimate way for a Trustee to prove standing to foreclose on a homeowner: a.) present the original note; b.) present the contract showing that the Trust purchased the note; and c.) then the mortgage follows the note, upon proof of purchase of the note.

191. Notwithstanding the codification of UCC Article 9, many trial courts nationally have permitted mortgage back security trustees, or other plaintiffs, to prove standing to foreclose by other means expressly excluded by, and not recognizing UCC Article 9, as the exclusive authority to prove standing.

192. However, no trial courts nationally permit a Trustee or other plaintiff to perpetrate a fraud on the court, use lack of candor, to lie, or to present perjured testimony-either live testimony, or through the use of false Affidavits, during the pendency of a foreclosure prosecution filed in equity.

193. Class Plaintiffs allege that Defendants have knowingly chosen particular method(s) to foreclose on Countrywide mortgagors that require Defendants to present forged, false and fraudulent evidence in order to file and

prosecute foreclosures filed, or caused to be filed, in this District and nationally.

194. One historically recognized method for a foreclosure plaintiff to prove standing to foreclose was by attaching a copy of a mortgage note endorsed in blank, and thereafter, by filing the original mortgage note with the trial court that is identical to the copy filed with the complaint. Any endorsements allonge thereto must be permanently affixed to the note in order to be considered part of the note. Although this method is not permitted under UCC Article 9, trial courts permit this method nonetheless in many jurisdictions. However, the endorsement cannot be a forgery even under the jurisdictions that permit such proof of standing to foreclose.

195. A second historically recognized method to prove standing was for a holder of a mortgage note to present the original note endorsed to the foreclosure plaintiff at trial, with other evidence and testimony regarding when the endorsement was placed on the mortgage note. Again, the endorsement cannot be a forgery even under the jurisdictions that permit such proof of standing to foreclose.

196. A third historically recognized method for a foreclosure plaintiff to prove standing was to present evidence of *valid* timely assignments of the mortgage note and mortgage to the foreclosure plaintiff. Many Hawaii foreclosure cases were filed under this theory of prosecution, prior to *Reyes-Toledo*, *supra,* as filed by Trustees that were not yet holders of mortgage notes at the moment the

**65**

complaint was filed. However, the assignment must be from a party with the right to enforce the note and mortgage, such as an owner or investor of the loan.

197. A fourth historically recognized method for a foreclosure plaintiff to prove standing was to produce trust securitization agreements, including the operative pooling and servicing agreement for the trust holding the pooled mortgage being foreclosed upon, stating contractual rights and responsibilities of the parties thereto, with the mortgage loan schedule showing the loan in question was purchased by that contract. However, the documents must be authentic and cannot be introduced without a proper foundational predicate.

198. A fifth historically recognized method for a foreclosure plaintiff to prove standing was to file an affidavit of ownership to prove its status as the holder of a mortgage note endorsed in blank. Although this method falls short of UCC Article 9, trial courts permit this method nonetheless in many jurisdictions.

199. Class Plaintiffs allege that Defendants and Enterprise members have chosen to prove standing to foreclose using forged mortgage note endorsements for alleging holder status, and false or fraudulent mortgage assignments, instead of relying upon other legitimate means to prove standing, that represents the gravamen of this Class Action Complaint.

200. Class Plaintiffs allege that CHL #2's current use of broken chain of title

document fixing companies, such as Meridian, creates a different subset of false and fraudulent mortgage and mortgage note assignments being used to falsely present standing to foreclose in this District from approximately 2018 forward.

201. Defendants are stuck with the path they have chosen for Class Plaintiffs, and all others so similarly situated, and should not be permitted to make false and fraudulent representations in court, pretending that the well established *sine qua non* of this Complaint, *infra*, is untrue.

202. It is irrelevant that Defendants are attempting to take an easier path to foreclosure, when the evidence currently being used to secure foreclosures is forged, false and fraudulent, and requires knowing use of perjured testimony from senior BANA executives and mortgage loan servicer corporate representatives, as filed, or caused to be filed by Defendants, in active and pending foreclosure cases nationally.

203. ALL MERS mortgage assignments pretending to bargain, sell, transfer, or convey Countrywide originated mortgage notes to a trustee, or anyone else, are false and fraudulent, as filed in land conveyance repositories nationally, because MERS does not now and has never, held or owned mortgage notes. [Exhibit 1]

204. Class Plaintiffs allege there are currently tens of thousands of false and fraudulent MERS mortgage note assignments filed in land conveyance repositories

nationally, currently being relied upon by unwitting trial court judges to find a foreclosure plaintiffs standing to foreclose, both for initial standing and for final judgment of foreclosure, that were wholly false and fraudulent *ab initio. See* Class Plaintiffs, Nathan Aiwohi's and Toby Keohokapu's findings of fact and conclusions of law excerpts, within each respective individualized statement of facts sections, *infra.* Those trial courts manifested reliance upon *sham* assignments, *infra*.

205. Mortgage-backed securities trustees, including Defendant, BONYM, have knowingly allowed Defendant, BANA's historical schemes to defraud to go forward in their own names, to obtain money or property, or to mitigate financial losses relative to breaches of fiduciary duties owed to trust Certificateholders regarding the same schemes knowingly allowed.

206. Although trustee breaches of fiduciary duty are not the subject matter of this Class Action Complaint, they do provide motive for trustees to continue perpetrating frauds on foreclosure trial courts, originally caused by BANA, for the purpose of obtaining money or property unlawfully.

207. Class Plaintiffs allege widespread use by Defendants of false, fraudulent, and perjured affidavits and declarations filed in foreclosure cases nationally, for the purpose of falsely attesting to the credibility, reliability,

truthfulness, and trustworthiness, of forged note endorsements, impossible MERS mortgage note assignments, and other contrived prior loan servicing records.

208. Class Plaintiffs allege widespread manipulation of the business records exception to the hearsay rule, the incorporated records doctrine, and sworn testimony as to ownership, without which, Defendants would be unable to prove standing to foreclose or to obtain final judgments of foreclosure using their current schemes.

209. Class Plaintiffs allege that use of false, fraudulent, and perjured testimony, for the purpose of convincing an unwitting trial court judge to enter forged, false and fraudulent evidence into evidence under either the business records exception to the hearsay rule, the incorporated records doctrine or from an affidavit of ownership constitutes mail and wire fraud within the meaning of 18 U.S. C. §§ 1341, 1343,  as a scheme or artifice to defraud Class Plaintiffs.

210. Every single time Defendants file or cause to be filed a motion for summary judgment on every single Countrywide originated, or purchased, mortgage, Defendants knowingly file false and fraudulent Affidavits therewith. —

**SCHEMES OR ARTIFICES TO DEFRAUD TIMELINE**:

**Approach No. 1: Foreclosures Made in the Name of MERS Prior to 2005-**

211. Prior to 2005, Countrywide and BANA directed the filing of foreclosure complaints filed by Mortgage Electronic Registration Systems Inc., ("MERS"), as plaintiff, presenting that MERS was both owner and holder of the mortgage notes being foreclosed upon.

212. In 2004-2005 Countrywide and BANA used the MERS owner and holder foreclosure standing presentment in foreclosure cases filed nationally, using a network of law firms engaged by Lender Processing Services.

213. Then in 2005, the Honorable Jon I. Gordon, Miami-Dade County Circuit Judge, struck those MERS foreclosures filed in his courtroom *as sham*, after MERS admitted that MERS never really owned, held, or had any interest in, mortgage notes. ("Florida MERS embarrassment") [Exhibit 1]

214. In 2006, Fannie Mae retained Baker & Hostetler LLP to investigate "the Florida MERS embarrassment" in a report published in the New York Times. The Hostetler report found attorneys around the nation were routinely lying to foreclosure judges. The Hostetler Report stated, regarding the effect of a note endorsed in blank, was that pursuant to UCC Article 9, that the mortgage followed the note upon proof of purchase of the debt. ("Hostetler Report") [Exhibit 2]

> "UCC§ 9-203(g) and its accompanying comment state that the transfer of an obligation secured by a security interest also transfers the security interest. [] Thus, the transfer of the promissory note, which is the obligation, also transfers the mortgage, which is the security

interest. Once the note is sold to Fannie Mae, the mortgage also transfers, despite the fact that the servicer, lender or MERS' name appears in the land records.

Borrowers thus cannot determine the chain of owners from public records.." *Id.* at p. 39

215. In the Hostetler Report, Fannie Mae's lawyers determined that Judge Gordon was correct: That Countrywide and BANA foreclosure attorneys were routinely lying to trial courts in Florida, and other states, that MERS was both owner and holder of mortgage notes being foreclosed upon, when MERS was not.

[Exhibit 2]

**Approach No 2:    Lost Note Claims Made Using Fake MERS Note Assignments-**

216. After the Florida MERS embarrassment was exposed, mortgage servicers in judicial foreclosure states across the country stopped filing foreclosures in the name of MERS and instead, began filing foreclosure complaints in the name of securitized trusts or mortgage servicers.

217. In the second wave of fraudulent foreclosures, Countrywide and BANA filed foreclosure complaints, falsely claiming to have lost the original mortgage notes, and by attaching copies of original mortgage notes to the complaint, lacking note endorsements made in blank.

218. In this second wave of fraudulent foreclosure cases, CHL #2 and

BANA-BAC caused or filed false and fraudulent assignments of mortgages recorded in land conveyance repositories nationally, falsely purporting that MERS sold notes and mortgages to the foreclosure plaintiffs, in order to falsely document and/or bolster plaintiffs standing to foreclose. *See* Class Plaintiff  Maria K. Williams-James Allegations regarding MERS Corrective Assignment, *infra; See also* Class Plaintiff Susan DeShaw Allegations regarding MERS Assignment, *infra*.

219. Examples of false and fraudulent MERS note sales are delineated in Class Plaintiff allegations below, within mortgage assignments filed in the Bureau of Land Conveyances for the State of Hawaii, as requested by BANA. *See* Class Plaintiff Nathan Aiwohi Allegations, Findings of the Court, *infra. See also* Class Plaintiff Susan DeShaw Allegations regarding MERS Assignment, *infra*.

220. MERS representatives acknowledged in 2006 that  MERS  never  had an ownership interest either mortgage notes or mortgages, and therefore, it would be impossible for MERS to sell them to foreclosure plaintiffs as Assignor owners or holders.

221. Class Plaintiffs allege that tens of thousands of these false and fraudulent MERS note assignments have been, and continue to be, filed in land conveyance repositories in this District and nationally, and that ALL require the

immediate injunctive relief sought by Class Plaintiffs, to vacate those erroneous false and fraudulent MERS Assignments filed and sitting in public records, directly effecting chain of title.

222. By way of example, fake MERS mortgage note assignments appear in 7 out of 8 Class Plaintiff allegations below, that Class Plaintiffs allege represents fraud on the court, and lack of candor, *per se. See* Aiwohi, Keohokapu, Baliguat, DeShaw, Williams-James, Rodriguez, and Nicolas individualized statements of facts, *infra.*

223. Trial court judges rely upon the truth and veracity of those fake MERS mortgage note assignments that result in final judgments of foreclosure to this day. *See* Class Plaintiff Nathan Aiwohi Allegations, Findings of the Court manifesting reliance, *infra.*

**Approach No. 3: The False Mortgage Assignment Robo-Signing Scandal-**

224. The third BANA scheme to defraud was executed because Countrywide mortgages were not timely negotiated to trusts that purchased those pooled mortgages, presenting a real problem for trustees, and agents thereof, desiring to foreclose on mortgages allegedly owned by those trusts, using mortgage notes and mortgages for standing to sue.

225. BANA engaged in widespread Robo-signing of mortgage assignments

in an effort to unlawfully fix trust chain of title deficiencies that continues to this day in this District and nationally.

226. In 2010, the Florida Attorney General's Office, and many other State Attorneys General, exposed the BANA "Robo-Signing Scandal", whereby BANA was caught presenting false, fraudulent, and fabricated evidence regarding mortgage ownership within CHL and BANA-BAC business records, to falsify a plaintiff trustee's, or plaintiff, loan servicer's, standing to file foreclosure cases and to prosecute them through disposition. [Exhibit 3]

227. Specifically, BANA created materially false and fraudulent mortgage assignments, improperly executed using rubber stamped signatures of individuals purporting to be authorized signors, later recorded in the public land records used in foreclosure courts nationally attempting to prove a plaintiff's standing to foreclose in those cases. [Exhibit 3]

228. The Florida Attorney General's office issued a powerpoint presentation entitled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases[8]" that detailed an industry wide Robo-signing scandal and the rampant use of false and fraudulent MERS assignments. [Exhibit 3]

---

[8] See Florida AG power point presentation Link at:
https://latimesblogs.latimes.com/money_co/2011/01/florida-attorney-general-slams-banks-foreclosure-practices.html

229. In 2010, the FBI's Jacksonville, Florida Office investigated the Robo-signing scandal and concluded in a case assessment memorandum that "millions of false and fictitious assignments of mortgages that were used to support foreclosure actions across the United States… caused the judicial process as it relates to foreclosures to be corrupted with false and fraudulent filings."  The FBI further concluded "this matter has the potential to be a top ten Corporate Fraud case." [Exhibit 4]

230. In 2010, the Honorable Judith Wizmur, Chief Bankruptcy Judge, District of New Jersey issued a ruling invalidating BANA's endorsement practices after taking testimony about it in a trial conducted in 2009.  *Kemp v. Countrywide Home Loans, Inc.*, (440 B.R. 624, 628-629 (D. N.J. Bkrtcy (2010)); *See also* [Exhibit 5]

231. In *Kemp,* Judge Wizmur rejected an after the fact endorsement, following the testimony of Linda DiMartini, Supervisor BAC Home Loans Servicing L.P., that she had "never seen an actual note that has an endorsement on the bottom" for any loan she handled between 2006 and 2009. BAC Home Loan Servicing is now BANA. [Exhibit 5]

232. Ms. DiMartini further confirmed BANA's routine business practice was to endorse original notes after the fact using a hand signed allonge, not a rubber-

stamped blank endorsement, only after it was needed in court for securitized loans. [Exhibit 5]

233. In 2022, BANA produced evidence and testimony in BONYM foreclosures litigated in Florida that showed law firms filed these bogus mortgage assignments had also filed foreclosure complaints alleging the notes were lost. In truth, BANA's records show the original notes were not lost, but sent to the law firms.

234. BANA's records show the images of the note taken during CHL#1's servicing of the loan shows the notes were not endorsed. The first images of the notes sent to these law firms with the rubber-stamped endorsement appeared in BANA's records after the law firm filed a copy of the endorsed note in the court file. The only logical explanation was that counsel for BANA and BONYM recorded false assignments and forged rubber-stamped endorsements.

235. In March, 2011, BANA signed a consent judgment with the OCC as a result of the Robo-Signing scandal that made a specific finding that BANA was litigating cases without proper endorsements or proper assignments. [Exhibit 6] [Exhibit 7][Exhibit 8]

236. The OCC Consent Judgment required BANA to conduct an Independent Foreclosure Review ("IFR") and identify every foreclosure case filed

without a properly endorsed note or proper assignment pending between 2009 and 2010. [Exhibit 8]. Going forward from April 4, 2012, BANA chose to continue filing foreclosure cases without lawful endorsements, or assignments, while ignoring OCC Orders wilful defiance thereof.

237. Class Plaintiffs alleges that substantially all of the Countrywide mortgage foreclosures that BANA filed, or caused to be filed, including those filed by Defendant, BONYM herein, in judicial foreclosure states, were, and are still filed using an after the fact forged rubber stamped signature in blank, falsely portraying execution by a former CHL #1 executive.

238. These endorsements are still forged, false and fraudulent, regardless of the passage of time. *See, infra,* Thomas Johnson Statement of Facts, Countrywide Limited Power of Attorney grant to Meridian authorizing after the fact endorsement fixes. [Exhibit 31][Exhibit 32][Exhibit 33]

239. BANA spent years, presented senior BANA executives and corporate representatives to offer perjured testimony, ordered the destruction of evidence in defiance of subpoenas for that evidence, backdated records, destroyed the backdated records in defiance of subpoenas for those records, and has paid billions of dollars in alternative judgments to keep these secrets sacrosanct that continue to damage Certificateholders and homeowners today, and uninterrupted, will remain

ongoing by BANA into perpetuity. [Exhibits 1-10]

240. On March 12, 2012, the U.S. Dept. of Housing and Urban Development Office of Inspector General ("HUD/OIG") issued a Memorandum of Review on BANA's Foreclosure and Claims Process (the "HUD Report"). [Exhibit 7]

241. The HUD Report explained on page 2 that BANA refused to cooperate with its investigation, "limiting [HUD/OIG's] access to employees and information" requiring the U.S. Department of Justice ("DOJ") to issue civil investigative demands. [Exhibit 7]

242. The HUD Report on page 4 details how BANA actively obstructed HUD/OIG's investigation by having counsel instruct witnesses not to answer or clarify answers to questions and refusing to "permit an effective walk through of its document execution process that would have facilitated an understanding of its process." [Exhibit 7]

243. Moreover, BANA "did not provide information and data in a timely manner or a point of contact who could explain and clarify the data" and provided incomplete responses to subpoenas.  [Exhibit 7]

244. The HUD Report on page 5 finds "these omissions impaired our review because they prevented us from measuring the complete impact of Bank of America's foreclosure practices." [Exhibit 7]

245. The HUD Report on page 4 explained that the OCC investigation resulted in BANA agreeing to resolve all violations by entering into a $25 Billion National Mortgage Settlement, together with 4 other banks. BANA's agree settlement amount was approximately $12.5 billion dollars. ("$25 Billion National Mortgage Settlement") [Exhibit 7]

246. On April 4, 2012, BANA entered into a consent judgment and agreed to a Settlement Term Sheet for the $25 Billion National Mortgage Settlement that required at Exhibit A, Section I, A, 1, thereto, that BANA rely only on "competent and reliable evidence" in foreclosure cases going forward. [Exhibit 7, PDF p. 11 ]

247. Defendants are using the same evidence for Class Plaintiffs' foreclosures that Defendants, BANA was prohibited from using on and after April 4, 2012, but now they are falsely declaring it competent and reliable evidence on a daily basis in trial courts nationally, *infra.*

248. The $25 Billion National Mortgage Settlement did not stop BANA or CHL #2 from filing, or causing to be filed, the same type fraudulent foreclosure actions against Class Plaintiffs that were sanctioned in the National Mortgage Settlement.

249. As BANA negotiated with the OCC, the HUD/OIG and the U.S. DOJ to resolve BANA's Robo-signing scheme, BANA immediately engaged in cover-

79

ups, subterfuge, and fraudulent business practices, designed  to create the false appearance that BANA was complying with the OCC Consent Order requiring an IFR endorsement  review  to identify  every BANA foreclosure case pending in 2009 and 2010 filed without a properly endorsed note.

250. In order to stall and buy time, BANA engaged contract workers to conduct an endless "Beta Test" of software that was to conduct a supposed IFR endorsement review when it went live, but it never did go live.

251. While these alleged Beta Tests were ongoing, BANA employees, agents and third party vendors, continued to document the process to rubber stamp Countrywide notes with CHL #1 executive's signature stamped blank endorsements, in order to present the false pretense that these notes were timely endorsed by CHL #1, before CHL #1 ceased business operations.

252. Thereafter, on February 28, 2013, the OCC amended the Consent Order to allow BANA to pay $1.1 Billion to resolve all the pending allegations of misconduct being investigated by the Independent Foreclosure Review. [Exhibit 9]

253. Approximately 2 million homeowners received checks for $300.00 or $600.00 under the OCC Consent Order Settlement and the OCC relieved BANA of its obligation to identify those cases pending between 2009 and 2010 that were filed without a properly endorsed note. [Exhibit 7][Exhibit 8][Exhibit 9]

254. Countrywide/BANA endorsements, assignments and business records remained false, fraudulent and unkept in the course of normal business activities during that extended time period of OCC review culminating on February 28, 2013, *supra.*

**Approach No. 4:  Robo-Signed Stamped Endorsements**-

255. BANA entered into the April 4, 2012 $25 Billion National Mortgage Settlement fully intending to continue reusing false, fraudulent, fabricated, and forged evidence to prove standing in its foreclosure cases, which directly violated the terms of the settlement agreement.

256. In this scheme BANA shifted from relying upon false and fraudulent MERS assignments filed in the public record, to relying upon original notes allegedly held by BANA plaintiffs depicting CHL #1 rubber stamped blank endorsements that BANA Agents inserted years after CHL #1 ceased operations, e.g. years after BANA's merger with Countrywide.

257. BANA's after the fact, undated, and (anonymous) stamped signatures were forged after the fact by BANA employees, agents, or third party vendors, because they were not executed by CHL #1 executives prior to July 1, 2008, or by the person whose name appears as the signatory.

258. BANA continued to use CHL #1 rubber stamped signatures for former

CHL #1 Executive Vice Presidents David Spector, Michelle Sjolander, and Laurie Meder for currently filed foreclosure actions based on mortgage loans originated by CHL #1, in this District and nationally, as evidence in ALL Class Plaintiff notes, *infra.*

**SourceHOV dba Sourcecorp Databases BANA CHL #1 Robo-Signing-**

259. On or about, April 1, 2011, BANA contracted with a document management vendor, Sourcecorp, to document CHL #1's after the fact, note endorsement processes, by uploading images of freshly endorsed CHL #1 notes and to input the dates those CHL #1 note endorsements were first received in BANA's records. Sourcecorp did not affix CHL #1 endorsements, but rather, documented the process for each CHL #1 note that went through an after the fact endorsement process.

260. The BANA/Sourcecorp contract became effective three (3) days after BANA signed the 2011 OCC Consent Judgment Order finding that BANA litigated foreclosure cases in 2009-2010 without properly endorsed notes.

261. In the case of *BONYM v. Lisa De Morales*, Case No.: 13-00808-CA-01 (Miami Dade Circuit Court), Sourcecorp was served with one of two non-party subpoenas for deposition duces tecum in January of 2016, after De Morales first filed a Notice of Intent to Serve Subpoena for Deposition Duces Tecum on Non-

Party in the same case on December 23, 2015.

262. Notwithstanding receipt of the De Morales subpoena duces tecum and another subpoena served on Sourcecorp in January of 2016, Sourcecorp began the purging of over 1.9 billion records, because they were ordered to do so by BANA. [Exhibit 10] The Sourcecorp purge took approximately 3 months from start to finish from November of 2015 and continuing through February of 2016.

263. In the case of *United States Ex Rel. Bruce Jacobs vs. Bank of America Corporation*, Case No.: 1:15-cv-24585-UU (SDFL), Sourcecorp records were again subpoenaed on June 1, 2017. As a result of the second subpoena for Sourcecorp-BANA-CHL#1endorsement processes database records, Sourcecorp confirmed that BANA ordered Sourcecorp purge the entirety of records being maintained for BANA, stating:

> "I don't believe we have anything more to produce, after our call on Wednesday we pushed to find all we could. We have confirmed that back in Feb 2016, BOA had us execute an extensive project to purge all its data, which we were obligated to do. Therefore, this is all we have." [Exhibit 10, PDF p. 2]

264. Neither Sourcecorp or BANA were ever held accountable for ordering the destruction of 1.9 billion records, while under subpoena for production of De Morales Sourcecorp records, *supra.*

265. The destruction of 1.9 billion Sourcecorp records is a milestone event

that is material and relevant to Class Plaintiff's allegations that BANA Robo-signed note endorsements as forgeries *en masse,* and then ordered the data-files documenting that highly irregular and unlawful activity destroyed.

266. In August, 2020, BANA again defied multiple subpoenas for the AS400 screenshots that contained Sourcecorp entries documenting the dates that BANA received endorsed original notes. BANA admitted that the screenshots "were no longer available due to a system migration", but then later produced archived data from the destroyed screenshots. The archived data in one case showed that the entries documented that the note was first received endorsed years after CHL#1 ceased operations. In another case, the data showed that BANA *backdated the entries* to falsely and fraudulently reflect receipt of the endorsed note before the date that BANA's document custodian received the original mortgage note; a factual impossibility.

267. BANA's use of rubber signature stamps depicting former CHL #1 Executives' signatures, was implemented for the purpose of avoiding detection, because BANA's failed Robo-signing scandal involved tens of thousands of original signatures contained on mortgage assignments that were easily recognizable as forgeries, even with the untrained eye.

268. Since blank Countrywide mortgage note endorsements were undated,

**84**

BANA could easily stamp those notes whenever, and they would still appear to have been endorsed by a CHL #1 Executive, prior to July 1, 2008, without detection.

269. Untimely note endorsements by BANA were also made for the purpose of unlawfully fixing chain of title deficiencies for those same mortgages that trustees, including BONYM, could have forced BANA to repurchase, within six years of origination by Countrywide.

270. Class Plaintiffs allege that note endorsements forged by BANA from 2008-2013, are still current forgeries, when electronically filed for the purpose of evidencing standing to foreclose on homeowners in this District and nationally.

271. They are forged because the person whose name appears in the endorsement did not sign the endorsement.

272. They are forged because nobody knows who actually signed them, as they were signed by teams of anonymous individuals *en masse*.

273. They are forged, as constructively backdated, because they were signed using signatures of former Countrywide executives years after the fact to fix chain of title deficiencies without Court Order.

274. They are forged because they are undated blank endorsements, signed by anonymous people pretending to be a named former executive from a previous

time period.

275. They are false and fraudulent because they portray a falsehood to an unwitting trial court judge relying upon them for accuracy, credibility, and trustworthiness, in order to find standing for Defendants to foreclose and enter final judgments of foreclosure based thereon.

276. In other words, forged notes still being used by Defendants, or caused to be used by Defendants by foreclosure plaintiffs, currently remain active false pretenses used by the Defendants as the truth, in an ongoing scheme or artifice to defraud for the purpose of obtaining money or property.

**Approach No. 5:   False MERS Mortgage Note Assignments Filed In Public Land Conveyance Repositories Nationally, As Note Sales-**

277. Post 2011, BANA continues to record mortgage assignments for CHL #1's originated loans in public records that falsely claim that MERS sold the mortgage, together with the mortgage note, to the foreclosing plaintiff, when MERS never owned or possessed the note or the rights thereto, as a false or fraudulent pretense to bolster plaintiff standing.

278. The false and fraudulent MERS assignments made by BANA, or caused to be filed by BANA, also violate MERS' Member policies and procedures, which prohibit MERS Members from claiming that MERS sold promissory notes, because MERS cannot and has never sold promissory notes.

279. These types of assignments are filed in an open and notorious manner in land conveyance repositories in this District and nationally and *are all false and fraudulent, per se,* but continue to be relied upon by trial courts nationally to find plaintiffs standing to foreclose and to obtain final judgment of foreclosure.

280. Defendants used and continue to use false and fraudulent mortgage assignments filed in land conveyance public records claiming that MERS sold both a homeowner's mortgage and mortgage note in order to falsely claim plaintiff's standing to foreclose, as a false pretense.

281. Defendants' scheme or artifice to defraud includes widespread false pretenses contained within loan servicer declarations electronically filed with foreclosure trial courts for the purpose of entering copies of mortgage file documents, assignments and notes into evidence, without live testimony, under either the incorporated records doctrine and/or the business records exception to the hearsay rule and/or as ownership Affidavits.

282. A major aspect of Defendants' current scheme to defraud includes plaintiff trustee filings of false and fraudulent loan servicer declarations attesting to the credibility, accuracy, and trustworthiness of attached original business records obtained from CHL #1, BANA-BAC, and CHL #2, together with false and fraudulent MERS note assignments, previously filed in public record repositories.

283. All of those declarations ignore the fact that Defendant, BONYM, as Trustee, sued Defendant, BANA, for the same Countrywide deficiencies claimed by Class Plaintiffs below, *infra,* yet somehow, magically, no business record deficiencies exist for purposes of BONYM's foreclosure actions filed against Countrywide mortgagors.

284. Defendants and Enterprise Members have become experts in bastardizing motions for summary judgment using loan servicer Affidavits that all contain false statements of fact, and omissions of material (negative) facts, regarding all Countrywide originated, or purchased, mortgage note endorsements and chain of title assignments.

285. In so doing, Defendants have constructively captured otherwise legitimate entities, and use them as innocent instrumentalities in their schemes to defraud Countrywide mortgagors; including the state court judiciary in this District, and nationally.

286. Class Plaintiffs allege that Defendants continued abuse of lack of candor to the court, and admission of perjured testimony of standing into evidence, in and of itself, constitutes a scheme or artifice to defraud, within the meaning of 18 U.S.C. §§ 1341, 1343.

**Approach 5: Why MERS Note Assignments Are A "Sham" *Ab Initio-***

287. Class Action Plaintiffs below claim that the MERS Note Assignments referenced in the Complaint *sub judice* are a sham, as defined in the case of *Rhea v. Halkney*, 157 So. 190, 193 (Fla. 1934), *infra,* as recorded in land conveyance repositories, and still used in active foreclosure cases filed, or caused to be filed, by Defendants in this District and nationally.

288. Class Action Plaintiffs allege that they do not need to prove standing to challenge sham MERS Note Assignments below, as Plaintiffs in this action suing Defendants for racketeering and for violations of the FHA, where said MERS Note Assignments cited represent Predicate Acts. *See Deutsche Bank Nat'l Trust Co. v. Williams*, CIVIL No. 11-00632 JMS/RLP (D. Haw. Mar. 29, 2012)(*See* rationale for opposite proposition)

**MERS Note Assignments:  Once A Sham, Always A Sham-**

289. Class Plaintiffs allege that the MERS Note Assignments delineated in the Complaint *sub judice*, are *void* as prohibited, unauthorized, and illegal, *infra. See U.S. Bank N.A. v. Mattos*, 398 P.3d 615 (Haw. 2017).

290. Additionally, Class Plaintiffs allege that said false and fraudulent MERS Note Assignments have independent legal significance to Class Plaintiffs, based on the manner, depth and breadth in which they are utilized by Defendants, in order to "*to create a charade to give it appearance of proceeding lawfully*" and

adopting *"the ends justify the means"* mentality. [*See quotes, infra,* by the Honorable Jon I. Gordon in the case of: *Mortgage Electronic Registration Systems, Inc. v. Enzo Cabrera, et al,* Case No.: 2005-CA-0425-05 (Miami-Dade County, Florida 2005), relative to MERS Note Assignments]

### The Alleged Charade to Give an Appearance of Proceeding Lawfully-

291. Defendants start out with a MERS Note Assignment embedded into land repository public record that has been in place for many years, and for which no corrective MERS Assignment has ever been filed by Defendants.

292. In some cases, Defendant, BONYM, will attempt to correct the sham MERS Note Endorsement by re-assigning just the mortgage to itself, while leaving the MERS Note Assignment in place. [Exhibit 26][Exhibit 27]

293. That BONYM procedure does not make the underlying void MERS Mortgage & Note Assignment to Defendant, BONYM un-void, and as such, Defendant, BONYM is assigning nothing to itself the second time. A mortgage follows the note so any assignment of only the mortgage is a legal nullity. [Exhibit 26][Exhibit 27]

294. A foreclosure Complaint is filed containing factual allegations pertaining to the MERS Note Assignment, that may also be appended to the Complaint. When a foreclosure Complaint is filed, Defendants' Attorneys may file

an Affidavit that states no known false statements of fact are contained in the Complaint, that the Complaint is filed in good faith, or words of similar import.

295. The Complaint allegations will always state that the MERS Note Assignment was filed in the public record, but they do not allege anywhere that Defendant, BANA employees, pretending to be an *ex officio* MERS Official, prepared, signed, and filed those MERS Note Assignments acting as a MERS Official for any particular filing.

296. As the foreclosure prosecution proceeds, Defendants may file one, two or more, Motions for Summary Judgment, appended to Declarations from mortgage loan servicer(s), and/or prior loan servicer(s), that further reference these MERS Note Assignments, and attest to their validity, accuracy, trustworthiness and reliability; that are again further appended again to Declarations made, as exhibits thereto. Class Plaintiffs allege all of those filings are separate predicate acts.

297. It is not uncommon for the same MERS Note Assignment to appear in the public land conveyance repository record, and in a foreclosure court file 3-4-5 times, or more, repeatedly appended to multiple electronic filings made by Defendants.

298. In the cases of Class Plaintiffs, Nathan Aiwohi and Toby Keohokapu, *infra,* Hawaii Circuit Judges specifically manifested reliance upon the truthfulness

of MERS Note Assignments filed in the public record and specifically cited that reliance within the Findings of Fact & Conclusions of Law Sections of Final Judgments of Foreclosure entered. In the case of Thomas Johnson, *infra,* Wilmington Trust's attorney specifically asked the trial court to take judicial notice of mortgage assignments filed in the public records, as hearsay exceptions under Hawaii law, in an effort to add to there credibility, reliability, and trustworthiness.

299. Plaintiffs then file related "Findings of Fact & Conclusions of Law" garnered from unwitting trial court judges in public land conveyance record repositories, again giving the entire foreclosure proceeding as prosecuted, the appearance of proceeding to summary disposition lawfully, when in fact those foreclosure proceedings were anything but.

**MERS Neither Owns, Holds, or Sells Mortgage Notes and Prohibits Portraying To Anybody That It Does-**

300. On September 28, 2005, in the case of *Mortgage Electronic Registration Systems, Inc. v. Enzo Cabrera, et al*, Case No.: 2005-CA-0425-05, the Honorable Jon I. Gordon, Circuit Court Judge Eleventh Judicial Circuit of Florida found, *inter alia,* that MERS was neither the owner or holder of mortgage notes, that MERS Note Assignments to any third party Assignee were false, and that MERS perpetrated a fraud on the court, via multiple foreclosure pleadings filed containing factual allegations based upon sham MERS Note Assignments.

[Exhibit 1]

301. Honorable Jon I. Gordon stated:

"*Now we address the more troubling question of whether MERS has committed fraud upon the Court* by knowingly filing pleadings which contain allegations which are clearly false, as a mere pretense set up in bad faith and without color of fact. "A plea is considered 'sham' when it is palpably or inherently false, and from the plain or conceded facts in the case, must have been known to the party interposing it to be untrue." *See Rhea v. Halkney*, 157 So. 190, 193 (Fla. 1934)." ("sham" or "sham pleading")
...

"*The evidence is clear and convincing the MERS 's allegations that it "owned" "held" and "possessed" the Mortgage Notes in questions are clearly, palpably and inherently false based upon the plain and conceded facts in the case.* The evidence is likewise clear and convincing that MERS at all times prior to making these allegations acted in bad faith knowing them to be false and indeed, it was forewarned of the potential consequences for making such false allegations. The falsity of the allegations is readily apparent from a cursory review of their own documents readily available on their official web site... *MERS created a world of electronic transactions which does not readily integrate into existing Florida law and procedure: it chose to fabricate the facts and to create a charade to give it appearance of proceeding lawfully------- in short, the ends justified the means.*" [Exhibit 1, PDF p. 15][Italics added]

302. The September 28, 2005 Judge Jon I. Gordon Order was incorporated into a May 19, 2006, treatise style, *Report To Fannie Mae Regarding Shareholder Complaints By Mr. Nye Lavalle*, authored by Baker & Hostetler, LLP, in the section titled "MERS Florida Embarrassment", p. 20, as found online here: http://www.fdnpro.com/pleadings/documents/Lavalle-FannieMae-Report.pdf

("Hostetler Report")(Finding that Judge Jon I. Gordon's findings of fact and conclusions of law were true, and noting that thousands of foreclosure cases nationally were implicated).

303. On April 4, 2017, Defendant, BANA, filed an Answer in the case styled: *United States of America, ex rel Bruce Jacobs, Plaintiffs vs. Bank of America Corporation, et al, Defendants,* Case No.: 1:15-cv-24585-UU (S.D.FLA) [DE 120], a federal false claims act litigation filed by Attorney Bruce Jacobs in Miami, Florida, where Defendant, BANA admitted several times: ¶28 "Defendants admit that MERS does not own or assign promissory notes"; ¶37 "Defendants admit that MERS does not own or assign promissory notes. Defendants admit that MERS maintains a manual titled "MERS® Systems Procedure Manual"; ¶43 "Defendants admit that MERS did not own and/or assign notes. Defendants admit that MERS assigned mortgages (but not notes) to Defendants after commencement of the investigation by HUD's OIG and the resulting consent judgment on April 4, 2012"; and ¶52 "..Defendants admit that MERS did not own any interest in the notes". *Id.*

304. Class Plaintiffs allege that Defendant, BANA's admissions that MERS does not "own or assign" notes, has not stopped Defendant, BANA, from prosecuting, or causing the prosecution of, foreclosure actions, based upon the

continuing false notion that MERS Note Assignments to Defendant, BONYM, and others, legitimately confer standing to foreclose, based upon the purported sale of a mortgage note to any MERS Note Assignee.

305. Although, Defendant, BANA stated as an admission in Case No.:  1:15-cv-24585-UU, *supra,* "..that MERS assigned mortgages (but not notes) to Defendants after commencement of the investigation by HUD's OIG and the resulting consent judgment on April 4, 2012, Class Plaintiffs allege that *tens of thousands of corrective MERS assignments* were never filed by Defendant, BANA, regarding false and fraudulent MERS Note Assignments filed prior to April 4, 2012, upon which current foreclosure actions are still ongoing, in this District and nationally.

**MERS® CORP Official Position Regarding MERS Note Assignments-**

306. As publicly stated in the MERS System Procedures Manual[9], published online since on or about 2006.

> "MERS is not a servicer of mortgage loans. MERS is not a debt collector. MERS does not lend money to borrowers. MERS is not entitled to payment on or to retain payment received of any funds owing in relation to mortgage loans where MERS serves as a mortgagee and nominee. MERS is not an investor, lender, beneficial

---

[9] This MERS Procedures Manual was published online by MERSCORP Holdings, Inc., doing business as ICE Mortgage Technology, that owns and operates the MERS® System, as found at:
https://www.theice.com/publicdocs/MERS_System_Procedures.pdf ("MERS Manual")

owner, note owner, or trustee." MERS Manual, p. 104

307. MERS Procedures Manual authorizes MERS Members' Officers [including banks and loan servicing companies holding a MERS Memberships], through special corporate resolutions adopted by MERS, to act as *ex officio* MERS Officials for the purpose of signing Assignments in the name of MERS, provided that the Assignments are prepared in accordance with, *inter alia,* MERS Rules, Procedures, applicable laws, rules and regulations. MERS Manual, p. 65. ( "*ex officio* MERS Officers" or "Officials")

308. Class Plaintiffs allege that their respective MERS Note Assignments delineated below, were not prepared, or signed by MERS employees, regardless of what the respective signature blocks state on those MERS Note Assignments, but rather, by bank and/or loan servicer employees acting as *ex officio* MERS Officers with conditional authority from MERS, while simultaneously engaging in activities specifically prohibited by MERS Procedures Manual.

309. MERS Procedures Manual provides, in pertinent part:

"Only signing officers are permitted to act in the name of MERS. *A Signing Officer's actions must comply with the Rules, the Procedures, applicable laws, rules and regulations, and the terms of the specific Corporate Resolution **that is the source of their authority.***" Manual p. 65

310. "Assignments-

96

MERS Signing Officers are authorized to sign a MERS assignment of mortgage of a mortgage loan registered to the Member on whose MERS Corporate Resolution they appear or its Affiliate Org ID(s).

*In the alternative, if the mortgage loan is not registered to the Member or its Affiliate Org ID then the Member's MERS Signing Officer is authorized to sign a MERS assignment of mortgage if the Member is the current promissory note holder.*

*MERS assignments should not contain any language purporting to assign the note (e.g. "MERS assigns the mortgage, together with the note/indebtedness" is prohibited language). Before signing a MERS assignment, a MERS Signing Officer should confirm that it contains no note transfer language.*

MERS assignments should not reference any effective date that is different from the date the MERS assignment was signed by a MERS Signing Officer. MERS assigns its interest in a mortgage on the date that a MERS Signing Officer executes an assignment of that mortgage." Manual, p. 108 [Italics added]

311. A "Sample" (proper) MERS Assignment is also published online[10], that specifically prohibits any MERS Member from filing any MERS Assignment purporting to grant, sell, assign, transfer or convey, a mortgage note, to wit: "*MERS is only assigning its interest in the security instrument. Language indicating MERS is assigning the promissory note is prohibited.*" *Id.*

312. The MERS rules and procedures AGAINST the drafting and filing MERS Note Assignments in the public record, as referenced multiple times in the

---

[10] Source:
https://www.theice.com/publicdocs/Sample_Assignment_from_MERS.pdf

MERS Procedures Manual and online, including prohibition and penalty warnings for doing so, are so prolific that any *ex officio* MERS Officials drafting and filing false MERS Note Assignments in public land conveyance repositories in this District and nationally did so knowingly and intentionally, eyes-wide-open.

313. Those same *ex officio* MERS Officials had to first pass a MERS Procedures Test and are also required to file frequent Certifications with MERS, certifying compliance with the same MERS Member Rules, Practices and Procedures that they knowingly violated.

314. Class Plaintiffs allege that while the MERS System is largely an *honor system*, the MERS System itself also makes MERS Note Assignments *void ab initio,* as specifically prohibited by MERS, because they purport to document a note sales transaction from MERS to any Assignee that is bogus, while falsely portraying a Uniform Commercial Code ("UCC") note negotiation that is likewise bogus.

**Separating the Note From the Mortgage Makes Assignment a Nullity-**

315. "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity." *Carpenter v. Longan,* 83 U.S. 271, 274-275 (1872)

316. "The assignment of the interest of the mortgage in the land without an assignment of the debt is considered to be without meaning or use. This is the general language of Courts of law as well as equity." *Carter v. Bennett,* 4 Fla. 283, 347 (1852)

**Independent Legal Significance-**

317. The MERS Note Assignments delineated in the instant Complaint documenting Mortgage-Note- sales- transactions that never occurred, have independent legal significance for Class Plaintiffs, because they falsely portray UCC negotiations of the certain Class Plaintiffs' Notes to Defendant, BONYM, in order to falsely present BONYM's standing to foreclose on those respective loans, *ab initio.*

318. Moreover, MERS® Corp grant of authority to MERS Members' Officers is specifically conditioned on strict compliance with MERS Procedures Manual for the creation and filing of MERS Assignments, such that, without strict compliance therewith, MERS did not authorize them and they are *void*, as unauthorized, *ab initio.*

319. Ergo, the same MERS Note Assignments originally identified by Judge Jon I. Gordon in 2005 to be a sham, continue to be used by Defendants in Class Plaintiffs' cases to this day, notwithstanding, in this District and nationally.

320.   Class Plaintiffs allege that Defendant, BANA's MERS Note Assignments purporting to "grant, sell, assign, transfer or convey" mortgage notes to any Assignees, are also *void* under Hawaii law, not only because they are specifically prohibited by MERS Member Procedures, but also because they falsely document in land conveyance repositories the negotiation of a mortgage note to any MERS Assignee that never took place, as a sham, for the purpose of falsely portraying legitimate standing to foreclose.

321. Class Plaintiffs allege that the main reason for Defendant, BANA's use of false and fraudulent MERS Note Assignments nationally, was to present a fall back position in the event that Countrywide blank Note endorsements were successfully challenged by foreclosure defendants as forgeries.

322. Class Plaintiffs allege that the specific MERS Note Assignments that are the *sine qua non* of the Complaint *sub judice* were prepared and filed by Defendant, BANA employees, or third party representatives, portraying themselves as MERS Officers, pursuant to MERS Member filing procedure authority, while being directly adverse to MERS Assignment filing procedures, as a sham perpetrated by Defendant, BANA, and knowingly embraced by Defendant, BONYM.

323. As Judge Jon I. Gordon stated "*MERS created a world of electronic*

**100**

*transactions which does not readily integrate into existing Florida law and procedure:* **it chose to** *fabricate the facts and to* **create a charade to give it appearance of proceeding lawfully**------- *in short, the ends justified the means*."

324. MERS Procedures Manual certainly "create a charade to give it appearance of proceeding lawfully", as MERS Procedures enable banks and loan servicers to file false and fraudulent MERS Note Assignments regularly, while prohibited and unauthorized by MERS officially, while simultaneously creating plausible deniability for MERS® Corp that this aberrant activity is ongoing by Defendants.

325. Defendants use of land conveyance public record repositories is remarkable for the purpose of creating a charade intending to give Defendants' the appearance of proceeding lawfully.

326. Regarding Class Plaintiffs, Defendant, BANA, created and filed false and fraudulent MERS Note Assignments and filed the same in public land conveyance record repositories.

327. These false and fraudulent MERS Note Assignments filed continue to be used by Defendant, BONYM, and others, for the purpose of falsely claiming standing to foreclose, to prosecute, and in this District especially, standing to obtain final judgment of foreclosure - considering its use in Hawaii as a means to

falsely allege Note holder status on the day a foreclosure action is filed.

328. The problem with that scenario is that the MERS Note Assignments to Defendant, BONYM is *void, ab initio,* as alleged by Class Plaintiffs, *supra.*

329. On occasion, Defendant, BONYM, recognizing that Defendant, BANA's original *ex officio* MERS Note Assignments to Defendant, BONYM were unauthorized, attempted to clean up those improprieties in the public record by re-assigning just the mortgage to itself.

330. BONYM's attempted latent corrective procedure belies the fact that where the original Assignment to BONYM is void, it is Assigning nothing to itself the second time around, because BONYM originally got nothing as a result of the original void MERS Assignment.

331. Defendant, BONYM's efforts only highlight original void Note Assignment illegalities from Defendant, BANA, but do nothing to *ipso facto* fix those illegalities for BONYM going forward.

332. BONYM's efforts appear to be for the purpose of cutting off the cancerous tumor from the void MERS Note Assignment it received, and then to go forward like it didn't exist to begin with, e.g. the ends justify the means.

333. The fact that BONYM re-assigns Mortgages to itself, evidences the fact that BONYM fully knows that the original MERS Note Assignment it received

from Defendant, BANA, was false and fraudulent, but went forward anyway. [Exhibit 26][Exhibit 27]

---

334. Class Plaintiffs allege that it *undisputed* in 2022 that MERS is not, and never has been, in the business of owning, holding, selling, collecting on, negotiating, or assigning mortgage notes, and therefore, has no note interests to assign to anyone, including, but not limited to Defendant, BONYM.

335. Notwithstanding, Class Plaintiffs allege that thousands of foreclosure cases are still being wrongfully prosecuted by Defendants using those same previously identified and embedded false and fraudulent MERS Note Assignments filed in public records, upon which trial court judges continue to manifest reliance daily in making findings of fact and conclusions of law, relative to those same MERS Note Assignments portrayed to trial court judges as the truth. *See* Aiwohi Statement of Facts, *infra*; *See also* Keohokapu Statement of Facts, *infra*.

336. Class Plaintiffs' sham Note Assignments are incorporated into Class Plaintiffs' foreclosure Complaint pleadings, Motions for Summary Judgment, and in Declarations in support thereof, making all of those pleadings sham pleadings, being currently filed in this District and nationally by Defendants, e.g. as "..pleadings which contain allegations which are clearly false, as a mere pretense

**103**

set up in bad faith and without color of fact", *supra, Judge Jon I. Gordon,* and for which Class Plaintiffs seek redress now.

**MANIPULATION OF RULES OF EVIDENCE ALLEGED:**

**Incorporated Records Doctrine-**

337. "[A] receiving entity's employee may provide sufficient foundation testimony for a record from a second entity, even though the employee cannot relate the other entity's specific record making practices, *if the employee is well familiar with the circumstances under which the record is prepared, if the record is prepared on behalf of the receiving entity and in accordance with its requirements, and if the receiver routinely relies on such records." See State v. Fitzwater,* 122 Haw. 354, 369  (Haw. 2010); *See also U.S. Bank N.A. v. Compton,* No. SCWC-18-0000699 (Haw. Jul. 9, 2021).

338. Business Records Exception to Hearsay Rule, HI Rev Stat § 902(11)-

"Rule 902 Self-authentication. Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

...

(11)  Certified records of regularly conducted activity. The original or a duplicate of a domestic or foreign record of regularly conducted activity that would be admissible under rule 803(b)(6), if accompanied by a written declaration of its custodian or other qualified person, certifying that the record was:

**104**

(A) Made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
(B) Kept in the course of the regularly conducted activity; and
(C) Made by the regularly conducted activity as a regular practice.

The declaration shall be signed in a manner that, if falsely made, would subject the maker to a criminal penalty under the laws of the state or country where the declaration is signed..." HRE Rule 902(11)

339. All of the United States have similar provisions for the business records exception to the hearsay rule and for the incorporated records doctrine.

340. All of Defendants' filed motions for summary judgment include loan servicer Affidavits and/or prior loan servicer Affidavits, upon which trial courts manifest reliance, that contain false and fraudulent material representations and material omissions, as part of Defendants' scheme or artifice to defraud alleged by Class Plaintiffs.

**BONYM  V.  for an order; NYSC Case No.: 651786/2011**

**CWALT TRUST 2006- 32CB (DESHAW),
CWALT TRUST 2006- 5T2 (AIWOHI),
CWMBS, CHL TRUST 2006-21 (KEOHOKAPU), and
CWALT TRUST 2006-OA10 (RODRIGUEZ)**

341. Class Plaintiffs, Aiwohi, Keohokapu, DeShaw, and Rodriguez, each have mortgages loans that were pooled into CWALT 2006-32CB, CWALT 2005-AO5, CWMBS, INC.- CHL 2006-21,  and CWALT 2006-OA10, respectively.

342. The Aiwohi, Keohokapu, DeShaw and Rodriguez mortgages were part of an $8.5 billion dollar fraud settlement agreement petition filed by Bank of New York Mellon ("BONYM") in New York Supreme Court on June 29, 2011 involving BANA fka Countrywide. ("New York Petition").

343. Class Plaintiffs present this section to represent the proposition that Defendant, BONYM, can argue that Defendant, BANA's Countrywide originated mortgage loan records are fraudulent for money, and then later argue that the same loan records are credible, accurate and trustworthy for money.

344. Its all about the money, and not about truthfulness, candor to the court, or perpetrating frauds upon homeowners in this District and nationally; its about securing money by all means possible, regardless of how.

345. The New York Petition, filed as a non-adversarial petition, sought court approval for the settlement already reached, as styled: *The Bank of New York Mellon (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures), Petitioner, v. for an order, pursuant to CPLR § 7701, seeking judicial instructions and approval of proposed settlement*; Case No.: 651786/2011. ("$8.5 billion settlement")

[Exhibit 11[11]][Exhibit 12][Exhibit 13]

[11]Exhibits 1 through 43 attached hereto and incorporated by specific reference, are solely for the purpose of referencing specific factual allegations made in the body of the Complaint to a core source document, related to the "particularity [of] the

346. In 2011, BANA, by and through, BAC Home Loans Servicing, LP ("BAC"), formerly Countrywide Home Loans Servicing, LP ("CHLS"), was BONYM's Master Servicer ("servicer") for mortgages pooled comprising 530 trusts, and first took over loan servicing on and after July 1, 2008, the date that BANA merged with Countrywide.

347. The BONYM $8.5 billion settlement <u>was not</u> for BANA to repurchase toxic CHL #1 originated loans, that would have required examining hundreds of thousands of mortgage files individually, but rather was for *an estimated amount* of past and future money damages to Certificateholders without court involvement to quiet title to the trusts.

348. From BONYM's perspective, as Trustee, it either had to sue its servicer BANA-BAC to repurchase billions of dollars of toxic loans, or settle with its servicer BANA-BAC in some manner in order to appease its Certificateholders; it chose the latter.

349. The inherent conflict of interest regarding BANA-BAC's continued servicing of toxic Countrywide mortgage loans for BONYM, as Trustee, during the same time periods that BANA-BAC could have been sued for repurchase of those same loans is blatant, open and notorious.

---

circumstances" pleading requirements of Rule 9(b) Fed. R. Civ. P.

350. From on or about July 1, 2008, through on or about 2013, BANA had an enormous financial stake, trillions of dollars, in <u>not being sued for repurchase</u> of toxic Countrywide originated loans, while remaining the active servicing agent for those same toxic loans.

351. BANA remained on as *pinch hitter* servicing agent for Countrywide originated loans, in order for a six (6) statutes of limitations- from staggered trust origination dates- to run out; the same time period upon which BANA could have been sued for repurchase by any trustee holding toxic Countrywide originated mortgage loans with an inclination to do so, including, but not limited to, BONYM.

352. Regarding BANA'S-BAC's own record keeping improprieties and mortgage file disparities, as servicer for BONYM, the New York Petition stated, in pertinent part:

> "28. On October 18, 2010, the Institutional Investors asserted in a separate letter – a notice of non-performance pursuant to Section 7.01(ii) of the PSA ("Notice of Non- Performance") – *that BAC HLS, as Master Servicer, also breached several provisions of the PSAs. The allegations were wide-ranging and detailed*.
>
> 29. The Institutional Investors alleged, for example, that BAC HLS violated Sections 2.03(c) of the Governing Agreements by *failing and refusing to notify the Trustee and others of Countrywide's breaches of representations and warranties*.
>
> 30. The Institutional Investors alleged that BAC HLS *failed to meet its*

*obligations under Section 3.01 of the Governing Agreements to "represent and protect the interests of the Trust Fund in the same manner as it protects its own interests in mortgage loans in its own portfolio."* According to the Notice of Non-Performance, BAC HLS breached Section 3.01 by: ***(i) failing to maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards; (ii) failing to demand that the Sellers cure deficiencies in mortgage records; (iii) incurring avoidable and unnecessary servicing fees as a result of its allegedly deficient record-keeping;*** and (iv) overcharging by as much as 100% the costs for maintenance, inspection and other services with regard to defaulted Mortgage Loans.

...

35. *Rather than commencing litigation against Countrywide and BAC HLS,* and mindful of the complexity, delay and enormous costs associated with litigation that could *require a loan-by-loan analysis of hundreds of thousands of loans* and present significant legal and factual hurdles, in November 2010, the Institutional Investors, with participation by the Trustee, initiated settlement discussions with Countrywide and Bank of America. Those discussions continued for seven months, involved dozens of face-to-face meetings and conference calls, and involved extensive dialogue among the parties concerning the merits of the Institutional Investors' allegations and Countrywide's defenses, and extensive analysis of the Trustee's likely recovery if it commenced – and prevailed in – litigation on behalf of the Trusts.

36. It was out of those discussions that the Institutional Investors, Countrywide, Bank of America, and the Trustee have agreed to the terms of the Settlement, and that the Institutional Investors have requested that the Trustee, on behalf of the Trusts, enter into the Settlement." *Id.* [Emphasis added][Exhibit 11, pps. 11-13]

353. However, the collection of $8.5 billion for estimated money damages

from BANA fka Countrywide did not also *ipso facto fix* incomplete, inaccurate, or

deficient business records or mortgage files, that BONYM used as the catalyst events to seek money damages from BANA, because: "..that could require a loan-by-loan analysis of hundreds of thousands of loans..".

354. That is exactly what Class Plaintiffs are requesting here, the "loan-by-loan analysis of hundreds of thousands of loans", because the underlying documents are still forged, false and fraudulent, regardless of the passage of time.

355. This allegation excerpt from BONYM's New York Petition ¶ 30 is especially telling: "..(ii) failing to demand that the Sellers cure deficiencies in mortgage records;..".

356. On and after July 1, 2008, it became lawfully impossible for BANA to cure full securitization deficiencies, absent court intervention to quiet title, or with court orders authorizing curative chain of title mortgage assignments, or corrective mortgage note endorsements necessary to fully securitize mortgage backed securities trusts  propagated with defective CHL #1 mortgages, in accordance with the express terms of trust origination agreements requiring timely mortgage assignment recording and delivery of properly endorsed notes to respective trust custodians.

357. Moreover, BANA would have been forced to use good faith efforts to modify Countrywide's discriminatory and predatory subprime mortgage loans that

targeted fraudulent foreclosures for communities of color.

358.   The second approach embraced by multiple trustees, including BONYM, was to permit BANA-BAC to fix deficiencies in mortgage records and negotiable instruments through a variety of schemes or artifices to defraud that BONYM acquiesced to with knowledge.

359. Option two, the self help fix scheme, required BANA-BAC to commit fraud in order to fix trust securitization deficiencies itself, without court intervention, by pretending to be CHL #1 after the fact, using Robo-signed rubber stamped note endorsements of previous Countrywide executives, rubber stamped signed anonymously.

360. Option two required BANA-BAC to forge former CHL #1 executive's signatures together with rubber stamped blank endorsements on hundreds of thousands of notes previously only made payable to Countrywide Bank, N.A., remaining deficient and inoperative to negotiate or transfer note ownership to respective trusts, or for purposes of proving a trustee's standing to foreclose.

361. Option two required BANA-BAC to engage the false pretense that related notes were timely negotiated to or held by trustees, prior to July 1, 2008, that is akin to falsely and fraudulently backdating official documents that BANA filed and caused to be filed electronically in foreclosure cases initiated in this

District and nationally.

362. Those BANA Robo-signing rubber-signature-stamping activities were not regularly conducted business activities by BANA, but rather, desperate, and secretive activities of BANA. So secretive in fact that BANA ordered the destruction of 1.9 billion records related thereto, backdated records related thereto, and then destroyed those backdated records in violation of multiple subpoenas. [Exhibit 10]

363. Those BANA Robo-signing note endorsement activities evidence incredible, inaccurate and untrustworthy collateral files and prior servicer records unleashed by BANA on to current loan servicers that must now lie about their existence to go forward in foreclosure.

364. It is axiomatic that trustees, including BONYM, had and continue to have an enormous financial stake in turning a blind eye toward BANA's, BAC's, and CHL #2's after the fact 'fixes' to mortgage file documents and negotiable instruments, while simultaneously hailing the credibility, truthfulness, and accuracy of the same, in order to obtain money or property.

365. There is no difference between BANA's use of former CHL #1's officer signature stamps after the fact, to unlawfully backdating official documents filed in the public record, as both official records portray something they are not, as false

pretenses used in a scheme or artifice to defraud by BANA for financial gain.

366. In 2022, trustees are faced with claiming through false or fraudulent loan servicer declarations, that original BANA fka Countrywide business records, including mortgage files, assignments, negotiable instruments and endorsements thereto, are credible, reliable, and trustworthy in order to falsely and fraudulently convince trial courts nationally to rely upon the truthfulness of those records, as directly caused by Defendants and proffered as the "truth".

367. Original business records maintained in the ordinary course of business activities cannot be altered, or otherwise 'fixed' to cure, legally time barred, mortgage assignment or note endorsement deficiencies, absent court intervention to quiet title, without representing and evidencing fraud, when later falsely declared to be accurate, credible and trustworthy, *ab initio*. Yet, Countrywide continues to engage multiple secretive document fixing companies, like Meridian, to do just that, in this District.

368. To the extent that BANA-BAC orchestrated the entry of false, fraudulent or forged mortgage assignments and note endorsements after the fact, that were later acquiesced by trustees in order to confer standing for plaintiffs to sue in foreclosure that did not previously exist, including by Defendant, BONYM, those unlawful events have still violated foreclosure homeowners' rights to due

process of law, and for unlawful seizure of property, with independent legal significance.

369. Where operative Countrywide mortgage foreclosure assignments, endorsements and declarations, are false, fraudulent and/or forged for the express purpose of birthing a plaintiff trustees standing to file a foreclosure action, a motion for summary judgment, or as evidence in trial, lack of candor, and a fraud on the court and upon homeowners has been perpetrated, as originally set into motion and effectively caused by BANA-BAC and CHL #2.

### Continuing Negative Effects of BANA's Footprint on Hawaiian Homelands-

370. Notwithstanding that BANA no longer has thirty-nine (39) branch office locations in Hawaii, the negative effects of BANA's false, and fraudulent conduct, mortgage note signature forgeries, sham MERS mortgage note assignments, and false mortgage assignments spawned by document fixing companies, still negatively effect and financially damage Hawaiian homeowners, as well as all other Countrywide originated mortgagees nationally.

### THE NATHAN EARL AIWOHI CASE

371. On March 12, 2013, Bank of New York Mellon, as Trustee filed a complaint for foreclosure in the Fifth Circuit Court for the State of Hawaii in the case styled: The Bank of New York Mellon Fka The Bank of New York, as

Trustee for the Certificateholders of the CWALT Alternative Loan Trust 2006-5t2 Mortgage Pass Through Certificates, Series 2006-5T2, Plaintiff, V. Nathan Earl Aiwohi, et Al, Defendants, Case No.: 5CC131000082.

**Operative Nathan Earl Aiwohi Documents-**

372. On January 5, 2006, Nathan Earl Aiwohi ("Aiwohi") signed a mortgage note payable to Countrywide Home Loans, Inc. in the amount of $675,000 accruing interest annually at the rate of 6.5%. ("Aiwohi Note")[Exhibit 16, PDF pps. 11-13]

373. The Aiwohi Note called for interest only payments for the first 120 months in the amount of $3.656.25 per month, or a total of $43,875 per year for 10 years or a total of $438,750 interest payments over 120 months. [Exhibit 16, PDF p. 11]

374. The Aiwohi Note called for principal and interest payments made over the second 240 months in the amount of $5,032.62 per month ($1,376.37 more per month than the interest only payment). [Exhibit 16, PDF p. 11]

375. The Aiwohi Note was subsequently endorsed, on  page 3 of 3 pages:

"PAY TO THE ORDER OF:

_____

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

**115**

BY:   <u>Initials Written</u>
      David A. Spector
      Managing Director" [Exhibit 16, PDF p. 13]

376. The David A. Spector Countrywide endorsements are false, fraudulent or forged, as entered by BANA employees, agents or third party contractors, after CHL #1's business operations ceased on and after July 1, 2008.

377. The endorsements were stamped by unnamed individuals pretending to be David A. Spector after CHL #1 ceased business operations and after David A. Spector ceased employment with Countrywide, on or about August, 2006.

378. The blank and undated endorsement is akin to a backdated document filed as official record, and are false and fraudulent for that additional reason.

379. The Aiwohi Note does not allege any identifiable MERS involvement and MERS is not in the business of Note holding or ownership.

380. A copy of the Aiwohi mortgage note was not attached to the Aiwohi Complaint filed March 12, 2013. Instead, Plaintiff relied upon a sham MERS mortgage note assignment to allege standing to foreclose.

381. On January 12, 2006, Nathan Aiwohi signed a first Mortgage, as Borrower ("Aiwohi Mortgage"), where the named Lender was Countrywide Home Loans, Inc. and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS"). [Exhibit 16, PDF pps. 15-35]

**116**

382. The DeShaw Mortgage contains the following MERS and Lender provisions, excerpted in pertinent part:

"(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as  nominee for Lender and Lender's successors and assigns. *MERS is the mortgagee under this Security Instrument.* MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888)679-MERS.

(D) "Lender" is COUNTRYWIDE HOME LOANS, INC." *Id.* [Italics added][Exhibit 16, PDF p. 16]

383. The Aiwohi Mortgage was recorded on January 12, 2006 in the State of Hawaii Bureau of Conveyances ("Bureau") Recorded as Doc. No.: 2006-007396.[Exhibit 16, PDF p. 16]

384. On October 4, 2011, a MERS Aiwohi Assignment, *as requested by Bank of America,* was recorded in the Bureau as Doc. No.: 2011-161429, stating:

" For Value Received, the undersigned holder of a Mortgage (herein " Assignor") .. *does hereby grant, sell, assign, transfer and convey* unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-5T2, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-5T2 whose address is.. *all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described* and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Date of Mortgage: 1/5//2006 Original Loan Amount: $675,000.00
Recorded in Kauai County,  HI on: 1/12/2006, book N/A, page N/A and instrument number 2006-007396." [Italics added]

385. The October 4, 2011 Aiwohi MERS Assignment purports to convey ownership of both the Aiwohi Mortgage and Mortgage Note to Bank of New York Mellon, as Trustee, however, MERS never owned or possessed the Aiwohi mortgage note to begin with. [Exhibit 16, PDF p. 16][Exhibit 17]

386. The October 4, 2011 Aiwohi MERS Assignment is a nullity, *in toto*, as a false or fraudulent conveyance document filed in the public record.

387. The October 4, 2011 Aiwohi MERS Assignment did not, and does not, convey note holder status to BONYM, a standing requirement and prerequisite for BONYM to file the complaint.

388. Copies of the Aiwohi Mortgage, Mortgage Note, and Assignment were electronically filed (as attachments) in the Fifth Circuit Court of Hawaii in Case No.: 5CC131000082 by Bank of New York Mellon, as Trustee, appended to Plaintiff's Motion for Summary Judgment filed on June 25, 2018.[Exhibit 16, PDF pps. 11-38]

**Motion For Summary Judgment Filed in Aiwohi Case No.: 5CC131000082-**

389. BONYM, as Trustee, electronically filed Plaintiff's Motion For Summary Judgement in the Aiwohi case on June 25, 2018, containing a "Declaration in Support of Motion and Upon Prior Business Records" from Keli

Smith ("Smith"), dated May 5, 2018, as an employee representative of Bayview, as successor servicing agent for Aiwohi's mortgage. [Exhibit 16, PDF pps. 3-57]

390.  Smith's Declaration stated the following related to Bayview's loan servicing for Aiwohi's mortgage, as excerpted in pertinent part:

> "1. That the undersigned is an officer, collection officer or employee of Bayview Loan Servicing, LLC (hereinafter referred to as "Bayview"), is duly authorized to sign this Declaration on behalf of Plaintiff, has reviewed the records and files in Bayview's possession regarding this matter which records and files are kept by Bayview in the ordinary course of business under the undersigned's custody and control, which records and files and the entries therein were made at or near the time of such acts by person or persons duly authorized to make the same, with Exhibits "l"-"7" attached hereto being part of and included in said business records, and based on the review has personal knowledge of and is competent to testify to the matters hereinafter stated and does hereby make this declaration in support of Bayview's foregoing Motion. *Each and every statement and representation of this paragraph shall apply to each and every paragraph hereinafter contained and to each of the Exhibits attached hereto and made a part hereof.*
>
> 2.The information in this Declaration is taken from Bayview's business records. I have personal knowledge of Bayview's procedures for creating these records. They are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of Bayview's regularly conducted business activities; and (c) created by Bayview as a regular practice..
> ...
>
> 4. Plaintiff has possession of the Note with standing to prosecute the instant action, and the right to foreclose the subject Mortgage. The Note has been indorsed to Blank. In anticipation that the original Note

119

would be required for these foreclosure proceedings, Plaintiff has since caused the original Note to be delivered to Bayview, as agent for the Plaintiff. Bayview received from the Plaintiff the original Note and reviewed the original Note. Bayview then caused the original Note to be delivered to the Plaintiffs attorney, TMLF Hawaii LLC, as agent for the Plaintiff. A true and correct copy of the original Note is attached hereto as Exhibit "1" and incorporated herein by reference..

...

6. An Assignment of Mortgage ("Assignment") dated 08/29/2011 was recorded in the Bureau as Document Number 2011-161429 on 10/04/2011. A true and correct copy of the Assignment is attached as Exhibit "3" and incorporated herein by reference. By that Assignment, Plaintiff is now the mortgagee of record..

...

10. The Plaintiff, as the Investor, has a passive role with the primary emphasis on tracking it return on investment. In terms of routine business records on the Loan, Bayview acts as the sole custodian of Plaintiffs records..

...

11. *Bayview became Plaintiffs loan servicer for the Loan being foreclosed in this action on 9/01/2017.*

12. I have been in the mortgage loan servicing industry for <u>11</u> years. Based upon my occupational experience, *I know that loan servicers follow an industry wide standard* on how to keep and maintain business records on the loan services performed in their portfolio which record keeping is part of the regularly conducted activity of loan servicers. *The only difference between loan servicers* is the computer software used and the formatting of reports. The type of and regular maintenance of loan information including the accounting under generally accepted principles for each mortgage loan is standard and computerized.

13. *Loan servicers engage in the regularly conducted activity* of entering payments made on mortgage loans at or near the time the payment is received and use an amortization program that applies the

payment received towards accrued interest, principal and in most cases, the balance of any funds is deposited into an escrow account for property related expenses such as real property taxes and property insurance.

14. In addition to logging payments received, loan servicers engage in the regularly conducted activity of recording and maintaining records of all disbursements made on each mortgage loan for all sums advanced as authorized for payment under the note and mortgage.

15. Aside from payments and disbursements, loan servicers as part of their regularly conducted activity send correspondence to borrowers on mortgage loan such as payment adjustments, responses to borrower inquiries, preparation and sending of default notices.

16. Finally, the loan servicer records, maintains and takes custody of all such daily business records and loan documents, including taking possession of the note and mortgage records on behalf of the Investor..
...

21.   *The prior loan servicers for this mortgage loan were Bank of America, N.A.*, Residential Credit Solutions, Inc., and Ditech Financial LLC ("Prior Servicers").

22.   Upon becoming Plaintiffs loan servicer, Bayview took custody and control of loan document and business records of the Prior Servicers and incorporated all such records into the business) records of Bayview.

23. *Before the Prior Servicers' records were incorporated into Bayview's own business records, it conducted a review of the Prior Servicers' records and found them in keeping with industry wide loan servicing standards and found the Prior Servicers' records were made as a part of a regularly conducted activity, met industry standards and determined to be trustworthy.*

24. In performing its services to the Plaintiff, *Bayview relies upon the accuracy of the Prior Serv1cers' records* and those records are now a

part of and used for all purposes in the conduct of Bayview's regularly conducted activity of keeping and maintaining its own business records.." *Id.*[Exhibit 16, PDF pps. 3-8]

391. In support of Smith's Declaration, Smith presented as true, a copy of the Aiwohi Note, and note endorsement (Ex. 1), and the Aiwohi Mortgage and Assignment (Ex. 2-3), as attached and incorporated into Smith's Declaration. *Id.*

392. On September 20, 2018, the trial court entered an Order titled: Findings of Fact, Conclusions of Law and Order Granting Plaintiff's Motion for Summary Judgment Against All Defendants and for Interlocutory Decree of Foreclosure; Exhibit "A", making certain findings of fact and conclusions of law based upon BONYM, as Trustee's representations to the trial court, excerpted in pertinent part:

"..FINDINGS OF FACT

To the extent that any of the following Findings of Fact shall be determined to be Conclusions of Law, they shall be deemed as such.

..5. *The Note was negotiated to Plaintiff, and the Mortgage was subsequently assigned to Plaintiff by that Assignment of Mortgage ("Assignment") recorded in the Bureau on 10/04/2011 as Document Number 2011-161429.*

6. Plaintiff was the holder of the Note at the time the Complaint was filed..

..CONCLUSIONS OF LAW

"..4. Plaintiff is the holder of the Note and Mortgage and is entitled to enforce them.

Plaintiff qualifies as the Note holder with standing to prosecute the instant action as the Note is endorsed in blank, thereby converting the Note to a bearer instrument, and because Plaintiff was the holder of the Note at the

**122**

time the Complaint was filed and is currently in rightful possession of the endorsed Note.

5. The Mortgage was duly assigned to Plaintiff by virtue of the Assignment..

..ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST ALL DEFENDANTS AND FOR INTERLOCUTORY DECREE OF FORECLOSURE..

Pursuant to the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:
1. Summary judgment and an interlocutory decree of foreclosure in favor of Plaintiff and against all Defendants is hereby entered.." *Id.*

393. The Aiwohi trial court granted summary judgment for BONYM based upon either the business records exception to the hearsay rule, or the incorporated records doctrine, derived from Pati Smith's Declaration, or both, because copies not originals were considered by the trial court in granting summary judgment for BONYM.

394. Bayview and Smith, by and through BONYM and as caused by BANA, used false and fraudulent manipulation of these two rules of evidence to trick or deceive the trial court into believing that core Aiwohi loan records and instruments were credible, reliable and trustworthy for entry of judgment against Aiwohi.

395. In the Aiwohi case, Smith used false and fraudulent material statement of fact, and material omissions of fact, to manipulate the business records exception to the hearsay rule and the incorporated records doctrine, as a scheme or

artifice to defraud, caused by BANA.

396. On September 25, 2018, the trial court's September 20, 2018 Order titled "Findings of Fact, Conclusions Of Law and Order Granting Plaintiff's Motion for Summary Judgment Against All Defendants and for Interlocutory Decree of Foreclosure..", was filed in the State of Hawaii Bureau of Land Conveyances, as document number A-68450972.

**Cunning or Clever Devices Used as a Trick to Deceive the Trial Court-**

397. The Smith Declaration, incorporating core Aiwohi mortgage and note instruments, was made for the purpose of setting forth a factual predicate for the *business records exception to the hearsay rule*, and for the *incorporated records doctrine* exception to the hearsay rule, so that BONYM could enter copies of false, fraudulent and forged, business records, mortgage, mortgage assignment, and the mortgage note and endorsements, into evidence, to deceive the Aiwohi trial court judge, by means of false or fraudulent pretenses, caused by BANA.

398. BONYM did not become a note holder by virtue of the MERS Assignment to BONYM, but that is what the Court concluded, e.g. "[t]he Note was negotiated to Plaintiff, and the Mortgage was subsequently assigned to Plaintiff by that Assignment of Mortgage ("Assignment") recorded in the Bureau on 10/04/2011 as Document Number 2011-161429."

399. Aside from the MERS Assignment, BONYM did not otherwise show that it was a Note holder at the onset of the Aiwohi case, as BONYM did not append a copy of the Aiwohi Note to the original Aiwohi Complaint filed.

**Smith's Declaration Was Both False and Fraudulent-**

400. In the first paragraph of the Smith Declaration, Smith presented a predicate for the business records exception to the hearsay rule encompassing not only Bayview, but for all prior servicers from the beginning of time, as a material false or fraudulent statement of fact, e.g. "Each and every statement and representation of this paragraph shall apply to each and every paragraph hereinafter contained and to each of the Exhibits attached hereto and made a part hereof.*"*

401. The Smith Declaration is also false and fraudulent, through knowing material omissions, used as a cunning or clever device to trick or deceive the trial court, by omitting material declarations about prior loan servicing by Countrywide and BANA-BAC, during which time, all of the atrocities averred in the instant complaint occurred.

402. The Smith Declaration does not even mention Countrywide as a prior loan servicer, notwithstanding that Countrywide originated all the loans in CWALT 2006-5T2 and was the original Master Servicer for that trust for BONYM.

403. The Smith Declaration represents a scheme or artifice to defraud, as a cunning or clever device to trick or deceive the trial court, for the purpose stating, or attempting to state, factual predicates for both the business records exception to the hearsay rule, and for the incorporated records doctrine exception to the hearsay rule, knowing that the copies of the business records and negotiable instruments from prior loan servicers sought to be admitted into evidence are unreliable, incredible, and untrustworthy, as false, fraudulent or forged.

404. The Smith Declaration was knowingly filed by BONYM, as Trustee, as caused by BANA.

405. Smith's Declaration is also false and fraudulent through material omissions and false pretenses related to the credibility, veracity, trustworthiness and accuracy, of business records transferred to Bayview at some point after they were falsified, forged, or otherwise altered by Bayview's predecessor loan servicers.

**Pati Smith's, Bayview's Declaration, Replete with Material Omissions–**

406.  Class Plaintiffs allege that Defendants omit facts in declarations that are material and relevant to a trial court's determination of the reliability, credibility, and trustworthiness of endorsements, assignments, and prior loan servicer records, specifically related to time periods after BANA took over loan

servicing from CHL #1, on and after July 1, 2008, through including on or about, 2014.

407. Where any particular mortgage was included in a prior fraud lawsuit resulting in settlement, those facts are always omitted from declarations filed, notwithstanding that those omitted facts are material to the trial courts determination. The same holds true for all Class Plaintiff declarations filed, *infra.*

408. In the Aiwohi case, Bayview as servicing agent for CWALT 2006-5T2 had knowledge that both Countrywide, from 2006-July 1, 2008, and BANA-BAC, from July 1, 2008 to on or about 2012, were prior servicers, yet omitted material facts regarding the credibility and trustworthiness of business records obtained, originating from Countrywide.

409. Bayview omitted a material fact that BANA fka Countrywide was engaged in wide scale mortgage origination improprieties or frauds from 2004-2008, for which BANA paid billions of dollars, based on alleged false, fraudulent and forged business records and certifications maintained in the normal course of its unlawful business activities.

410. Bayview omitted a material fact that business records maintained in the ordinary course of continuing unlawful business practices are inherently incredible, unreliable, and untrustworthy, *per se.*

411. Bayview omitted a material fact that if it did not incorporate prior servicer records that it would have no business servicing those records.

412. Bayview omitted a material fact that BONYM entered into an $8.5 billion dollar fraud settlement with its prior servicer BANA fka Countrywide, based upon allegations made by BONYM that the CWALT 2006-5T2 Trust, together with 529 other like trusts, contained untrustworthy mortgage origination files, and mortgage file deficiencies, including, initial trust securitization failures that were not fixed by the seller of those loans, e.g. Countrywide, prior to the date Countrywide ceased to legally exist.

413. Bayview omitted a material fact that one of the reasons for the 2011 New York Settlement was that toxic mortgage loan files were neither credible or reliable.

414. Bayview omitted a material fact that Countrywide's records completely failed industry underwriting standards, and that underlying mortgage file records were neither prepared or maintained in legitimate day to day business operations of BANA fka Countrywide.

415. Bayview omitted the material fact that BANA-BAC, as subsequent prior loan servicer, concealed mortgage file discrepancies from Certificateholders of 530 trusts, including, CWALT Trust 2006-5T2, at the same time that BANA

could have been sued to repurchase those same deficient and toxic loan pools, into the trillions of dollars.

416. Bayview's omissions of fact, were both material and relevant to the Aiwohi trial court's determination that Aiwohi's mortgage files, mortgage assignment, note and endorsements, and other business documents, were reliable, credible, and trustworthy, and were sufficient evidence to enter summary judgment against Aiwohi.

417. On March 24, 2022 the Intermediate Court of Appeals for the State of Hawaii, Vacated the trial court's final judgment of foreclosure for Class Plaintiff Nathan Aiwohi, and remanded the Aiwohi case back to the trial court in Case No. CAAP-18-0000736, but not regarding matters that are the *sine qua non* of the instant Complaint.

## THE TOBY ALAMOANA KEOHOKAPU, JR. CASE

418. On April 16, 2012, The Bank of New York Mellon, as Trustee filed a complaint for mortgage foreclosure in the First Circuit Court for the State of Hawaii in the case styled: *The Bank of New York Mellon Fka The Bank of New York, as Trustee for the Certificateholders of the CWMBS, INC., CHL Mortgage Pass Through Trust 2006-21, Mortgage Pass Through Certificates 2006-21, Plaintiff, vs. Toby Alamoana Keohokapu, Jr., et al, Defendants,* Case No.:

1CC121001026 (formerly Case No.: 12-1-1026-04).

**Operative Toby Alamoana Keohokapu, Jr. Documents-**

419.   On   November   17,   2006,   Toby   Alamoana   Keohokapu,   Jr. ("Keohokapu") signed an "Interest Only Fixed Rate Note" mortgage note payable to First Magnus Financial Corporation, an Arizona corporation, in the amount of $720,000   accruing   interest   annually   at   the   rate   of   6.75%.   ("Keohokapu Note")[Exhibit 18, PDF pps. 26-30]

420.  Although the Keohokapu Note does not disclose the amount of money received by Class Plaintiff Keohokapu, only that he was to pay back $720,000.00 principal  plus  interest,  it  does  appear  that  BONYM  has  claimed  the  unpaid principal balance due on the note is $694,239.15. [Exhibit 18, PDF p. 26]

421.  Interest only monthly payments were set at $4,050.00 for the first 120 months, commencing on January 1, 2007, or a total of $486,000.00 interest only payments for the first 10 years. This amount is not a part of the $720,000.00 to be paid back as principal and interest, and is nowhere noted on the face of the note. [Exhibit 18, PDF pps. 26-30]

422.  Principal and interest payments were set at $5,474.62 for month 121 through month 360, or an additional total of $720,000.00 of principal and interest payments to be made over the following 20 years, with any remaining balance paid

in full on or before December 1, 2036. [Exhibit 18, PDF pps. 26-30]

423.  Class Plaintiff Keohokapu was to pay back a total of $1,799,909.01 for this original $694,239.15 mortgage loan [$486,000 first 10 years + $1,313,909.01 next 20 years].

424. Had Class Plaintiff Keohokapu originally been set up with a 30 year 6.75% mortgage note in the amount of $720,000.00, his monthly payments would have been $4,669.91, principal plus interest, for 360 payments, or a total of $1,681,166.27 over 30 years.

425.  The  Keohokapu Note was subsequently endorsed, not on the Note, but on a separate piece of paper, as follows:

> "WITHOUT RECOURSE
> PAY TO THE ORDER OF
> COUNTRYWIDE BANK, N.A.
> FIRST MAGNUS FINANCIAL CORPORATION,
> an Arizona Corporation
>
> BY:   /s/ Susan Maja
>         Susan Maja, Closer" [Exhibit 18, PDF p. 30]

426.  The Keohokapu Note was subsequently endorsed, on a same separate piece of paper, but upside down, as follows:

> "PAY TO THE ORDER OF
>
> WITHOUT RECOURSE
> COUNTRYWIDE BANK, N.A.

By:   *Laurie Meder*
      LAURIE MEDER
      SENIOR VICE PRESIDENT"  [Exhibit 18, PDF p. 30]

427. The separate piece of paper containing the two endorsements was suppose to be an allonge to the Keohokapu Note, however, it was only prepared in preparation for the Keohokapu foreclosure case filing in April, 2012, and not beforehand, and was not permanently affixed to the Keohokapu Note, *infra.* [Exhibit 18, PDF p. 30]

428.  The separate piece of paper containing the two endorsements was not maintained with the original Keohokapu Note after it was prepared, and was not so permanently affixed to the Keohokapu Note to be operative as an endorsement of the Keohokapu Note at any moment in time. [Exhibit 18, PDF p. 30]

429. This is akin to handing a check to a bank teller with an endorsement on a separate piece of paper, that would be wholly inoperative to negotiate the check.

430. The Laurie Meder Countrywide Bank, N.A., upside down- endorsement is false, fraudulent or forged, as entered by BANA employees, agents or third party contractors, after CHL #1's business operations ceased on and after July 1, 2008. [Exhibit 18, PDF p. 30]

431. The Laurie Meder endorsement was stamped by an unnamed individual pretending to be Laurie Meder after CHL #1 ceased business operations,

and the upside down-endorsement was Robo-signed specifically for preparing the Keohokapu foreclosure case for filing, immediately on or before April, 2012. [Exhibit 18, PDF p. 30]

432.   The blank and undated Laurie Meder endorsement is akin to a backdated document filed as official record, and is false and fraudulent for that additional reason. [Exhibit 18, PDF p. 30]

433.   The Keohokapu Note does not allege any identifiable MERS involvement and MERS is not in the business of Note holding or ownership. [Exhibit 18, PDF pps. 26- 30]

434.   On November 17, 2006, Toby Keohokapu and Kelly Keohokapu signed a first Mortgage, as Borrower ("Keohokapu Mortgage"), where the named Lender was First Magnus Financial Corporation, an Arizona corporation, and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS"). [Exhibit 18, PDF pps. 32-47]

435.   The Keohokapu Mortgage contains the following MERS and Lender provisions,  excerpted in pertinent part:

"(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as  nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888)679-MERS.

**133**

(D) "Lender" is FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION" [Exhibit 18, PDF p. 33]

436. The Keohokapu Mortgage was recorded on November 22, 2006 in the State of Hawaii Bureau of Conveyances, Recorded as Doc. No.: 2006-214421. [Exhibit 18, PDF p. 32]

437. On January 19, 2012, a MERS Keohokapu Assignment, as requested by Bank of America, was recorded in the Hawaii Bureau of Conveyances as Doc. No.: A-44010901, stating:

" For Value Received, the undersigned holder of a Mortgage (herein " Assignor") .. *does hereby grant, sell, assign, transfer and convey* unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWMBS, INC., CHL MORTGAGE PASS- THROUGH TRUST 2006-21 MORTGAGE PASS -THROUGH CERTIFICATES, SERIES 2006-21 whose address is.. all beneficial interest under that certain *Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue* under said Mortgage..

Date of Mortgage: 11/17/2006 Original Loan Amount: $720,000.00 Recorded in Honolulu County,  HI on: 11/22/2006, book N/A, page N/A and instrument number 2006-214241.." [Exhibit 18, PDF p. 49][Exhibit 19][Italics added]

438. Again, the January 19, 2012 MERS Keohokapu Assignment was prepared and filed specifically in preparation for the Keohokapu foreclosure complaint filing that occurred on April 16, 2012, *supra.* [Exhibit 19, PDF p. 49]

**134**

439. The January 19, 2012 Keohokapu MERS Assignment purports to convey ownership of both the Keohokapu Mortgage and Mortgage Note to The Bank of New York Mellon, as Trustee, however, MERS never owned or possessed the Keohokapu mortgage note to begin with. [Exhibit 18, PDF p. 49][Exhibit 19]

440. The false pretense of pretending to "grant, sell, assign, transfer and convey" .. "the note(s) and obligations therein described and the money due and to become due thereon.." falsely records a negotiation of the Keohokapu mortgage note to BONYM for the purpose of falsely evidencing BONYM standing to foreclose on the Keohokapu mortgage note. [Exhibit 18, PDF p. 49][Exhibit 19]

441. There was no MERS Assignment of the Keohokapu mortgage note to BONYM, because MERS did not own or hold the note to begin with, does not own or hold mortgage notes and never has, and it is expressly against the policy of MERS to claim the same. The Note Assignment is false and fraudulent *in toto.* [Exhibit 18, PDF p. 49][Exhibit 19]

442. The January 19, 2012 Keohokapu MERS Assignment is a nullity, *in toto,* as a false or fraudulent conveyance document filed in the public record. [Exhibit 19]

443. The January 19, 2012 Keohokapu MERS Assignment did not, and does not, convey note holder status to BONYM, a standing requirement and prerequisite

135

for BONYM to have filed the Keohokapu complaint in 2012.

444. The Keohokapu trial court judge manifested reliance upon the veracity of the MERS mortgage note assignment for purposes of finding BONYM's standing to foreclose in the Keohokapu foreclosure case, as delineated in the trial court's Findings of Fact, Conclusions of Law and Order Granting Plaintiff's Motion for Summary Judgment, *infra.*

445. Copies of the Keohokapu Mortgage, Mortgage Note, and Assignment were electronically filed (as attachments) in the First Circuit Court of Hawaii in Case No.: 1CC121001026 by Bank of New York Mellon, as Trustee, appended to Plaintiff's Motion for Summary Judgment filed on December 5, 2018. [Exhibit 18]

**Motion For Summary Judgment Filed on December 5, 2018 in the Keohokapu Foreclosure Case No.: 1CC121001026-**

446. Plaintiff BONYM filed a ninety-three (93) page bundled document containing these substantive sub-parts: a.) Motion for Summary Judgment ("MSJ"); b.) Memorandum in Support of MSJ; c.) Declaration of Indebtedness and on Prior Business Records, by Adrian Hargrove, Shellpoint Mortgage Servicing; d.) Keohokapu Note; e.) Keohokapu Mortgage; f.) MERS/BONYM Assignment; g.) Notice of Intent to Accelerate; h.) Payment History/Transaction History Screen-shots; i.) Affidavit of Bank of America, N.A. RE: Possession of Note as Prior Servicer, by Nicole Renee Williams; j.) original Complaint for Mortgage

Foreclosure, dated April 16, 2012; k.) Keohokapu Note & (separate) Allonge; l.) Declaration of Counsel; l.) Status Report Servicemembers Civil Relief Act and HRS § 667-17 Affirmation; and m.) Notice of Hearing, set for January 16, 2019. [Exhibit 18]

447. BONYM's December 5, 2018 MSJ contained the declaration of Adrian Hargrove, Foreclosure Specialist ("Hargrove"), Shellpoint Mortgage Servicing ("Shellpoint"), as Exhibit "A" thereto. [Exhibit 18, PDF pps. 17-68]

448. Hargrove's Declaration stated the following related to Shellpoint's loan servicing for Keohokapu's mortgage in ¶¶ 1-30 thereto:

"I *Adrian Hargrove,* declare under penalty of law that the following is true and correct:

1. I am authorized to sign this Declaration as an authorized signer of New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing as servicer for THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATE-HOLDERS OF CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-21 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21 ("Plaintiff").

2. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing maintains records for the loan in its capacity as Plaintiffs servicer. As part of my job responsibilities for New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing, I am familiar with the type of records maintained by New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing in connection with the Loan. As such, I am authorized to make this Declaration.

3. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing is

137

the current loan servicer for Plaintiff and acts as the exclusive representative and agent of Plaintiff in the servicing and administering of mortgage loans referred to New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing, including the Loan being foreclosed in this action.

4. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing services the underlying mortgage loan and note for the property referenced in this Declaration of Indebtedness for THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWMBS, INC., CHL MORTGAGE PASSTHROUGH TRUST 2006-21 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-21.

5. *The information in this Declaration is taken from New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's business records. I have personal knowledge of New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's procedures for creating these records. They are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's regularly conducted business activities; and (c) created by New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing as a regular practice.*

6. On or about 11/17/2006, Defendant TOBY ALAMOANA KEOHOKAPU, JR. ("Borrower"), for value received, duly made and executed an Interest Only Fixed Rate Note ("Note") in the amount of $720,000.00. *A true and correct copy of the Note is attached as Exhibit "1" and is incorporated herein by reference.*

7. *Plaintiff has possession of the Note with standing to prosecute the instant action and the right to foreclose the subject Mortgage. The original Note has been indorsed in blank. Plaintiff has reviewed the Note and is entitled to collect on the Note. Plaintiff caused the original Note, indorsed in blank, to be delivered to the Plaintiffs*

*attorney, TMLF Hawaii LLLC, as agent for the Plaintiff.*

*8. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's records indicate that Plaintiff had possession of the original Note, indorsed in blank, as of 04/16/2012, the date of the filing of the complaint in this foreclosure.*

9. The Note is secured by that certain Mortgage ("Mortgage"), encumbering the real property located at 98-179 Kauhihau Place, Pearl City, HI 96782, which was recorded in the Bureau of Conveyances of the State of Hawaii ("Bureau") as Document Number 2006-214241 on 11/22/2006. *A true and correct copy of the Mortgage is attached as Exhibit "2" and is incorporated herein by reference.*

*10. An Assignment of Mortgage ("Assignment") dated 12/30/2011 was recorded in the Bureau as Document Number A-44010911 on 01/19/2012. A true and correct copy of the Assignment is attached as Exhibit "3" and is incorporated herein by reference. By that Assignment, Plaintiff is now the mortgagee of record.*

11. The owner of the Note and Mortgage for a particular mortgage loan is commonly referred to in the loan servicing industry as the Investor. *The Investor for this mortgage loan is the Plaintiff.*

12. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing maintains all the day to day loan documents, records and accounting of payments on the Loan being foreclosed in this action including all documents and business records acquired by Plaintiff when it purchased the subject mortgage loan.

13. Under the terms of New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's servicing arrangement, Plaintiff does not participate in, keep and maintain any of the day to day loan documents, inputting of accounting data, saving of business records and all communications with borrower.

*14. The Plaintiff, as the Investor, has a passive role with the primary emphasis on tracking its return on investment.* In terms of routine

business records on the Loan, New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing acts as the sole custodian of Plaintiffs records.

*15. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing became Plaintiffs loan servicer for the Loan being foreclosed in this action on 07/07/2015.*

*16. **I have been in the mortgage loan servicing industry for 2 years**. Based upon my occupational experience, I know that loan servicers follow an industry wide standard on how to keep and maintain business records on the loan services performed in their portfolio which recordkeeping is part of the regularly conducted activity of loan servicers.* The only difference between loan servicers is the computer software used and the formatting of reports. The type of and regular maintenance of loan information including the accounting under generally accepted principles for each mortgage loan is standard and computerized.

17. Loan servicers typically engage in the regularly conducted activity of entering payments made on mortgage loans at or near the time the payment is received and use an amortization program that applies the payment received towards accrued interest, principal and in most cases, the balance of any funds is deposited into an escrow account for property related expenses such as real property taxes and property insurance.

18. In addition to logging payments received, loan servicers engage in the regularly conducted activity of recording and maintaining records of all disbursements made on each mortgage loan for all sums advanced as authorized for payment under the note and mortgage.

19. Aside from payments and disbursements, loan servicers as part of their regularly conducted activity send correspondence to borrower on mortgage loan such as payment adjustments, responses to borrower inquiries, preparation and sending of default notices.

20. Finally, the loan servicer records, maintains and takes custody of

all such daily business records and all loan documents, including taking possession of the note and mortgage records on behalf of the Investor.

21. Borrower defaulted in the performance of the terms set forth in the Note and Mortgage by failing to pay the principal, interest and advances in the manner therein provided. Written Notice ("Notice") was given to Borrower of the default and of mortgagee's intention to accelerate the loan if the default was not cured. A true and correct copy of this Notice is attached as Exhibit "4" and is incorporated herein by reference. Despite the Notice, Borrower failed or neglected to cure the default. As a result, mortgagee exercised its option in accordance with the terms of the Mortgage and Note to accelerate the loan and declare the entire principal balance due under the Note.

22. The Payment History attached as Exhibit "5", which I have reviewed, is a true and correct copy, and is part of the business records described above. It shows that Borrower defaulted, the default has not been cured, and the amount stated below, as tabulated from the business record, is owed on the Loan. The record includes fees and costs that are subject to change based on inter alia, a per diem interest accrual for each day after 10/01/2018 until paid.

Principal Balance: $694,239.15
Interest Amount:  $339,743.70
Interest Due From 07/01/2011 to 10/01/2018@ 6.750%
Per Diem: $128.39
Property Inspection Costs:  $278.28
Property Preservation:  $240.00
Hazard Insurance:  $17,696.00
County Real Property Taxes:  $17,231.90
Credit I Unapplied Balance: ($5,778.56)
Total Due: $1,063,650.47

23. *The prior loan servicer for this mortgage loan was Bank of America, N.A. ("Prior Servicer").*

24. *Upon becoming Plaintiffs loan servicer, New Penn Financial, LLC*

*d/b/a Shellpoint Mortgage Servicing took custody and control of loan documents and business records of the Prior Servicer and incorporated all such records into the business records of New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing.*

*25. Before the Prior Servicer's records were incorporated into New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's own business records, it conducted an independent check into the Prior Servicer's records and found them in keeping with industry wide loan servicing standards and only integrated them into New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's own business records after finding the Prior Servicer's records were made as part of a regularly conducted activity, met industry standards and determined to be trustworthy.*

*26. In performing its services to the Plaintiff, New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing relies upon the accuracy of the Prior Servicer's records and those records are now a part of and used for all purposes in the conduct of New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's regularly conducted activity of keeping and maintaining its own business records.*

27. The Prior Servicer's records are regularly used and relied upon by New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing in all dealings with all the borrower, in reporting all profit and loss on the mortgage loans to the Plaintiff, in the preparation, filing and payment of income taxes dependent upon such information, and in evaluating New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's own job performance.

*28. To the extent the Prior Servicer's records are not accurate, New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing, on its own behalf and on behalf of Plaintiff, has a contractual right of recourse against the Prior Servicer for any loss or damage caused by the Prior Servicer's records.*

*29. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing did review and determine the Prior Servicer's business records were*

**142**

*trustworthy otherwise it would not have incorporated it into its own records.*

30. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing has retained TMLF Hawaii LLLC, to prosecute this foreclosure action on Plaintiffs behalf and is obligated to pay a reasonable fee and reimburse costs incurred in connection with the firm's services. Those attorney's fees and costs are not included in this Declaration. Rather, the above law firm will submit its own Declaration supporting and requesting the fees and costs from this action in accordance with applicable law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of October, 2018 at Houston, Texas.

By: Adrian Hargrove.." ("Hargrove Declaration")  [Exhibit 18, PDF pps. 17-24][Emphasis added]

449. In support of Adrian Hargrove's Declaration, Hargrove presented as true, again, a copy of the Keohokapu Note, and note endorsements (Ex. 1), and the Keohokapu Mortgage and MERS Assignment (Hargrove Declaration Exhibits 1-3), as also attached and incorporated into BONYM's filed MSJ. [Exhibit 18, PDF pps. 17-50]

450. BONYM's December 5, 2018 MSJ contained the declaration of Nichole Renee Williams ("Williams"), Assistant Vice President, Bank of America, N.A., within Exhibit "5" thereto. [Exhibit 18, PDF pps. 69-71]

451. Williams' Declaration stated the following related to BANA's prior

**143**

loan servicing for Keohokapu's mortgage in ¶¶ 1-6 thereto:

"I, *Nichole Renee Williams*, being first duly sworn an oath, deposes and says:

1. I am authorized to sign this Affidavit on behalf of Bank of America, N.A. ("BANA"), which was the prior servicer for the subject loan (the "Loan").

2. As prior servicer, BANA maintained records for the Loan. As part of my job responsibilities for BANA, I am familiar with the type of records that were maintained by BANA in connection with the Loan. As such, I am authorized to make this Affidavit.

3. The information in this Affidavit is taken from BANA's business records. I have personal knowledge of BANA's procedures for creating these records. They are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of BANA's regularly conducted business activities; and (c) created by BANA as a regular practice.

4. On 04/1612012, the Complaint for Mortgage Foreclosure; Exhibits "A", "I"- "3 ";; Summons ("Complaint") was filed herein. A true and correct copy of the Complaint is attached hereto as Exhibit "B".

5. At the time the Complaint was filed, BANA was the servicer for the Loan.

6. On 0411612012, BANA was in possession of the original promissory note dated 11/1712006 in the principal amount of $720,000.00 executed by TOBY ALAMOANA KEOHOKAPU, JR. and in favor of First Magnus Financial Corporation, an Arizona corporation, endorsed in blank ("Note"). A true and correct copy of the Note is attached hereto as Exhibit "C".

Further Affiant Sayeth Naught.

**144**

//..

By: *Nichole Renee Williams..*
Title: Assistant Vice President (AVP) Bank of America, N.A."
("Williams Declaration") [Exhibit 18, PDF pps. 69-71][Italics added]

452.   On September 24, 2019, the trial court entered an Order titled: Findings of Fact, Conclusions Of Law and Order Granting Plaintiff's Motion for Summary Judgment Against All Defendants and for Interlocutory Decree of Foreclosure; ETC. [Exhibit 20], making certain findings of fact and conclusions of law based upon BONYM, as Trustee's representations to the trial court, as excerpted in pertinent part:

"..FINDINGS OF FACT

To the extent that any of the following Findings of Fact shall be determined to be Conclusions of Law, they shall be deemed as such..
...

*5. The Note was negotiated to Plaintiff and the Mortgage was subsequently assigned to Plaintiff by that Assignment of Mortgage ("Assignment") recorded in the Bureau on 01/19/2012 as Document Number A-44010911.*

*6. Plaintiff was the holder of the Note, indorsed in blank at the time the Complaint was filed.*

*7. The Note, Mortgage, and Assignment are collectively referred to as the "Loan Documents"..*
...

..CONCLUSIONS OF LAW..

**145**

To the extent that any of the following Conclusions of Law shall be determined to be Findings of Fact, they shall be deemed as such..
...

4. Plaintiff is the holder of the Note and Mortgage and is entitled to enforce them. Plaintiff qualifies as the Note holder with standing to prosecute the instant action as the Note is indorsed in blank, thereby converting the Note to a bearer instrument, and Plaintiff is currently in rightful possession of the indorsed Note.

5. Plaintiff was the holder of the Note, indorsed in blank, at the time the Complaint was filed.

6. The Mortgage was duly assigned to Plaintiff by virtue of the Assignment." [Exhibit 20, PDF pps. 4-7][Emphasis added]

453. The Keohokapu trial court granted summary judgment for BONYM based upon either the business records exception to the hearsay rule, or the incorporated records doctrine, derived from Hargrove's Declaration, and/or Williams' Declaration, or both, because copies not originals were considered by the trial court in granting summary judgment for BONYM. [Exhibit 20]

454. The Keohoapu trial court manifested reliance upon the false or fraudulent MERS note assignment to BONYM, in its Finding of Fact, Conclusions of Law, *supra.* [Exhibit 19][Exhibit 20]

455. Defendant, BANA and Defendant, BONYM caused the Keohokapu trial court's Findings of Fact, Conclusions of Law, and Order Granting Motion for Summary Judgment, by United States Mail, to be filed in the State of Hawaii

Bureau of Conveyances on October 3, 2019, as Document No.: A-72150879. [Exhibit 20]

456. Shellpoint and BANA, by and through BONYM, used false and fraudulent manipulation of these two rules of evidence to trick or deceive the trial court into believing that core Keohokapu mortgage records and instruments were credible, reliable and trustworthy for entry of judgment against Keohokapu on September 23, 2019. [Exhibit 18][Exhibit 19][Exhibit 20]

457. In the Keohokapu case, Hargrove and Williams used false and fraudulent material statements of fact, and omissions of material facts, to manipulate the business records exception to the hearsay rule and the incorporated records doctrine, as a scheme or artifice to defraud, caused by BANA and BONYM.

**Cunning or Clever Devices Used as a Trick to Deceive the Trial Court-**

458. The Hargrove and Williams Declarations, incorporating core Keohokapu mortgage records, were made for the purpose of setting forth a factual predicate for the business records exception to the hearsay rule, and for the incorporated records doctrine exception to the hearsay rule, so that BONYM could enter copies of false, fraudulent and forged, business records, mortgage, mortgage assignment, and the mortgage note and endorsements, into evidence in order to

**147**

deceive the Keohokapu trial court judge, by means of false or fraudulent pretenses, as caused by Defendant, BANA and Defendant, BONYM.

459. The Keohokapu Note was not "negotiated" to BONYM by virtue of the MERS Note Assignment to BONYM, but that is what the Court concluded, e.g. *"...5. The Note was negotiated to Plaintiff and the Mortgage was subsequently assigned to Plaintiff by that Assignment of Mortgage ("Assignment") recorded in the Bureau on 01/19/2012 as Document Number A-44010911."*, *supra.* [Exhibit 19][Exhibit 20]

460. Defendants file the same false and fraudulent papers over and over again, and then, also cause judgments unlawfully obtained therefrom to be filed in public record repositories, for the purpose of adding an air of legitimacy to their unlawful activities, as further insult and injury to the rule of law in this District and nationally.

461. Defendants' unlawfully obtained judgments buttress Defendants' unlawfully filed MERS mortgage note assignments, without which, those judgments would not have been obtained. [Exhibit 19][Exhibit 20]

**The Hargrove Declaration Was Both False and Fraudulent-**

462. ¶5 of the Hargrove Declaration presented a predicate for the business records exception to the hearsay rule encompassing not only Shellpoint, but for all

prior servicers from the beginning of time, as a material false or fraudulent statement of fact, especially considering ¶ 16 where Hargrove states that she's been a "Foreclosure Specialist" for only two (2)years. [Exhibit 18, PDF pps. 18, 20]

463.   ¶11 of the Hargrove Declaration states that the investor for the Keohokapu mortgage loan was BONYM, but BONYM is acting solely as Trustee for the investors, making this statement false and fraudulent as well, for purposes of falsely alleging standing to foreclose. [Exhibit 18, PDF p. 19]

464.   ¶¶ 23-29 of the Hargrove Declaration presented a predicate for the incorporated records doctrine exception to the hearsay rule, as a material false or fraudulent statements of fact, as Shellpoint became Keohokapu's new loan servicer on July 7, 2015, more than a year before Hargrove was even employed by Shellpoint as a Foreclosure Specialist. [Exhibit 18, PDF pps. 20-23]

465.   Hargrove had no knowledge of any vetting processes that Shellpoint employed on July 7, 2015, if any, to determine credibility and trustworthiness of records incorporated from BANA, and her statements related thereto were wholly contrived, because that is what her employer told her to swear to on the computer generated Declaration that she signed under oath.

466. In ¶28 Hargrove implies, as further corroboration that mortgage records incorporated from prior loan servicer BANA are *trustworthy*, that Shellpoint could

sue BANA "[t]o the extent the Prior Servicer's records are not accurate,..". [Exhibit 18, PDF p. 23]

467. Lastly, in ¶29 Hargrove stated that "*29. New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing did review and determine the Prior Servicer's business records were trustworthy otherwise it would not have incorporated it into its own records.*" [Exhibit 18, PDF p. 23]

468. The ¶29 testament that this Countrywide loan being serviced by Shellpoint was found to be trustworthy, otherwise Shellpoint would not have incorporated Keohokapu's Countrywide records into Shellpoint's records, belies the fact that Shellpoint would have no business operations servicing Countrywide mortgages unless it declared all Countrywide mortgage records that it received to be trustworthy.

469. The Hargrove Declaration is also false and fraudulent, through knowing material omissions, used as a cunning or clever device to trick or deceive the trial court, by omitting material declarations about prior loan servicing by Countrywide and BANA-BAC, during which time, all of the atrocities averred in the instant complaint occurred.

470. The Hargrove Declaration does not even mention Countrywide as a prior loan servicer, notwithstanding that Countrywide originated, or purchased, all

the loans in CWMBS, INC., CHL Mortgage Pass Through Trust 2006-21, Mortgage Pass Through Certificates 2006-21, and was the original Master Servicer for that trust for BONYM, prior to July 1, 2008.

471. As to Defendant, BANA and Defendant, BONYM, the Hargrove Declaration represents a scheme or artifice to defraud, as a cunning or clever device to trick or deceive the trial court, for the purpose stating, or attempting to state, factual predicates for both the business records exception to the hearsay rule, and for the incorporated records doctrine exception to the hearsay rule, knowing that the copies of the business records and negotiable instruments from prior loan servicers sought to be admitted into evidence are unreliable, incredible, and untrustworthy, as false, fraudulent or forged.

472. Defendant, BANA and Defendant, BONYM, knowingly used a false and fraudulent Hargrove Declaration, regardless of whether Hargrove actually knew her statements to be false or not.

473. The Hargrove Declaration was knowingly filed by BONYM, as Trustee, and as caused by BANA, as Prior Loan Servicer.

474. Defendants, BONYM and BANA, knowingly filed Hargrove's Declaration, knowing full well that it was false and fraudulent, so that it could unlawfully foreclose upon Keohokapu, bastardizing the rules of evidence in the

process, so that the trial court would manifest reliance upon forged, false and fraudulent declarations and business records.

475. The Hargrove Declaration is also false and fraudulent through material omissions of fact, related to the credibility, veracity, trustworthiness and accuracy, of business records transferred to Shellpoint many years after they were falsified, forged, or otherwise altered by Shellpoint's predecessor loan servicers, BANA, BANA-BAC, and/or CHL #1.

**The Williams' Declaration was both False and Fraudulent-**

476. ¶3 of the Williams' Declaration was specifically made for the purpose of laying a predicate for the business records exception to the hearsay rule, restated in pertinent part:

> "3. The information in this Affidavit is taken from BANA's business records. I have personal knowledge of BANA's procedures for creating these records. They are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; (b) kept in the course of BANA's regularly conducted business activities; and (c) created by BANA as a regular practice." [Exhibit 18, PDF p.70]

477. Aside from Ms. Williams having no personal basis for such a Declaration, the statements made in ¶3 are both false and fraudulent, because core Countrywide mortgage note endorsements were not made at or near the time of negotiation to the trusts, or made by persons with personal knowledge-other than

they were Robo-signers, were not kept in the course of regularly conducted business activities, but rather evidence unlawful business activities, and were not created as a regular practice, having been created through subterfuge, that is all well documented.

478. Class Plaintiffs allege that Williams was in Texas and Keohokapu's original records and mortgage note were in California. [Exhibit 18, PDF p. 69]

479. Ms. Williams' Declaration is also false and fraudulent for many additional reasons that follow, all of which fly in the face of her stated business records exception to the hearsay predicate declared, *infra.*

480. Countrywide kept all mortgage notes locked in a vault in California, and endorsements were oftentimes placed on a separately kept allonge that was not permanently affixed to the mortgage note, as in Keohokapu's case. That is an abnormal activity.

481. In Keohokapu's case, the endorsements allonge was added to the mortgage file in preparation of the foreclosure case filing, on or immediately before, April 16, 2012 by Defendant, BANA for Defendant BONYM. That is an abnormal activity, because it means that the CHL 2006-21 Trust was not properly securitized on or before July 1, 2008.

482. A cursory review of the Keohokapu note endorsements *reveal with the*

*naked eye* that the allonge was maintained separately, as the copy of the "original" Keohokapu Note contains 4 hole punches at the top, while the endorsements allonge merely contains 2 hole punches at the top. [Exhibit 18, PDF pps. 26-31]

483. Therefore, it is impossible for the Keohokapu Note endorsements allonge to have been permanently affixed to the Keohokapu Note without also containing 4 hole punches; that means that it was created and maintained separately from the Keohokapu Note and is inoperative as a Note allonge for that same reason.

484. That would be akin to someone presenting a check to a bank teller with their endorsement on a separate piece of paper-the teller would not cash the check, as the separate piece of paper containing the endorsement is not contained on or within the four corners of the check. [Exhibit 18, PDF pps. 26-31]

485. Class Plaintiffs allege that a separately kept and maintained note endorsement does not act to negotiate that instrument under the UCC, or any other law.

486. Class Plaintiffs additionally allege that keeping and maintaining an allonge to a mortgage note separately only adds to the propensity for further frauds to be committed by Defendants, that are the *sine qua non* of this Complaint, considering the nature of the fluid allonge filed in Keohokapu's case, that was

154

supposed to be permanently affixed to the note, forever, in order to be operative as a negotiable instrument *ab initio*. Clearly Keohokapu's allonge was not.

487. Because the Keohokapu note endorsements created after the fact pretend to be that of a former CHL #1 executive, Laurie Meder, the after the fact endorsement is akin to a back dated, Robo-signed endorsement, by an anonymous individual who pretended to be Laurie Meder signing prior to July 1, 2008.

488. The endorsement in blank was forged, because it was not signed by Laurie Meder and was not signed on or before July 1, 2008, the date that CHL #1 ceased business operations.

489. The MERS Assignment to BONYM is likewise false and fraudulent, as a scheme or artifice to defraud, because it intends to falsely evidence negotiation of the Keohokapu note to BONYM, but MERS has never owned or held a mortgage note, and claiming the same is specifically against MERS member policy. Its fraudulent *in toto*.

490. Because the January19, 2012 MERS Note Assignment to BONYM is fraudulent, it is likewise inoperative to make BONYM mortgagee for the Keohokapu Mortgage Assignment, or to confer standing to foreclose on the Keohokapu residence. [Exhibit 19]

**Hargrove's and Williams' Declarations, Omissions of Material Facts–**

491. The same types of material omissions of fact exist in declarations filed in all of Class Plaintiffs' cases. All material and relevant negative facts that would cause a trial court judge to raise an eyebrow that prior servicer records are not credible, reliable or trustworthy are simply omitted from declarations authored.

492. Class Plaintiffs allege that these omissions of material facts are just as harmful as affirmative false and fraudulent representations made, at that pinnacle moment when a trial court judge is in the process of manifesting reliance, or not, on declarations made by loan servicing agents, for the purpose of granting a final judgment of foreclosure.

493. Defendant, BONYM and Shellpoint, by and through Adrian Hargrove, as  its Foreclosure Specialist of 2 years, as current servicing agent for CWMBS, Inc., CHL Mortgage Pass Through Trust 2006-21, had knowledge, that both Countrywide, from 2006-July 1, 2008, and BANA-BAC, from July 1, 2008 to on or about 2012, were prior servicers, yet omitted material facts regarding the credibility and trustworthiness of business records obtained, originating from Countrywide.

494. Defendant, BONYM and Shellpoint omitted a material fact that BANA fka Countrywide was engaged in wide scale mortgage origination improprieties or frauds from 2004-2008, for which BANA paid billions of dollars, based on alleged

false, fraudulent and forged business records and certifications maintained in the normal course of its unlawful business activities.

495. Defendant, BONYM and Shellpoint omitted a material fact that business records maintained in the ordinary course of continuing unlawful business practices are inherently incredible, unreliable, and untrustworthy, *per se.*

496. Defendant, BONYM and Shellpoint omitted a material fact that if it did not incorporate prior servicer records that it would have no business servicing those records.

497. Defendant, BONYM and Shellpoint omitted a material fact that BONYM entered into an $8.5 billion dollar fraud settlement with its prior servicer BANA fka Countrywide, based upon allegations made by BONYM that the ALL Countrywide mortgages pooled and sold in the form of mortgage backed securities to investors, or Certificateholders, including Keohokapu's mortgage, contained untrustworthy mortgage origination files, and mortgage file deficiencies, including, initial trust securitization failures that were not fixed by the seller of those loans, e.g. Countrywide, prior to the date Countrywide ceased to legally exist. [Exhibit 11] [Exhibit 12][Exhibit 13]

498. Defendant, BONYM and Shellpoint omitted a material fact that one of the reasons for the 2011 New York Settlement was that toxic mortgage loan files

were neither credible or reliable. [Exhibit 11] [Exhibit 12][Exhibit 13]

499. Defendant, BONYM and Shellpoint omitted a material fact that Countrywide's records completely failed industry underwriting standards, and that underlying mortgage file records were neither prepared or maintained in legitimate day to day business operations of BANA fka Countrywide. [Exhibit 11][Exhibit 12][Exhibit 13]

500. Defendant, BONYM and Shellpoint omitted the material fact that BANA-BAC, as subsequent prior loan servicer, concealed mortgage file discrepancies from Certificateholders of 530 trusts, including, CHL 2006-21, at the same time that Defendant, BANA could have been sued to repurchase those same deficient and toxic loan pools, into the trillions of dollars. [Exhibit 11][Exhibit 12][Exhibit 13]

501. Defendant, BONYM and Shellpoint omitted a material fact that CWMBS, CHL 2006-21, that included Keohokapu's mortgage, was also part of another $500 million dollar settlement, as delineated in the Central District of California Class Action styled:  Maine State Retirement System, individually, and on behalf of all others similarly situated, vs. Countrywide Financial Corporation, et al., Case No.: 2:10-cv-00302-MRP-MAN. [Exhibit 14][Exhibit 15]

502. Keohokapu's mortgage was the subject of two separate fraud

settlements, one for the benefit of 530 separate trust Certificateholders, as filed by BONYM against BANA, and one regarding the Maine State Retirement System Class Action Case, *supra.* [Exhibits 11-15, inclusive]

503. Defendant, BONYM fosters the proposition that its loan servicer records are truthful, accurate and trustworthy for financial gain when suing Countrywide mortgagors in foreclosure, after having previously stated that those same Countrywide business records were untruthful, inaccurate and untrustworthy, when suing BANA.

504. Defendant, BANA and Defendant, BONYM should both be equitably estopped from ever claiming, under Oath, that Countrywide mortgage records are reliable, accurate, trustworthy or credible, because they are not, and the fact they are not is a foregone conclusion, based upon the tens of billions of dollars of judgments paid by Defendant, BANA over the years, including judgments paid to Defendant, BONYM, as Trustee for Certificateholders.

505. Rather, Defendants are like two headed dragons collecting money from everyone in sight, by any means necessary, lawful or unlawful.

506. Defendant, BONYM and Shellpoint's omissions of fact, were both material and relevant to the Keohokapu trial court's determination that Keohokapu's mortgage files, mortgage assignment, note and endorsements, and

other business documents, were reliable, credible, and trustworthy, and were sufficient evidence to enter summary judgment against Keohokapu, with copies appended to BONYM's filed Motion for Summary Judgment. [Exhibit 20]

## THE BARBARA ANITA BALIGUAT ESTATE CASE

507. On November 29, 2013, Bank of New York Mellon, as Trustee filed a complaint for foreclosure in the First Circuit Court for the State of Hawaii in the case styled: the Bank of New York Mellon Fka The Bank of New York, as Trustee for the Certificateholders of CWMBS Inc., CHL Mortgage Pass Through Trust 2006-OA5, Mortgage Pass Through Certificates, Series 2006-OA5, Plaintiff, v. Barbara Anita Baliguat ("Baliguat Complaint"), et al.; Case No.: 1CC131003138. [Exhibit 21]

508. On March 1, 2020 the trial court granted Darlene K. Ebos, as Personal Representative of the Estate of Barbara Anita Baliguat, Deceased, to substitute in for Jonathan F.K. Baliguat as personal representative for the decedent's estate. ("Ebos")

509. The Baliguat Complaint incorporated by specific reference, attached copies of the Baliguat mortgage note, mortgage, MERS Assignment to BONYM, and BONYM's attorney's affirmation attesting to statements made by a Lyvonne Jones, Resurgent Capital Services, L.P. as to the "truth and veracity of the

allegations set forth in the Complaint". [Exhibit 21, PDF pps. 45-46]

**Operative Barbara Anita Baliguat Documents-**

510. On January 10, 2006, Barbara Anita Baliguat ("Baliguat") and John Ferndnez Baliguat, signed a mortgage note payable to Countrywide Home Loans, Inc. in the amount of $423,500 accruing interest annually at the rate of 1.25%, with special terms as a "Maximum Limit" note, whereby principal could never exceed 115% of the original principal balance. ("Baliguat Note") [Exhibit 21, PDF pps. 12-17]

511. Class Plaintiffs aver that the Baliguat Note is a classical example of a Countrywide predatory lending note commonly used at that time and representing a violation of the Fair Housing Act within the four corners of the Note, for Baliguat who is in a protected class. [Exhibit 21, PDF pps. 12-17]

512. The Baliguat Note for $423,500 entered at 1.25% interest on January 10, 2006 was to automatically convert to an adjustable rate Note on March 1, 2007, with an interest cap set at 9.950%, and a maximum one month increase of 7.5% in any given one month period. [Exhibit 21, PDF p. 12]

513. The way that the Baliguat Note was structured, Baliguat's principal and interest payment more than tripled in less than 18 months, none of which is readily apparent from looking at the Note.

514. The Baliguat Note stated that Principal could never exceed 115% of the original Principal balance, or never exceed $487,025, or that would create a default. The original monthly payment for Baliguat's 40 year loan was set at only $1,121.62 per month. [Exhibit 21, PDF p. 12]

515. The Baliguat Note is known as a reverse amortization Note, being that a default is created by failing to pay monthly payments when due, or upon exceeding 115% of the Principal balance, which are both built into the loan.

516. Class Plaintiffs allege that the Baliguat Note *ab initio* represented a planned foreclosure by Countywide from the day it was written and that Defendant BANA had an obligation, pursuant to the Fair Housing Act, to modify Baliguat's loan, so as not to make it a predatory loan in violation of the Fair Housing Act.

---

517.  The Baliguat Note was subsequently endorsed as follows:

"PAY TO THE ORDER OF:

_____
WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY:   Initials Written_____
        David A. Spector
        Managing Director" [Exhibit 21, PDF p. 15]

518. The David A. Spector Countrywide endorsements are false, fraudulent

or forged, as entered by BANA employees, agents or third party contractors, after CHL #1's business operations ceased on and after July 1, 2008.

519. The endorsements were stamped by unnamed individuals pretending to be David A. Spector after CHL #1 ceases business operations and after David A. Spector ceased employment by Countrywide on or about August, 2006.

520. The blank and undated endorsement is akin to a backdated document filed as official record, and are false and fraudulent for that additional reason.

521. The Baliguat Note does not allege any identifiable MERS involvement and MERS is not in the business of Note holding or ownership.

522. On January 10, 2006, Baliguat signed a first Mortgage, as Borrower ("Baliguat Mortgage"), where the named Lender was Countrywide Home Loans, Inc. and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS"). [Exhibit 21, PDF pps. 19-40]

523. The Baliguat Mortgage contains the following MERS and Lender provisions, excerpted in pertinent part:

"(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns. *MERS is the mortgagee under this Security Instrument.* MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is COUNTRYWIDE HOME LOANS, INC." *Id.* [Italics

added][Exhibit 21, PDF p. 20]

524. The Baliguat Mortgage was recorded on January 19, 2006 in the Office of Assistant Registrar of the Land Court of the State of Hawaii ("Land Court"), Land Court Doc. No.: 3380400, also noted on the Transfer Certificate of Title No. 561,816. [Exhibit 21, PDF p. 19]

525. On June 1, 2012, a MERS Baliguat Assignment, *as requested by Bank of America,* was recorded in the Land Court as Doc. No.: T-8187212, stating:

> " For Value Received, the undersigned holder of a Mortgage (herein "Assignor") .. *does hereby grant, sell, assign, transfer and convey* unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWMBS, INC., CHL MORTGAGE PASS-THROUGH TRUST 2006-OA5, MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2006-OA5 whose address is.. *all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described* and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage..
>
> Date of Mortgage: 1/10/2006 Original Loan Amount: $423,500.00
> Certificate of Title Number: 561,816
> Recorded in Honolulu/Torrens, HI on: 1/19/2006, book N/A, page N/A and instrument number 3380400.." [Italics added][Exhibit 21, PDF pps. 42-43][Exhibit 22]

526. The June 1, 2012 Baliguat MERS Assignment purports to convey ownership of both the Baliguat Mortgage and Mortgage Note to Bank of New York Mellon, as Trustee, however, MERS never owned or possessed the Baliguat

mortgage note to begin with.[Exhibit 22]

527. The June 1, 2012 Baliguat MERS Assignment is a nullity, *in toto*, as a false or fraudulent conveyance document filed in the public record.[Exhibit 22]

528. The June 1, 2012 Baliguat MERS Assignment did not, and does not, convey note holder status to BONYM, a standing requirement and prerequisite for BONYM to file the complaint.

529. Copies of the Baliguat Mortgage, Mortgage Note, and Assignment were electronically filed (as attachments) in the First Circuit Court of Hawaii in Case No.:1CC131003138   by Bank of New York Mellon, as Trustee, appended to Plaintiff's Complaint filed on November 29, 2013.

530. Appended to the Baliguat Complaint was an "HRS § 667-0 and P Affirmation" filed by BONYM's attorney that contains a hearsay third party "truth and veracity" statement from the then current loan servicer, as excerpted in pertinent part:

> "2. On November 15, 2013, I  received a written communication from *Lyvonne Jones, Foreclosure Specialist for Resurgent Capital Services, LP., the servicing agent* for plaintiff in the above-captioned mortgage foreclosure action, which informed me that *she personally reviewed the Plaintiffs documents and business records for factual accuracy and that she confirmed the truth and veracity of the allegations set forth in the Complaint for Mortgage Foreclosure filed with the Court as well as the accuracy of the notarizations contained in the documents filed therewith.*

**165**

3. Based upon the written communication from the person identified in Paragraph 2, as well as upon my own inspection and other reasonable inquire under the circumstances, I affirm that, to the best of my knowledge, information and believe, the Summons, Complaint and other papers filed or submitted to the Court in this matter contain no false statements of fact or law and that the Plaintiff has legal standing to bring this foreclosure action..." *Id.*

531. The Baliguat foreclosure case is still pending at this time, and no motion for summary judgment has been filed yet by BONYM, as Trustee.

532. Here, BONYM's attorney filed a sworn Affirmation based on an unsworn written communication allegedly received from Lyvonne Jones, Foreclosure Specialist for Resurgent Capital Services, LP ("Jones"), *confirming the truth and veracity of the allegations set forth in the complaint*, as a procedural prerequisite for standing to file the Baliguat Complaint.

533. As such, Jones confirmed the veracity of this Baliguat allegation in ¶7:

"On 5/10/2012, the aforementioned Note and Mortgage were assigned to Plaintiff, .. by virtue of Assignment of Mortgage ("Assignment") filed in the Land Court on 6/1/2012.."

534. That Baliguat complaint allegation ¶7, as well as the Jones truth and veracity confirmation, and BONYM's attorney's sworn Affirmation are false and fraudulent, because MERS does not own, hold, or assign mortgage notes, a fact that is well known by BANA and BONYM.  [Exhibit 22]

**Real and Imminent Harm Feared Going Forward In Baliguat Foreclosure Case-**

**166**

535. CHL Mortgage Pass Through Trust 2006-OA5, Mortgage Pass Through Certificates, Series 2006-OA5, that included the Baliguat mortgage, was part of a $500 million dollar settlement agreement reached with BANA in the case styled: Maine Retirement System, Plaintiff, v. Countrywide Financial Corporation [BANA], Countrywide Home Loans, Inc., et al; Case No.: 2:10-cv-00302-MRP-MAN, as filed in the Central District of California, relative to Countrywide mortgage loan origination deficiencies.

536. At some point BONYM will be required to file prior loan servicer declarations attesting to the reliability, credibility and trustworthiness of prior servicer records, upon which, current loan servicers will present a predicate for the business records exception to the hearsay rule and/or the incorporated records doctrine.

537. Those evidentiary rules do not adequately encompass systemic fraud as garbage in, when someone is willing to lie to the court under oath, as Class Plaintiffs allege in the Complaint *sub judice.*

538. Any current loan servicer for BONYM, as Trustee for CHL 2006-AO5 has knowledge that both Countrywide, from 2006-July 1, 2008, and BANA-BAC, from July 1, 2008 to on or about 2012, were prior loan servicers, and will omit material facts regarding the credibility trustworthiness of business records and

instruments originating from Countrywide and serviced by BANA-BAC, and CHL #2.

539. Even if current loan servicer representatives lack actual knowledge, Defendants don't, and as such, those Affidavits cannot be lawfully filed anyway without constituting a lack of candor, and fraud on the trial court and upon homeowners.

540. Any current loan servicer for BONYM will omit material facts that BANA fka Countrywide was engaged in wide scale mortgage origination frauds, including master loan servicer improprieties alleged from 2004-2013, for which BANA paid billions of dollars, based on alleged false, fraudulent and forged business records and certifications maintained in the normal course of its unlawful business activities.

541. Any current loan servicer for BONYM will omit a material fact that business records maintained in the ordinary course of continuing unlawful business practices are inherently incredible, unreliable, and untrustworthy, *per se.*

542. Any current loan servicer for BONYM will omit a material fact that if it did not incorporate prior servicer records for Countrywide originated loans that it would have no business servicing Countrywide mortgages whatsoever.

543. Any current loan servicer for BONYM will omit a material fact that

Countrywide's records completely failed industry underwriting standards, and that underlying mortgage file records were neither prepared or maintained in legitimate day to day business operations of BANA fka Countrywide.

544. Any current loan servicer for BONYM will omit facts from loan servicer declaration(s) that are material and relevant to the Baliguat trial court's determination of whether Baliguat's mortgage files, mortgage assignment, note and endorsements, and other business documents, are reliable, credible, and trustworthy for entry into evidence in the Baliguat foreclosure case.

## THE SUSAN DESHAW CASE

545. On September 27, 2016, Bank of New York Mellon, as Trustee filed a complaint for foreclosure in the First Circuit Court for the State of Hawaii in the case styled: The Bank of New York Mellon Fka The Bank of New York, as Trustee (CWALT 2006-32CB) v. Susan Deshaw, et al, Case No.: 1CC161001821. [Exhibit 23]

**Operative Susan DeShaw Documents-**

546. On July 27, 2006 Susan Kay Broer DeShaw signed a mortgage note payable to First Magnus Financial Corporation, an Arizona corporation in the amount of $418,400 accruing interest annually at the rate of 6.75%. ("DeShaw Note")[Exhibit 23, PDF pps. 17-20]

**169**

547. The DeShaw Note, or on an allonge thereto, was  subsequently endorsed by Theresa Johnson, Closing Manager, First Magnus Financial Corporation "Without Recourse, Pay To The Order Of Countrywide Bank, N.A." and contains an original signature. [Exhibit 23, PDF p. 20]

548. The DeShaw Note, was subsequently endorsed as follows, all contained in one signature stamp placement beneath Susan DeShaw's signature on page 3 of 3 of the DeShaw Note:

"Pay to the order of:                     Pay to the order of:

Countrywide Home Loans, Inc.             _____
Without Recourse                          Without Recourse
Countrywide Bank, N.A.                     Countrywide Home Loans, Inc.

By:   *Laurie Meder*                       By:   *Michelle Sjolander*
      Laurie Meder, SVP                          Michelle Sjolander, SVP"

[Exhibit 23, PDF p. 19]

549. The DeShaw Countrywide endorsements are false, fraudulent or forged, as entered by BANA employees, agents or third party contractors, after CHL #1's business operations ceased on and after July 1, 2008.

550. The endorsements were stamped by unnamed individuals pretending to be Laurie Meder and Michelle Sjolander, after CHL#1 ceased business operations and after Meder and Sjolander ceased employment by Countrywide.

551. The blank and undated endorsements are akin to backdated documents

filed as official records, and are false and fraudulent for that additional reason.

552. The DeShaw Note does not allege any identifiable MERS involvement and MERS is not in the business of Note holding or ownership.

553. On July 27, 2006 Susan Kay Broer DeShaw signed a first Mortgage, as Borrower ("DeShaw Mortgage"), where the named Lender was First Magnus Financial Corporation ("First Magnus") and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS"). [Exhibit 23, PDF pps. 22-41]

554. The DeShaw Mortgage contains the following MERS and Lender provisions, excerpted in pertinent part:

> "(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. *MERS is the mortgagee under this Security Instrument.* MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, F1lnt, MI 48S01 -2026, tel. (888) 679-MERS.
>
> (D) "Lender" is FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION" *Id.* [Italics added][Exhibit 23, PDF p. 23]

555. The DeShaw Mortgage was recorded on August 1, 2006 in the State of Hawaii Bureau of Conveyances ("Bureau") Recorded as Doc. No.: 2006-140228. [Exhibit 23, PDF p. 22]

556. On September 2, 2011, a MERS DeShaw Assignment, *as requested by Bank of America*, was recorded in the Bureau as Doc. No.: 2011-141243, stating:

" For Value Received, the undersigned holder of a Mortgage (herein " Assignor") .. *does hereby grant, sell, assign, transfer and convey* unto THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-32CB, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-32CB whose address is.. *all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described* and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage..

Date of Mortgage: 7/27/2006 Original Loan Amount: $418,400.00 Recorded in Honolulu County, HI on: 8/1/2006, book N/A, page N/A and instrument number 2006-140228.." *Id.*  [Italics added][Exhibit 23, PDF pps. 42-43][Exhibit 26]

557. The September 2, 2011 DeShaw MERS Assignment purports to convey ownership of both the DeShaw Mortgage and Mortgage Note to Bank of New York Mellon, as Trustee, however, MERS never owned or possessed the DeShaw mortgage note to begin with. [Exhibit 26]

558. The September 2, 2011 DeShaw MERS Assignment is a nullity, *in toto*, as a false or fraudulent conveyance document filed in the public record. [Exhibit 26]

559. On November 24, 2015, a second DeShaw Assignment was recorded in the Bureau as Doc. A-58060922 by The Bank of New York Mellon, as Trustee, as Assignor and Assignee, stating:

"Know all men by these presents, that The Bank of New York Mellon FKA the Bank of New York , As Trustee for the Certificate Holders

**172**

CWALT, Inc., Alternative Loan Trust 2006-32CB, Mortgage Pass-Through Certificates, series 2006-32CB.. does hereby grant, bargain, sell, assign, "transfer;"and set over to THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK; AS TRUSTEE (CWALT 2006-32CB) (ASSIGNEE).. all interest under that certain mortgage executed by DENNIS DUANE DESHAW AND SUSAN KAY BROER-DESHAW HUSBAND AND WIFE to Mortgage Electronic Registration Systems, Inc.; as nominee for First Magnus Financial Corporation, its successors and assigns dated July 27, 2006, in the amount of $418.400.00 and recorded August 1, 2006 Document No.2006-140228 in State of Hawaii Honolulu/Bureau of Conveyances ,· PARCEL# 9-4-134-230" [Exhibit 27]

560. The November 25, 2015 DeShaw Assignment is ineffective to cleanse, or fix, the September 2, 2011 false or fraudulent MERS Assignment to Bank of New York Mellon, purporting to Assign the DeShaw Note together with the DeShaw Mortgage to Bank of New York Mellon. [Exhibit 27]

561. Copies of the DeShaw Mortgage, Mortgage Note, and Assignments dated September 2, 2011 and November 25, 2015 were electronically filed (as attachments) in the First Circuit Court of Hawaii in Case No.: 1CC161001821 by Bank of New York Mellon, as Trustee, as follows: 1.) Complaint filed 9/27/2016 [Exhibit 23]; 2.) Plaintiff's Motion for Summary Judgment filed 12/29/2017 [Exhibit 24]; and 3.) Plaintiff's Renewed Motion for Summary Judgment filed 11/14/2018.[Exhibit 25]

**Motion For Summary Judgment Filed in DeShaw Case No.: 1CC161001821-**

562. BONYM, as Trustee, electronically filed Plaintiff's Motion For Summary Judgement in the DeShaw case on December 29, 2017, containing a Declaration from Brian Nwabara ("Nwabara"), dated November 8, 2017 ("first Nwabara declaration"), from Bayview Loan Servicing, LLC ("Bayview"), as successor servicing agent for DeShaw's mortgage. [Exhibit 24, PDF pps. 10-18]

563. Nwabara's first Declaration contains the following excerpts related to prior loan servicers for the DeShaw loan:

"3. (INCLUDE IF THE RECORDS INCLUDE INFORMATION OBTAINED FROM A PRIOR SERVICER OR LENDER). *Bayview's records include and incorporate records for the Loan obtained from [insert name of all known prior servicers] (Prior Servicer")*, which are prior loan servicer(s) for the Loan. The records obtained by Bayview from the Prior Servicer are kept and maintained by Bayview in the ordinary course of its business for the purpose of maintaining an accounting of payments received, expenses incurred, and amounts advanced with regard to the Loan, and such records are relied upon by Bayview in the regular course of its business. The information regarding the Loan transferred to Bayview from the Prior Servicer has been validated in many ways, including, but not limited to, going through a due diligence phase, review of hard copy documents, and review of the payment history and accounting of other fees, costs. and expenses charged to the Loan by Prior Servicer. *It is Bayview's regular practice, after these phases are complete, to receive records from prior servicers and integrate these records into Bayview's business records at the time of acquisition. Once integrated, Bayview maintains and relies on these business records in the ordinary course of its mortgage loan servicing business.*

4. Based upon my occupational experience in the loan servicing industry, I know that loan servicers follow an industry wide standard on how to keep and maintain business records for the mortgage loans

**174**

they are servicing industry, which record keeping is part of the regularly conducted activity of loan servicers. *Upon information and belief, Prior Servicer followed the industry wide standard of making records for the Loan at or near the time of the occurrence of the maters set forth in such records, by an employee or representative with knowledge of the acts or events recorded, and such records were obtained, kept and maintained  by Prior Servicer in the regular course of Prior  Servicer's business.*  It is an industry wide standard for the type of loan information and regular maintenance of loan information including, but not limited to the accounting under generally accepted principles for each mortgage loan, to be standard and computerized. Upon further information and belief, such standard processes were used by Prior Servicer to keep an accounting for the Loan. *Bayview relies on such records in the ordinary course of its business. Based on the standard processes described above and on my own independent review of the Loan Documents. the prior records for the loan received from the Prior Servicer and incorporated into Bayview's records are accurate to the best of my knowledge.*"  *Id.* [Italics added][Exhibit 24, PDF pps. 11-12]

564. In support of Nwabara's Declaration, Nwabana presented as true, a copy of the DeShaw Note, and note endorsements (Ex. B), and the Deshaw Mortgage and two Assignments (Ex. C-E). [Exhibit 24]

**Renewed Motion For Summary Judgment Filed in DeShaw Case 1CC161001821-**

565. BONYM, as Trustee, electronically filed Plaintiff's Renewed Motion For Summary Judgement in DeShaw case on November 14, 2018, containing a different Declaration  from  Brian Nwabara, dated June 14, 2018. ("second Nwabara declaration") [Exhibit 25, PDF pps. 15-23]

566. Nwabara's second Declaration stated the following regarding prior

servicing agents:

"3. *Bayview's records include and incorporate records for the Loan obtained from First Magnus Financial Corporation and Countrywide Home Loans, Inc. ("Prior Servicers")*, which are prior loan servicer(s) for the Loan. The records obtained by Bayview from the Prior Servicers are kept and maintained by Bayview in the ordinary course of its business for the purpose of maintaining an accounting of payments received, expenses incurred, and amounts advanced with regard to the Loan, and such records are relied upon by Bayview in the regular course of its business. The information regarding the Loan transferred to Bayview from the Prior Servicers has been validated in many ways, including, but not limited to, going through a due diligence phase, review of hard copy documents, and review of the payment history and accounting of other fees. costs, and expenses charged to the Loan by Prior Servicer. *All documents have been reviewed. specifically the Note hereinafter described, Mortgage hereinafter described, First AOM hereinafter described, Second AOM hereinafter described, and Notice of Acceleration. It is Bayview's regular practice, after these phases are complete, to receive records from prior servicers and integrate these records into Bayview's business records at the time of acquisition. Once integrated, Bayview maintains and relies on these business records in the ordinary course of its mortgage loan servicing business.*

4. Based upon my prior occupational experience in the loan servicing industry, I know that loan servicers follow an industry wide standard on how to keep and maintain business records for the mortgage loans they are servicing, which record keeping is part of the regularly conducted activity of loan servicers. *Upon information and  belief, Prior Servicer followed the industry wide standard of making records for the Loan at or near the time of the occurrence of the matters set forth in such records, by an employee or representative with knowledge of the acts or events recorded, and such records were obtained, kept and maintained by Prior Servicer in the regular course of Prior Servicer's business.* It is an industry wide standard for the type of loan information and regular maintenance of loan information, including but not limited to the accounting under generally accepted

principles for each mortgage loan, to be standard and computerized. Upon further information and belief, such standard processes were used by Prior Servicer to keep an accounting for the Loan. Bayview relies on such records in the ordinary course of its business. Based on the standard processes described above and on my own independent review of the Loan Documents, the prior records for the Loan received from the Prior Servicer and incorporated into Bayview's records are accurate to the best of my knowledge. " [Exhibit 25, PDF pps. 16-17]

567. In support of Nwabara's second Declaration, Nwabara presented as true, a copy of the DeShaw Note, and note endorsements (Ex. B), but not the mortgage, or two mortgage assignments. *Id.*

568. Plaintiff's Renewed Motion For Summary Judgement in the DeShaw case filed on  November 14, 2018, contained a separately attached Request For Judicial Notice, dated November 13, 2018, requesting that the trial court take Judicial Notice of DeShaw mortgage documents filed in the Bureau of Conveyances for the State of Hawaii, including: the mortgage to First Magnus recorded August 1, 2006, Document No. 2006-140228;  the first MERS mortgage (and note) assignment to BONYM  recorded on September 2, 2011, Document No.: 2011-141243;  and  the second  BONYM  mortgage assignment to itself recorded on November 24, 2015, Document No. A-58060922. [Exhibit 25, PDF pps. 26-28]

569. On July 25, 2019, the trial court entered an Order Granting Plaintiff's

Renewed Motion For Summary Judgment (as a docket entry) in the DeShaw

foreclosure case, finding, *inter alia*:

> "*The Court Finds and Concludes Plaintiff Established Through Admissible Evidence* That There Is No Genuine Issue of Material Fact for Trial as to Plaintiff's Foreclosure Claim and Plaintiff Is Entitled to Judgment as a Matter of Law..
>
> Accordingly, Plaintiff's Motion for Summary Judgment and for Interlocutory Decree of Foreclosure Is Granted. The Court Notes That Evidence Offered by Plaintiff the Court Determines to Be Inadmissible Is Contained in Paragraph 4 of Brian Nwabara's Declaration in Which He Attests Based on "Information and Belief" That Prior Servicers Followed Industry Wide Standards. Statements Based on "Information and Belief" Are Not Sufficient under Rule 56. Therefore, the Court Did Not Consider Two Statements Contained in Paragraph 4 That Begin with "Upon Information and Belief." Notwithstanding the Inadmissibility of Two Sentences in Paragraph 4, *Considering Other Statements Contained in Nwabara's Declaration Concerning Bayview's Review, Integration, and Reliance upon the Prior Servicers Records, the Court Concludes the Two Inadmissible Sentences Are Not Material for Purposes of Granting Plaintiff's Motion..*" [*Id.* At DE 121][Italics added][ALL CAPS MODIFIED to first letter Cap]

570. The DeShaw trial court granted summary judgment for BONYM based

upon the incorporated records doctrine, e.g. "..review, integration and reliance.."

by Bayview, as derived from Nwabara's declarations, notwithstanding Nwabara's

<u>failed attempt</u> to get core prior loan servicer records into evidence using the

business records exception to the hearsay rule.

571. Bayview and Nwabara, by and through BONYM and as caused by

**178**

BANA, used false and fraudulent manipulation of these two rules of evidence to trick or deceive the trial court into believing that core DeShaw loan records and instruments were credible, trustworthy, and reliable for entry of judgment against DeShaw.

572. In the DeShaw case, Nwabara used false and fraudulent material statement of fact, and material omissions of fact, to manipulate the business records exception to the hearsay rule and the incorporated records doctrine, as a scheme or artifice to defraud, caused by BANA, and embraced by the Countrywide Cleanup Enterprise for financial gain.

### Cunning or Clever Devices Used as a Trick to Deceive the Trial Court-

573. Both Nwabana Declarations were made for the purpose of setting forth a factual predicate for the *business records exception to the hearsay rule*, and for the *incorporated records doctrine* exception to the hearsay rule, so that BONYM could enter copies of false, fraudulent and forged, business records, mortgage assignments, a copy of the mortgage note and endorsements, into evidence, to deceive the DeShaw trial court judge, by means of false or fraudulent pretenses, caused by BANA.

### Nwabana's Declarations Were Both False and Fraudulent-

574. The first Nwabara declaration is false and fraudulent, through knowing

material omissions, used as a cunning or clever device to trick or deceive the trial court, by omitting material declarations about prior loan servicing by Countrywide and BANA-BAC, during which time, many of the material acts complained of in the instant complaint occurred.

575. Both Nwabana Declarations were false and fraudulent from use of the phrase "on information and belief", especially relating to the business records exception for prior loan servicers, because both Nwabana and BONYM knew that the underlying statements connected to those introductory disclaimers were false.

576. Both Nwabana's Declarations represent a scheme or artifice to defraud, as a cunning or clever device to trick or deceive the trial court, through the electronic filing of false or fraudulent declarations with the trial court, caused by BANA.

577. Both Nwabana's false declarations were made for the purpose of stating, or attempting to state, factual predicates for the business records exception to the hearsay rule, and for the incorporated records doctrine exception to the hearsay rule, knowing that the copies of the business records and negotiable instruments *incorporated* from prior loan servicers sought to be admitted into evidence were incredible, unreliable and untrustworthy.

578. The second Nwabara declaration is also false and fraudulent, through

**180**

knowing material omission, remaining silent regarding more than 4 years of prior loan servicing by BANA-BAC, not Countrywide, during which time,  many of the material acts complained of in the instant complaint occurred.

579. Both Nwabana's Declarations are false and fraudulent through material omissions and false pretenses related to the credibility, veracity, trustworthiness and accuracy, of business records transferred to Bayview at some point after they were falsified, forged, or otherwise altered by Bayview's predecessor loan servicers.

**Nwabana's Declarations Were Replete with Omissions of Material Facts-**

580. Bayview as servicing agent for CWALT 2006-32CB had knowledge that both Countrywide and BANA-BAC were prior servicers, yet omitted those facts from the first Nwabana declaration, and omitted BANA-BAC from the second Nwabana declaration.

581. Bayview omitted a material fact that BANA f/k/a Countrywide was engaged in wide scale mortgage origination improprieties or frauds from 2004-2008, for which BANA paid billions of dollars, based on alleged false, fraudulent and forged business records and certifications maintained in the normal course of its unlawful business activities.

582. Bayview omitted a material fact that business records maintained in the

ordinary course of continuing unlawful business practices are inherently incredible, unreliable, and untrustworthy, *per se.*

583. Bayview omitted a material fact that if it did not incorporate prior servicer records that it would have no business servicing Countrywide originated mortgages whatsoever.

584. Bayview omitted a material fact that Bayview has never rejected a single Countywide originated mortgage file for servicing as unreliable.

585. Bayview omitted a material fact that BONYM entered into an $8.5 billion dollar fraud settlement with its prior servicer BANA fka Countrywide, based upon allegations made by BONYM that the CWALT 2006-32CB Trust, together with 529 other like trusts, contained untrustworthy mortgage origination files, and mortgage file deficiencies, including, initial trust securitization failures that were not fixed by the seller of those loans, e.g. Countrywide.

586. Bayview omitted a material fact that one of the reasons for the 2011 New York Settlement was that toxic mortgage loan files were neither credible or reliable.

587. Bayview omitted a material fact that Countrywide's records completely failed industry underwriting standards, and that underlying mortgage file records were neither prepared or maintained in legitimate day to day business operations of

BANA fka Countrywide.

588. Bayview omitted the material fact that BANA-BAC, as subsequent prior loan servicer, concealed mortgage file discrepancies from Certificateholders of 530 trusts, including, CWALT Trust 2006-32CB, at the same time that BANA could have been sued to repurchase those same deficient and toxic loan pools, into the trillions of dollars.

589. Bayview's material omissions of fact, were both material and relevant to the DeShaw trial court's determination that DeShaw's mortgage files, mortgage assignments, note and endorsements, and other business documents, were reliable and trustworthy, and were sufficient evidence to enter summary judgment against DeShaw.

590. Class Plaintiffs allege that Defendants' conduct evidenced lack of candor to the trial court judge, and a scheme or artifice to defraud Countrywide mortgagors in order to illegally divest those homeowners of their property interests, using trial court judges as unwitting accomplices.

## THE THOMAS JOHNSON CASE

591. On December 6, 2019, U.S. Bank Trust National Association ("USBTNA"), as Trustee, filed a complaint for foreclosure in the First Circuit Court for the State of Hawaii in the case styled: US Bank Trust National

Association, As Trustee of the Igloo Series III Trust, Plaintiff, v. Thomas Moses Johnson, III. ("Johnson"), Defendant; Case No.: 1CCV190002277. ("Johnson Complaint")[Exhibit 28]

592. Igloo Series III Trust is a Delaware Trust established on April 27, 2017, Document No.: 6393447, with USBTNA as its Registered Agent.

593. The Igloo Series III Trust was established for the purpose of purchasing *certain non performing Countrywide loans*[12] originally purchased by Fannie Mae and still owned by Fannie Mae in 2017. [Exhibit 32]

594. On or about June 9, 2017 Fannie Mae announced, via a Press Release published on its Website[13] titled: "Fannie Mae Announces Winners of its Latest Non-Performing Loan Sale", that included a public sale notice regarding Igloo Series III Trust (Balbec Capital LP) winning bid and purchase of 681 Fannie Mae mortgage loans, comprising the Igloo Series III Trust.  That Fannie Mae purchase by Igloo Series III Trust in 2017 includes Johnson's Countrywide originated mortgage loan. [Exhibit 32]

---

[12] This loan pool, that included the Johnson mortgage, was called 'non performing' by HUD, without regard to the fact that Class Plaintiffs allege that the Johnson mortgage was both a predatory mortgage loan, as well as a discriminatory mortgage loan, originated in violation of the Fair Housing Act.
[13] Found at this link from the Fannie Mae Website, as of March 13, 2022: https://www.fanniemae.com/newsroom/fannie-mae-news/fannie-mae-announces-winners-its-latest-non-performing-loan-sale-0

595. Johnson's mortgage loan was sold to Igloo Series III Trust in June, 2017 by Fannie Mae. [Exhibit 32]

596. Johnson's Countrywide originated mortgage loan was also included within BANA's $16.65 fraud settlement with the United States, as announced on August 21, 2014, that included these BANA fraud admissions:

> " ..In addition, Countrywide and Bank of America made admissions concerning their conduct, including that they were aware that many of the residential mortgage loans they had made to borrowers were defective, that many of the representations and warranties they made to the GSEs about the quality of the loans were inaccurate, and that they did not self-report to the GSEs mortgage loans they had internally identified as defective..
> ..
> ..Requiring an admission of wrongdoing as part of Bank of America's agreement to resolve the SEC charges filed today provides an additional level of accountability for its violation of the federal securities laws...
> ...
> The bank has also conceded that it originated risky mortgage loans and made misrepresentations about the quality of those loans to Fannie Mae, Freddie Mac, and the Federal Housing Administration ("FHA")."
>
> https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department-settlement-financial-fraud-leading

597. The Johnson Complaint attached copies of, *inter alia,* Johnson's mortgage note, mortgage, MERS Assignment to Countrywide, and Countrywide Assignment to USBTNA in 2019. [Exhibit 28, PDF pps. 15-91]

598. None of those aforementioned documents mentioned Fannie Mae as

prior owner, owner, or real party in interest, or Countrywide acting as an Attorney In Fact for Fannie Mae or HUD.

**Operative Thomas Johnson Documents-**

599. On April 18, 2006, Johnson signed an "Interest Only- Adjustable Rate Note" payable to Countrywide Home Loans, Inc. in the amount of $592,500 accruing interest annually at the rate of 7.875%, initially, for the first 120 months. ("Johnson Note")[Exhibit 28, PDF pps. 15-18]

600. The Johnson Note 7.875% mortgage note, delineating monthly payments of $3,888.28 per month, automatically converted to an adjustable rate note, with a cap of 12.875% per annum, plus an added principal payment, for all time periods on and after June 1, 2011, for the remaining 240 months of the Note. [Exhibit 28, PDF p. 15]

601. Class Plaintiffs aver that the Johnson Note is another classical example of a Countrywide predatory lending note commonly used at that time, within the four corners of the Note.

602. The way that the Johnson Note was structured, Johnson's principal and interest payments almost doubled in June, 2011, none of which is readily apparent from looking at the Note.

603. Class Plaintiffs allege that the Johnson Note *ab initio* represented a

planned foreclosure by Countywide from the day it was written.

---

604. The Johnson Note was subsequently endorsed, on page 4 of 4 pages:

"PAY TO THE ORDER OF:

_____

WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY:   Initials Written_____
       David A. Spector
       Managing Director"

[Exhibit 28, PDF p. 18]

605. The David A. Spector CHL #1 endorsements are false, fraudulent or forged, as entered by BANA employees, agents or third party contractors, after CHL #1's business operations ceased on or about July 1, 2008.

606. The endorsements were stamped by unnamed individuals pretending to be David A. Spector after CHL #1 ceased business operations and after David A. Spector left CHL #1's employ, on or about August, 2006.

607. The blank and undated endorsement is akin to a backdated document filed as official record, and are false and fraudulent for that additional reason.

608. On April 18, 2006, Johnson signed a Mortgage, as Borrower ("Johnson Mortgage"), where the named Lender was Countrywide Home Loans, Inc.  and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS").

**187**

[Exhibit 28, PDF pps. 20-58]

609. The Johnson Mortgage contains the following MERS and Lender provisions, excerpted in pertinent part:

"(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as J nominee for Lender and Lender's successors and assigns. *MERS is the mortgagee under this Security Instrument*. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is COUNTRYWIDE HOME LOANS, INC." *Id.* [Italics added][Exhibit 28, PDF p. 21]

610. The Johnson Mortgage was recorded on May 15, 2006 in the Office of Assistant Registrar of the Land Court of the State of Hawaii ("Land Court"),  Land Court  Doc. No.: 3428374, also noted on the Transfer Certificate of Title No. 805,065.[Exhibit 28, PDF p. 20]

611. On July 27, 2007, a MERS Johnson Assignment was recorded in the Land Court as Doc. No.: 3634250, stating:

"ASSIGNMENT OF MORTGAGE FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for Countrywide Home Loans, Inc., its successors and assigns does hereby assign and transfer without recourse to COUNTRYWIDE HOME LOANS, INC., a New York Corporation, its successors and assigns, whose address is 400 Countrywide Way, SV-35, Simi Valley, CA 93065 *all of its right, title and interest in and to that certain mortgage recorded* on May 15, 2006 in Office of the Assistant Registrar, Land Court, State of Hawaii, as Document No. 3428374 and noted on Transfer Certificate of Title No. 805,065." *Id.*

188

[Italics added][Exhibit 28, PDF pps. 86-87]

612.   Immediately thereafter in 2006, Johnson's mortgage was sold to Fannie Mae, and remained in Fannie Mae's mortgage loan portfolio through June, 2017.

613. On February 13, 2019, a Countrywide Home Loans, Inc. Johnson Assignment, as requested by Meridian Asset Services, LLC, was recorded in the Land Court as Doc. No.: T-10635257, stating in pertinent part:

> "FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, COUNTRYWIDE HOME LOANS, INC., whose address is 1800 TAPO CANYON RD., SIMI VALLEY, CA 93063, (ASSIGNOR), does hereby grant, assign and transfer to U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE IGLOO SERIES Ill TRUST, whose address is 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251, (ASSIGNEE), its successors, transferees and assigns forever, *all beneficial interest under that certain mortgage, together with the certain note(s) described therein* with all interest, all liens, and any rights due or to become due thereon.
>
> Date of Mortgage: 4/18/2006
> Original Loan Amount; $592,500.00..
> ..
>
> Filed of Record: In Book/Liber/Volume N/A, Page N/A, Document/Instrument No: 3428374; CERT# 1086446 in the Recording District of HONOLULU COUNTY REGISTERED LAND COURT, BI Recorded on 5/15/2006.."
>
> Signed:   "Countrywide Home Loans, Inc. By Meridian Asset Services, LLC, Its Attorney-In-Fact", by Jessica B. Thornton, Vice President, Meridian Asset Services, LLC, as Attorney-In-Fact for

Countrywide Home Loans, Inc. *Id.* [Exhibit 28, PDF pps. 89-91][Exhibit 31][Exhibit 32][Exhibit 33]

614. On August 25, 2020 On February 13, 2019, a USBTNA Johnson Assignment, as drafted by Meridian Asset Services, LLC, was recorded in the Land Court as Doc. No.: T-11194535, stating in pertinent part:

> "FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES Ill TRUST, whose address is 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251, (ASSIGNOR), does hereby grant, assign and transfer to WILMINGTON SAVINGS FUND SOCIETY, FSB, AS OWNER TRUSTEE OF THE RESIDENTIAL CREDIT OPPORTUNITIES TRUST V-E, whose address is 3020 OLD RANCH PARKWAY SUITE 180, SEAL BEACH, CA 90740, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.
>
> Date of Mortgage: 411812006
> Original Loan Amount: $592,500.00..
> ...
> Filed of Record: In Book/Liber/Volume N/A, Page N/A
> Document/Instrument No: 3428374; CERT# 1086446 in the Recording District of Honolulu County Registered, Land Court, HI, Recorded on 5115/2006..
> ...
> Signed: US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES III TRUST, BY MERIDIAN ASSET SERVICES, LLC, ITS ATTORNEY-IN-FACT, by Murat Deniz, Vice President, Meridian Asset Services, LLC. *Id.* [Exhibit 30, PDF pps. 156-157]

**190**

615. On October 1, 2020, Wilmington Savings Fund Society, FSB, as Owner Trustee of the Residential Credit Opportunities Trust V-E ("Wilmington Trust") substituted into the Johnson foreclosure case as "the new real party in interest". [Exhibit 30]

616. On June 30, 2022, Wilmington Trust filed Plaintiff's Motion for Summary Judgment and for Interlocutory Decree of Foreclosure, etc.. in the Johnson case, that attached all assignments related to Johnson's property. [Exhibit 30, PDF pps. 147-157]

617. The June 30, 2022, Wilmington Trust MSJ also contains a special "Request for Judicial Notice" for, *inter alia,* all assignments filed in the Land Court related to Johnson's property [Exhibit 30, PDF pps. 27-28], following multiple legal arguments why "..documents that have been recorded in the Land Court or Bureau of Conveyances of the State of Hawaii, such as the Mortgage and Assignments of Mortgage, are admissible under the following Hawaii Rules of Evidence", as exceptions to the hearsay rule, including under HRS Chap. 626, HRE Rules 201 (providing for judicial notice of facts), HRE 803(b)(14) (providing for records of documents affecting an interest in property, if the record is a record of a public office), and HRE 902(4) (providing that extrinsic evidence of authenticity as a condition precedent is not required with respect to Certified copies

of public records). [Exhibit 30, PDF pps 14-15]

618.  Coming full circle, Wilmington Trust's arguments seem to be that Certified copies of Assignment(s) filed in public land conveyance records constitute evidence affecting property conveyance and that trial court's must manifest reliance upon them without delving into the veracity of those publicly filed documents any further.

619.  The Johnson mortgage was never recorded in any public land conveyance record, as being sold, conveyed or transferred by Countrywide to Fannie Mae, and now, Johnson's mortgage chain of title just *leap frogs over* Fannie Mae completely leaving a 13 year void in its wake. [Exhibit 32][Exhibit 33][Exhibit 30]

620.  Countrywide's February 13, 2019 assignment of Johnson's *mortgage and note* to Igloo Series III Trust stating that Countrywide "..does hereby grant, assign and transfer to U.S. BANK TRUST NATIONAL ASSOCIATION... *all beneficial interest under that certain mortgage, together with the certain note(s) described therein..."* , by Meridian Asset Services, LLC, as Attorney In Fact, is false or fraudulent, because Johnson's Countrywide mortgage note was previously sold by Countrywide to Fannie Mae immediately after origination in 2006, and also, because Meridian Asset Services, LLC, did not assign Johnson's mortgage

and note to Igloo Series III Trust as Power of Attorney for Fannie Mae. [Exhibit 30, PDF pps. 152-153]

621. Similarly, USBTNA's August 25, 2020 assignment of Johnson's *mortgage and note* to Wilmington Trust stating that USBTNA "..does hereby grant, assign and transfer to WILMINGTON SAVINGS FUND SOCIETY, FSB, AS OWNER TRUSTEE OF THE RESIDENTIAL CREDIT OPPORTUNITIES TRUST V-E ... *all beneficial interest under that certain mortgage, together with the certain note(s) described therein...*" , by Meridian Asset Services, LLC as Attorney In Fact for USBTNA, is false or fraudulent, because the underlying conveyance from Countrywide to USBTNA is false and fraudulent. [Exhibit 30, PDF pps. 156-157]

**Meridian Asset Trust, LLC Land Conveyance Repository Filings-**

622.  The 2019-2020 Johnson mortgage and mortgage note assignments, drafted and filed by Meridian Asset Service, LLC, as Attorney in Fact, are representative of a new wave of *secretive* chain of title fixing companies, *infra,* that are neither loan servicers, or prior loan servicers, that are employed as outside vendors to *fix* chain of title deficiencies, by any means necessary, in this District and nationally.

623. BANA, by and through CHL #2, continues to engage in mortgage chain

of title document fixes, as evidenced by the original 2019 Countrywide-Meridian Assignment filed in the Johnson case. [Exhibit 28, PDF pps. 89-91][Exhibit 31][Exhibit 30, PDF pps. 152-153]

624. BANA, by and through CHL #2 continues to steer foreclosure cases nationally relating to loans originated by CHL #1  prior to July 1, 2008, that CHL #2 neither owns or services at this time, and including CHL #1 loans originally sold to Fannie Mae, and then sold by Fannie Mae to third party purchasers- like Igloo Series III Trust, for which Wilmington Trust is now seeking to foreclose.

### Countrywide - Meridian Asset Services, LLC Power Of Attorney-

625. On February 13, 2019, a Countrywide Home Loans, Inc. Limited Power Of Attorney was recorded in the Land Court as Doc. No.: T-10635258 ("CPOA"), granting Meridian Asset Services, LLC ("Meridian"), authority to act as its Attorney-In-Fact stating that it: "..rela[t]es solely to the transfer of servicing of those certain mortgage loans (such loans, the "Loans") that CHL *formerly serviced* pursuant to the Fannie Mae Servicing Guide." [Emphasis added to the term "formerly serviced", as Countrywide has not serviced Fannie Mae's loans since on or before July 1, 2008.][Exhibit 31]

626. The Countrywide-Meridian Limited Power Of Attorney is a grant of authority to Meridian to document UCC mortgage and mortgage note transactions

that never occurred, without lawful authority, and that are a sham *in toto*.

627. The CPOA provided, as excerpted in pertinent part:

" Each of the Loans comprise a promissory note evidencing a right to payment and performance secured by a security interest or other lien on real property evidenced by one or more mortgages, deeds of trust, deeds to secure debt or other forms of security instruments (each, a "Mortgage"). The Parties agree that this Limited Power of Attorney is coupled with an interest.

As used above, the term "Actions" shall mean and be limited to the following acts in each case only with respect to the Loans and in accordance with state, federal and applicable law.

1. *Execute or file assignments of Mortgages,* or of any beneficial interest in a Mortgage;

2. Execute or file reconveyances, deeds of reconveyance or releases or satisfactions of mortgage or similar instruments releasing the lien of a Mortgage;

3. ***Correct or otherwise remedy any errors*** *or deficiencies contained in any transfer or reconveyance documents provided or prepared by CHL or a prior transferor,* ***including, but not limited to note indorsements****;*

4. Execute or file quitclaim deeds or..special warranty deeds..in respect of property acquired through a foreclosure or deed in lieu of foreclosure ("RFO Property");

5. Execute and deliver documentation with respect to the marketing and sale of RFO property.. and any other document necessary to effect the transfer of RFO Property;

6. Execute or file any documents necessary and appropriate to substitute the creditor or foreclosing party in a bankruptcy or foreclosure proceeding in respect of any of the Loans;

**195**

provided, *however, that  nothing herein shall permit Meridian to commence, continue, or otherwise prosecute or pursue any foreclosure proceeding in the name of CHL.  All indorsements executed pursuant to this Limited Power Of Attorney shall contain the words "without recourse," and unless the laws require otherwise [] after documents of transfer [sic] pursuant to this Limited Power Of Attorney shall contain the following sentence:  "This [insert document title] is made without recourse to or against [insert name of entity in whose Name the action is taken] or Countrywide Home Loans, Inc., and without representation or warranty, express or implied, by [insert name of entity in whose Name the action is taken] or Countrywide Home Loans, Inc."*

With respect to the Actions, CHL gives to said attorney-in-fact full power and authority to execute such instruments and to do and perform all and every act and thing requisite, necessary and proper to carry into effect the power or powers granted..
...

Nothing contained herein shall be construed to grant Meridian the power to (i) initiate or defend any suit, litigation, or proceeding in the name of CHL or be construed as a duty of CHL to initiate or defend any suit, litigation, or proceeding in the name of Meridian, (ii) incur or agree to any liability in the name of or on behalf of CHL, or (iii) execute any document or take any action on behalf of, or in the name, place or stead of, CHL except as provided herein. This Limited Power Of Attorney is entered into and shall be governed by the laws of the State of New York without regard to conflicts of laws principles of such state..
...

IN WITNESS WHEREOF Countrywide Home Loans, Inc. has executed this Limited Power of Attorney this 15th day of June, 2018.

COUNTRYWIDE HOME LOANS, INC.

By:   */s/ Joe Pagenelli*
Name:   Joe Pagenelli
Title:   Vice President"

**196**

[Italics added][Exhibit 31]

628. Class Plaintiffs allege that the 2019 Countywide-Meridian Power of Attorney, paragraph 3., *supra,* grants Meridian authority to do whatever it takes, including *leap-frogging- chain-of-title* in the public record, in order to fix deficient historical CHL transfers by any means necessary, without lawful authority, and in open defiance to the rule of law. [Exhibit 31]

629. The 2019-2020 Johnson Mortgage Assignments are an attempt by Meridian to hide Countrywide chain of title deficiencies going back to 2006, considering that Countrywide never recorded a mortgage and note assignment when Fannie Mae purchased the Johnson mortgage in 2006.

630. So Meridian's solution was to just jump over that deficient 13 year span like it never existed by recording a false and fraudulent mortgage assignments instead, while building upon a new falsely created chain of title for Johnson's property.

631. Because Fannie Mae sold the Johnson mortgage note to Igloo Series III Trust in 2017, Countrywide did not own the Johnson mortgage and note in 2019 to sell to USBTNA, and as such, the February 13, 2019 Meridian Johnson assignment is a sham.

632. Moreover, according to the February 13, 2019 Johnson assignment,

**197**

Countrywide only assigned "..all beneficial interest under that certain mortgage, together with the certain note(s) described therein" to Igloo Series III Trust instead of conveying mortgage and note ownership to the trust outright, as a bonafide purchaser for value.

633.  The February 13, 2019 Countrywide assignment to USBTNA is void, as false and fraudulent, and therefore, does not constitute lawful evidence of standing for USBTNA on behalf of Igloo Series III Trust to file a foreclosure action against Johnson in this District. The 2019 assignment specifically documents a chain of title sales transaction that never occurred in 2019 and is fiction.

634.  The 2019-2020 Johnson assignments are false and fraudulent documents filed in the Bureau of Land Conveyances for the State of Hawaii, and remain sitting there, so that an unwitting trial court judge can manifest reliance upon those public records for finding that plaintiff USBTNA and now Wilmington Trust has standing to sue, prosecute and foreclose upon Johnson, using sham public records, e.g. records documenting UCC transactions that never occurred, or did not occur on the dates alleged. [Exhibit 30, PDF pps. 25-28]

**BANA-Countrywide Employs Multiple Document Fixing Vendors-**

635. A cursory review of the Bureau of Conveyances for the State of Hawaii

Website reveals that from 2017 to the present date, Countrywide Home Loans, Inc. filed Limited Powers of Attorney to these third party chain of title and/or note conveyances *fixing companies* identical in all material respects to the Meridian POA excerpted above: 1.) Select Portfolio Servicing, Inc., Doc No: T-11363492; 2.) Bayview Loan Servicing, LLC, Doc. No.: A-64100521; 3.) Carrington Mortgage Services, LLC, Doc. No.: T-10760127; 4.) as previously stated, Meridian Asset Services, LLC used for Johnson's 2019-2020 Meridian Assignments, Doc. No.: T-10635256]; 5.)  Penny Mac Loan Services, LLC, Doc. No.: A-62540650; and 6.) Specialized Loan Servicing, LLC., Doc. No.: T-10907264.

636. All of the aforementioned Countrywide POA's grant authority to those named companies to receive and manipulate mortgage loans files, including securitized trust mortgage loan files, to correct mortgage chain of title and also to *fix endorsement deficiencies* where necessary.

637. Class Plaintiffs allege that there is no lawful way to fix endorsement deficiencies for these original Countrywide loans without Count intervention to quiet title, and that use of document fixing companies is both unlawful, and results in absurd chain of title fixes, as evidenced in the Johnson assignment, *supra,* by leap-frogging years worth of ownership.

638. Related to Countrywide originated, or purchased, mortgages pooled

into securitized trusts formed prior to July 1, 2008, current manipulations by mortgage loan fixer companies evidence ongoing attempts to fix contractual trust deficiencies, after the fact.

639. Class Plaintiffs allege that all after the fact fixes portraying real time land conveyance chain of title activities always evidence fraud.

640. Those specific acts for which Countrywide Home Loans, Inc. Granted its authority represent license for those companies to create false and fraudulent chain of title documents, especially MERS note assignments, in order to create standing for plaintiff trustees to sue in foreclosure that would not otherwise exist absent those fraudulent acts taken by document fixing companies.

641. Meridian Asset Servicing LLC previously advised the SEC that "..Meridian was engaged to perform diligence on multiple pools of mortgage loans purchased from various sellers through acquisitions that took place between September 2015 and October 2017...The diligence was performed at Meridian's office in St. Petersburg, Florida. The diligence consisted of an analysis of the mortgage chain of title as well as then current outstanding recorded liens.". *See* https://www.sec.gov/Archives/edgar/data/1257102/000089109218000461/e77290_ ex99-12.htm [Exhibit 33]

642. It is axiomatic that where chain of title, or note conveyance deficiencies

**200**

201 of 264

exist, regarding mortgage back securities trusts established prior to July 1, 2008, that a court of competent jurisdiction should be required to quiet title to those trusts.

643. Chain of title fixing companies, like Meridian, are actively participating in fixing chain of title deficiencies for their principal BANA by and through its conduit Countrywide.

644. There is no such thing as self help chain of title fixes for MBS securitized trusts, without representing fraud on some level, including the fact that such alterations do not constitute regularly conducted business activities from service providers who will later attest to their validity.

## THE MARIA K. WILLIAMS-JAMES CASE

645. Williams-James  suffered  for  over a decade enduring constant foreclosure court hearings, while BANA collected and kept her mortgage payments and a subsequent loan servicer foreclosed upon her at the same time.

646. The subsequent loan servicer ultimately obtained a second judgment of foreclosure against Williams-James, using all of the false and fraudulent evidence from the first foreclosure, through lack of candor and dishonesty, and ultimately sold Williams-James' home at foreclosure sale to a new owner.

### Operative Maria K. Williams-James Documents-

647. On July 18, 2019, Green Tree Servicing, LLC aka Ditech Financial LLC ("Green Tree"), as servicer for VRMTG Asset Trust, filed a Verified Second Amended Complaint for Foreclosure of Mortgage in the Eleventh Circuit Court for the State of Florida in the case styled: Green Tree Servicing LLC, Plaintiff, vs. Maria K. Williams-James, et al; Case No.:  2015-CA-018433. ("Williams-James Complaint") The Williams-James Second Amended Complaint contained appended exhibits including the related mortgage note, mortgage, some assignments, and servicer power of attorney. [Exhibit 36]

648. On June 2, 2004, Gordon James, husband of Maria Williams-James ("James") signed a mortgage note payable to Countrywide Home Loans, Inc. in the amount of $51,700.00, accruing interest annually at the rate of 6.0%. [Exhibit 36, PDF pps. 10-11]

649. The James note was subsequently endorsed as follows on p. 2 of 2:

"PAY TO THE ORDER OF:

_____
WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.

BY:   Initials Written_____
        David A. Spector
        Managing Director" [Exhibit 36, PDF p. 11]

650. The David A. Spector CHL #1 endorsements are false, fraudulent or

forged, as entered by BANA employees, agents or third party contractors, after CHL #1's business operations ceased on or about July 1, 2008.

651. The endorsements were stamped by unnamed individuals pretending to be David A. Spector after CHL #1 ceased business operations and after David A. Spector left CHL #1's employ on or about August, 2006.

652. The blank and undated endorsement is akin to a backdated document filed as official record, and are false and fraudulent for that additional reason.

653. The James Note does not allege any identifiable MERS involvement and MERS is not in the business of Note holding or ownership.

654. On June 2, 2004, James, joined by Williams-James, signed a Mortgage, as Borrower ("Williams-James Mortgage"), where the named Lender was Countrywide Home Loans, Inc. and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS"). [Exhibit 36, PDF pps. 12-22]

655. The Williams-James Mortgage contains the following MERS and Lender provisions, excerpted in pertinent part:

"(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as J nominee for Lender and Lender's successors and assigns. *MERS is the mortgagee under this Security Instrument*. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is COUNTRYWIDE HOME LOANS, INC." *Id.* [Italics

added][Exhibit 36, PDF p. 12]

656. The Williams-James Mortgage was recorded on June 19, 2004 in the Miami-Dade Clerk of Courts, County Recorder's Official Records [hereinafter "Miami Public Record"], as CFN 2004R0493716. [Exhibit 36, PDF p. 12]

657. On August 18, 2010, a MERS Williams-James Assignment, was recorded in the Miami Public Record, as CFN 20100559548, BOOK 27391, and PAGE 3648, stating:

> "Mortgage Electronic Registration Systems, Inc., as Nominee for Countrywide Home Loans, Inc., ("Assignor"), C/O 400 Countrywide Way, Simi Valley, California 93065-6298, *has granted, bargained, sold, assigned, transferred and set over, and by these presents does grant, bargain, sell, transfer and set over* unto BAC Home Loans Servicing, L.P. f/k/a Countrywide Home Loans Servicing, L.P., ("Assignee" ), C/O 400 Countrywide Way, Simi Valley, California 93065-6298, *the following described Mortgage(s)* recorded in the Public Records of Miami-Dade County, State of Florida, *together with the note of obligation described in said Mortgage(s),* and the money due and to become, due thereon, with interest as therein provided, pursuant to section 701 .02, Florida Statutes.
>
> Date of Mortgage:  June 2, 2004
> Mortgage Recording Date: June 19, 2004
> Clerk's File Number: 2004R0493716" *Id.* [Italics added][Exhibit 34]

658. This August 18, 2010 MERS Assignment reveals that BAC Home Loans Servicing, L.P. was formerly known as Countrywide Home Loans Servicing, L.P. was utilizing the identical Countrywide facilities taken over from the BANA-Countrywide merger. [Exhibit 34]

659. The August 18, 2010 MERS Assignment is false and fraudulent, because MERS is not in the business of owning or holding mortgage notes, and therefore, it would be impossible for it to "bargain, sell, transfer, and set over" the note to BAC Home Loans as the Assignment pretends.

660. Interestingly, before this August 18, 2010 MERS Assignment was recorded in Miami-Dade County, Florida, these same types of MERS Assignments were identified as false and fraudulent, and creating *sham foreclosure proceedings* in Miami-Dade County, thereafter referred to as *The Miami Embarrassment, supra.*

661. On September 16, 2011, a (corrective) MERS Williams James Assignment, was recorded in the Miami Public Record, as CFN 20110624074, stating, *inter alia*:

> "FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc., ("Assignor"),  hereby assigns and transfers to Bank of America, National Association, successor' by merger to BAC Home Loans Servicing, L.P. f/k/a Countrywide Home Loans Servicing, L.P., ("Assignee"), its successors and assignees, all its right, title and interest in and to that certain Mortgage executed by Gordon James (Deceased), Joined by His Wife, Maria K. Williams, and Eva Mae Miles (Deceased), a Single Woman, and dated Jw1e 2, 2004 and recorded June 19, 2004 in Official Records Instrument No. 2004R0493716, in Book 22409, Page 1256 of Miami-Dade County, State of Florida.

> *This Corrective Assignment of Mortgage is being filed for purposes of correcting a scrivener's error in  that  Assignment of Mortgage recorded in Original Records Book  27391 at  Page 3648, which resulted in the inadvertent and erroneous inclusion  of  language*

*purporting to bargain and sell the Mortgage described therein and to grant, bargain, sell, transfer and set over the associated Note, as the execution of said Assignment was intended to document the actual transaction being the transfer of the Mortgage only..*

Signed on this 12th day of September, 2011.

Mortgage Electronic Registration Systems, Inc."
[Italics added][Exhibit 35]

662. The September 12, 2011 MERS Assignment is false and fraudulent, because this was not, and is not a "scriveners error" resulting in the "inadvertent and erroneous inclusion of language purporting to .. grant, bargain, sell, transfer and set over the associated Note..", but rather, was knowing, intentional and purposeful. [Exhibit 34][Exhibit 35]

663. Trial Court Judges in this District, and nationally, rely upon, and have relied upon, that same MERS erroneous Assignment of Note language for Granting plaintiffs' final judgments of foreclosure.

664. MERS as Nominee for BANA, BAC or Countrywide did not go back to the Public Records in this District, or nationally, to file corrective assignments of mortgages, deleting its erroneous assignments of mortgage notes, upon the truth of which trial court judges rely for granting final judgments of foreclosure to this day, in this District and nationally.

665. In that regard, MERS as Nominee for BANA, BAC or Countrywide, by

**206**

and through BANA as a MERS Member, continues to propagate a fraud on the Courts in this District, and nationally, as evidenced by Class Plaintiff Aiwohi's September 20, 2018 Final Judgment Of Foreclosure, *supra,* restated here in pertinent part:

> ""..FINDINGS OF FACT
>
> To the extent that any of the following Findings of Fact shall be determined to be Conclusions of Law, they shall be deemed as such.
>
> ..5. *The Note was negotiated to Plaintiff, and the Mortgage was subsequently assigned to Plaintiff by that Assignment of Mortgage ("Assignment") recorded in the Bureau on 10/04/2011 as Document Number 2011-161429.*"

666. The Aiwohi trial court relied upon the truthfulness that the Aiwohi mortgage note was "negotiated" to plaintiff, by virtue of this false and fraudulent MERS Aiwohi Assignment, as specifically requested by Defendant, BANA, *supra.*

667. On October 4, 2011, BANA caused the false and fraudulent Aiwohi MERS Assignment to be filed in Hawaii, notwithstanding that, the Williams-James MERS (corrective) Assignment (correcting false information) was filed in Miami, Florida, on September 16, 2011.

668. Class Plaintiffs aver that all of the MERS Assignments filed in this District and nationally purporting to negotiate Countrywide originated mortgage notes, and pretending to portray false ownership transfer thereof to foreclosure

plaintiffs, upon which trial courts rely, must be fixed by BANA in public land conveyance records nationally right now.

669. Class Plaintiffs further aver that if these false and fraudulent MERS Note Assignments are not corrected now that trial courts nationally will continue to rely upon the truthfulness of those erroneous note negotiation filings to find that Countrywide originated mortgage notes were "negotiated", as a bargained for consideration to foreclosure plaintiffs, also falsely making the same, holders in due course under applicable UCC regulations.

670. The same type false and fraudulent MERS Note Assignments, as requested by BANA, are present in Class Plaintiffs' Aiwohi, Keohokapu, Baliguat, and Johnson cases, *supra,* as currently active and pending in this District.

671. All of those MERS assignments recorded in the Bureau of Land Conveyances for purposes of falsely evidencing standing to foreclose are false and fraudulent.

672. On January 29, 2014, a BANA filed Williams-James Assignment, was recorded in the Miami Public Record, as  CFN  2014R0070274, stating, *inter alia*:

> "For Value Received. the undersigned holder of a Mortgage (herein "Assignor") whose address is 1800 TAPO CANYON ROAD, SIMI VALLEY, CA 93063 does hereby grant, sell, assign, transfer  and convey unto GREEN TREE SERVICING LLC whose address is 7360 S. KYRENE ROAD, TEMPE, AZ 85283 all beneficial interest under that certain Mortgage described below together with the note(s) and

obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage..

...

BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS  SERVICING, LP, FKA COUNTRYWIDE HOME LOANS  SERVICING  LP" *Id.*

673. On November 19, 2018, a Williams-James Assignment filed by Ditech Financial LLC f/k/a Green Tree Servicing LLC, by  Mission Global, LLC its Attorney-in-fact, was recorded in the Miami Public Record, as CFN  20180702384, stating, *inter alia*:

"Date of Assignment October 16th, 2018 Assignor: DITECH FINANCIAL LLC F/K/A GREEN TREE SERVICING LLC BY MISSION GLOBAL, LLC ITS ATTORNEY-IN-FACT at 345 ST. PETER STREET, SUITE 1100, SAINT PAUL. MN 55102
Assignee: *VRMTG ASSET TRUST* at 650 FIFTH AVENUE, SUITE #1001, NEW YORK, NY 10019
Executed By: GORDON JAMES, A MARRIED MAN, JOINED BY HIS WIFE MARIA K WILLIAMS, AND EVA MAE MILES. A SINGLE WOMAN
To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR COUNTRYWIDE HOME LOANS, INC_"ITS SUCCESSORS AND ASSIGNS"
Dated: 06-02-2004 Recorded: 06-19-2004 as Instrument No. 2004R0493716, Book/Reel/Liber 22409, Page/Folio 1256 In the County of Miami-Dade, State of Florida..
...
KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above named Assignee, the said Mortgage having an original principal sum

**209**

of $51,700.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

DITECH FINANCIAL LLC F/K/A GREEN TREE SERVICING LLC
BY MISSION GLOBAL, LLC ITS ATTORNEY-IN-FACT
On October 16th, 2018" *Id.* [Italics added]

674. There are no further William-James Mortgage Assignments recorded in the public record, and specifically, there is no recorded mortgage assignment from VRMTG Asset Trust (assignor) to VRMTG ACQ, LLC (assignee) filed in the Miami Public Record.

675. Thereafter VRMTG ACQ, LLC Appointed Selene Finance LP as its "Servicer" and "Attorney In Fact" in a Limited Power of Attorney dated May 17, 2018, filed as part of the Williams-James foreclosure Complaint previously noted. [Exhibit 36 PDF pps. 26-29]

676. VRMTG Asset Trust, the owner of the Williams-James Mortgage Assigned to them on November 19, 2018, *supra,* was not a party to the May 17, 2018  Limited  Power of Attorney signed by VRMTG ACQ, LLC., *supra,* and as such is legally inoperative to make Selene Finance LP either a Servicer or Limited Power of Attorney for VRMTG Asset Trust.

**210**

677. Neither the Green Tree Servicing, LLC, or the Selene Finance LP alleged Powers of Attorney were filed in the Public Record regarding the Williams-James foreclosure action.

678. On October 20, 2020, VRMTG Asset Trust filed a Motion For Final Summary Judgment Of Foreclosure in the Miami-Dade, Williams-James foreclosure, Case No.: 2015-018433-CA, with attachments including an "Affidavit in Support of Summary Final Judgment" with multiple attachments, as authored by Dawn Horne, Selene Finance, L.P. ("Selene" or "Horne"), likewise dated October 20, 2020. [Exhibit 37, PDF pps. 21-25]

679. Horne's October 20, 2020 Affidavit states in pertinent part:

"2.  As an employee of Selene, I run familiar with and understand Selene's loan servicing records, which may include prior servicer records, and Selene's procedures for making and maintaining loan servicing records. My job duties include reviewing and interpreting Selene's business records such that I can competently swear to the status of a particular account, including, but not limited to, loan origination information, servicing transfers, authentication of business records, correspondence to borrowers, property visits, dates of default, and amounts owed.

3.  As part of my current job responsibilities for Selene, I am familiar with, and have personal knowledge of, the type of records maintained in connection with the mortgage loan made to Gordon James; deceased. This affidavit is based on my personal knowledge of the mortgage servicing business records of Selene. The facts contained herein are based upon such practices..
...
5.  *I have personal knowledge of Selene's routine practices and*

*procedures for making and maintaining the records I am testifying about. They are: (a) made at or near the time of the occurrence of the recorded matter(s); (b) made by, or from information transmitted by, persons with knowledge of the recorded matter(s); and (c) kept in the course of Selene's regularly conducted business activities. It is the regular practice of Selene to make such records.*

6. *The attached record also contains, in part, records from the prior servicers. Before the Loan was serviced by Selene it was serviced by Bank of America, N.A., ("BANA") and Ditech Financial LLC f/k//a Green Tree Servicing, LLC, ("Ditech") The Loan records include records that Selene added (also known as boarded) from BANA and Ditech.* As a part of my job responsibilities, I have been trained on and am familiar with Selene's routine boarding practice, described below. And, because the Loan was boarded, I know the records were verified consistent with Selene's routine boarding practice.

7. When Selene acquires loan servicing rights from a prior servicer, the records of the prior servicer are integrated (boarded) to Selene's records, such that the prior servicer's records regarding the loan are incorporated into Selene's records. *Before incorporating the prior servicer's records into its records, Selene verifies the accuracy of the boarded records. Selene works with the prior servicer to resolve any discrepancies found during the boarding process.* Selene keeps and relies on the boarded loan records in the normal course of the business of servicing.." *Id.* [Italics added][Exhibit 37, PDF pps. 21-23]

680. Horne's Affidavit is false and fraudulent for the same reasons other Class Plaintiff's Declarations are false and fraudulent, and was specifically filed in order to attempt to lay a predicate for: 1.) The business records exception to the hearsay rule; and 2.) The incorporated records doctrine exception to the hearsay rule.

681. Horne's Affidavit ¶5 is false, fraudulent, and/or materially misleading,

because Selene did not create the core Williams-James records that Horne is attesting to, and because Selene only came into the picture in 2018.

682. Hornes's Affidavit ¶¶ 6-7 are intended to get around the hearsay rule, by manipulating the incorporated records doctrine, e.g. for instance, hypothetically, Horne calls Green Tree and/or BANA and/or BAC  and/or Countywide and asks them if there underlying mortgage assignments and note endorsements are false, fraudulent or forged, and those parties tell Horne 'no, of course not'.

683. Any trial courts use or continued use of the incorporated records doctrine as a means to enter any Countywide originated mortgage loan files or business records into evidence for purpose of summary judgment, belies the fact that by definition those records a laden with fraud.

684. Conversely, Horne's incorporated records doctrine Affidavit constructively implies that it does not matter whether the prior servicer records are laden with false, fraudulent or forged documents and records, so long as Selene accepts them "as true" during boarding processes.

685. Horne's Affidavit attesting to the accuracy, validity, trustworthiness and credibility of prior loan servicer records, including originated instruments, is also materially false and fraudulent for the same reasons previously described.

686. Ultimately, Williams James went to trial in the second foreclosure after

over a decade of showing proof she paid BANA the mortgage payments. She won the trial, only to have the judgment entered by a judge who then recused herself after admitting her bias. The judgment entered by the recused judge stated Williams James had not paid her mortgage since 2010. The first judgment vacated after Williams James provided proof she paid her mortgage in the first foreclosure also stated Williams James had not paid her mortgage since 2010.

687. The trial court sold Williams James' home to a third party purchaser who advised the court he met with her, believed her case to be a travesty of justice and unconstitutional, and asked for a full refund, wanting no part of this "blood diamond" that would deprive an African American school teacher of her property without due process, when she paid her mortgage. The successor judge ordered Williams James to file her motion to vacate judgment due to fraud

## THE LAZARA A. RODRIGUEZ CASE

### Operative Lazara A. Rodriguez Documents-

688. On November 23, 2009, BONYM filed an Amended Mortgage Foreclosure Complaint in the Miami-Dade Circuit Court against Lazara A. Rodriguez, Case No.: 2009-CA-062378, styled: The Bank of New York Mellon FKA The Bank of New York, as Trustee for the Certificateholders of the CWALT, Inc., Alternative Loan Trust 2006-OA10 Mortgage Pass-through Certificates,

Series 2006 -OA10, Plaintiff, vs. Lazara A. Rodriguez, et al., that pre-dated electronic filing. [Exhibit 38]

689. On March 2, 2018, BONYM filed the original Rodriguez mortgage and mortgage note with the Clerk of Courts in Case No.: 2009-CA-062378.

690. On May 17, 2006, Lazara A. Rodriguez ("Rodriguez") signed an "Adjustable Rate Note" payable to Amnet Mortgage, Inc., dba American Mortgage Network of Florida in the amount of $480,000, accruing interest annually at the rate of 1.25%, subject to a accrued maximum limit principal cap of 115% of the original amount borrowed, and a scheduled monthly payment of $1,599.61. ("Rodriguez Note")[Exhibit 38, PDF pps. 23-27]

691. Class Plaintiffs aver that the Rodriguez Note is a classical example of a Countrywide predatory lending note commonly used at that time and representing a violation of the Fair Housing Act within the four corners of the Note, for Rodriguez who is in a protected class.

692. The Rodriguez Note for $480,000 entered at 1.25% interest on May 17, 2006 was to automatically convert to an adjustable rate Note on July 1, 2007, with an interest cap set at 9.950%, and a maximum one month increase of 7.5% in any given one month period. [Exhibit 38, PDF pps. 23-24]

693. The Rodriguez's Note stated that Principal could never exceed 115% of

**215**

the original Principal balance, or never exceed $552,000.00, or that would create a separate default scenario. [Exhibit 38, PDF pps. 23-24]

694. The Rodriguez's Note is known as a reverse amortization Note, being that a default is created by failing to pay monthly payments when due, or upon exceeding 115% of the Principal balance, which are both built into the loan.

695. Class Plaintiffs allege that the Rodriguez's Note *ab initio* represented a planned foreclosure by Countywide from the day it was written and that Defendant BANA had an obligation, pursuant to the Fair Housing Act, to modify Rodriguez's loan, so as not to make it a predatory loan in violation of the Fair Housing Act, for Rodriguez who is in a protected class.

696. Countrywide targeted elderly americans from communities of color and approved them for loans for which they had no ability to repay.

697. The undated chain of rubber stamped endorsements purport to document a transfer of Ms. Rodriguez's note and mortgage from Amnet Mortgage Inc., d/b/a American Mortgage Network of Florida to Countrywide Bank, N.A., to Countrywide Home Loans Inc., to a blank endorsement. [Exhibit 38, PDF pps. 26-27]

698. The endorsements were stamped by unnamed individuals pretending to be David A. Spector after CHL #1 ceased business operations and after David A.

Spector left CHL #1's employ, on or about August, 2006. [Exhibit 38, PDF pps. 26-27]

699. The blank and undated endorsement is akin to a backdated document filed as official record, and are false and fraudulent for that additional reason. [Exhibit 38, PDF pps. 26-27]

700. The Rodriguez Note does not allege any identifiable MERS involvement and MERS is not in the business of Note holding or ownership.

701. On May 17, 2006, Rodriguez signed a Mortgage, as Borrower ("Rodriguez Mortgage"), where the named Lender was Amnet Mortgage Inc., d/b/a American Mortgage Network of Florida ("Amnet"), and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS"). [Exhibit 38, PDF pps. 7-22]

702. The Rodriguez Mortgage, filed on June 19, 2006 in the Miami Public Record, as CFN 2006R0666257, Book 24643, Page 4381, contains the following MERS and Lender provisions, excerpted in pertinent part:

"(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns. *MERS is the mortgagee under this Security Instrument*. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is AMNET MORTGAGE INC., D/B/A AMERICAN

MORTGAGE NETWORK OF FLORIDA" *Id.* [Italics added][Exhibit 38, p. 7]

703.  On August 24, 2009, a MERS Rodriguez Assignment, was recorded in the Miami Public Record, as CFN 2009R0613178, BOOK 26988, and PAGE 2887, stating:

> FOR VALUE RECEIVED, on or before July 15, 2009, the undersigned, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, I CORPORA TED AS NOMINEE FOR AMNET MORTGAGE, INC., D/B/A AMERICAN MORTGAGE NETWORK OF FLORIDA, ("Assignor") assigned, transferred and conveyed to: THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2006-OA10 MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2006-OA10, ("Assignee") whose address is 7105 Corporate Drive PTX-C-35, Plano, TX 75024, its successors and/or assigns, all of the right, title, and interest of Assignor in and to that certain Mortgage (the "Mortgage") dated May 17, 2006 and recorded June 19, 2006 in Official Records Book 24643 at Page 4381 of the public records of MIAMI-DADE County, Florida, encumbering the following described real property:
>
> LOT 16 IN BLOCK 1 OF A TILLA PARK, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 19 AT PAGE 13 OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.
>
> as the same may have been amended from time to time; *together with the Note and indebtedness secured thereby.*" *Id.* [Exhibit 39]

704.  The August 24, 2009 MERS AMNET Assignment to BONYM evidences, by default, that CWALT 2006-OA10 not properly securitized with the Rodriguez mortgage prior to July 1, 2008. [Exhibit 39]

**218**

705. This MERS Assignment is false and fraudulent because it documents a sales transaction, backdated to July 15, 2009 in the public record, that never occurred, and is wholly fictitious, and contrived.

706. Moreover, AMNET filed for Chapter 11 Bankruptcy on or about August 6, 2007, and to the extent AMNET owned the Rodriguez mortgage and note on August 24, 2007, MERS as Nominee for AMNET could not lawfully assign the Rodriguez mortgage and note to BONYM, without running afoul of United States bankruptcy laws.

707. So to alleviate that problem MERS just filed the AMNET assignment three weeks after AMNET filed for Chapter 11, but backdated the transaction to July 15, 2009, three weeks before the bankruptcy filing, in order to create false standing for BONYM to foreclose against Rodriguez.

708. The CWALT 2006-OA10 Trust, within which the Rodriguez mortgage is contained, was listed as Res, as included in the Class Action Lawsuit filed in the Central District of California by the Maine State Retirement System, Individually, and on behalf of All Others Similarly Situated, Plaintiffs, vs. Countrywide Financial Corporation, et al, in Case No.: 2:10-cv-00302--MRP-MAN; ultimately resulting in a $500 million dollar settlement approved by the Honorable Senior U.S. District Court Judge Mariana R. Pfaelzer on December 6, 2013 ("Maine State

Retirement System Case"). [Exhibit 14][Exhibit 15]

709. The CWALT 2006-OA10 Trust, within which the Rodriguez mortgage is contained, was also listed as Res, as included in the $8.5 billion dollar fraud settlement agreement petition filed by Bank of New York Mellon ("BONYM") in New York Supreme Court on June 29, 2011 involving BANA fka Countrywide. ("New York Petition"), Case No.:  651786/2011. [Exhibit 11][Exhibit 12] [Exhibit 13]

710. It appears that the CWALT 2006-OA10 Trust, within which the Rodriguez mortgage is contained, was listed as Res, in two simultaneous Countrywide  fraud lawsuits ongoing  at the same time and paid out on both, one in California federal court and the second in New York State Supreme Court.

**Florida Litigation Privilege vs. Wrongful Foreclosures-**

711. In 2021, a Miami Circuit Judge ordered Class Plaintiff Rodriguez evicted from her home, notwithstanding that defense counsel established that her the foreclosure was wrongful, and that forged, false and fraudulent records were used by BONYM in the case.

712. In *Pino v. Bank of New York, Mellon,* 57 So. 3d 950 (Fla. 4th DCA 2011), the defendant in a mortgage foreclosure action filed by BONYM appealed the trial court's denial of his motion under Florida Rule of Civil Procedure 1.540(b)

to vacate BONYM'S voluntary dismissal, for the purpose of imposing sanctions on BONYM for filing a fraudulent assignment of mortgage in that case. In other words, in order to stop the defendant's pending motion for sanctions, BONYM voluntarily dismissed the foreclosure action.

713. Although Florida's Fourth DCA Affirmed the *Pino* trial court's denial of defendant's motion to vacate BONYM's voluntary dismissal, it Certified this Question of Great Public Importance to the Florida Supreme Court:

> "We conclude that this is a question of great public importance, as many, many mortgage foreclosures appear tainted with suspect documents. The defendant has requested a denial of the equitable right to foreclose the mortgage at all. *If this is an available remedy as a sanction after a voluntary dismissal, it may dramatically affect the mortgage foreclosure crisis in this State.* Accordingly we certify the following question to the Florida Supreme Court as of great public importance:
>
> DOES A TRIAL COURT HAVE JURISDICTION AND AUTHORITY UNDER RULE 1.5W(b), Fla.R.Civ.P., OR UNDER ITS INHERENT AUTHORITY TO GRANT RELIEF FROM A VOLUNTARY DISMISSAL WHERE THE MOTION ALLEGES A FRAUD ON THE COURT IN THE PROCEEDINGS BUT NO AFFIRMATIVE RELIEF ON BEHALF OF THE PLAINTIFF HAS BEEN OBTAINED FROM THE COURT?" *Pino v. Bank of New York, Mellon,* 57 So. 3d 950 (Fla. 4th DCA 2011)[Italics added]

714. There was no voluntary dismissal in the Rodriguez case by BONYM, it's just that the trial court refused to meaningfully address the many frauds alleged by Rodriguez, together with Rodriguez's requests for sanctions.

**221**

715. Although Rodriguez raised the same frauds claimed in *Pino, supra*, with the trial court and appellate court, and considering that NO voluntary dismissal was ever filed, Florida's Third DCA still permitted BANA to argue that *litigation privilege* required that Rodriguez be denied any relief, and that the trial court's only remedy was to hold BANA in contempt of court for refusal to produce records.

716. In consideration that a foreclosure complaint is filed in equity, a claimed *litigation privilege* should not be found to be an absolute defense to forged note endorsements, false mortgage assignments, lack of candor, claimed frauds on the trial court, the filing of false and fraudulent Affidavits, service history, payment history, counterclaims filed alleging fraud and racketeering, and filed defense motions regarding the same.

717. In consideration that a foreclosure complaint is filed in equity, foreclosure defense counter claims for racketeering, FHA violations, and fraud, should not be dismissed by a trial court based upon a *litigation privilege* claimed by a foreclosure plaintiff.

718. In the wrongful foreclosure context, specifically involving Countrywide originated or purchased mortgages, the *litigation privilege* has become a license for Defendants, in Florida, to commit the rampant frauds, such as those alleged in the

Complaint *sub judice,* with apparent judicial impunity.

719. That is a bastardization of the rule of law and should not be permitted to continue, as it presents the public appearance of impropriety for a foreclosure plaintiff's attorney to tell a trial court judge to their face they intend to ignore the trial court's order, and then to boldly invite the trial court judge to hold them in contempt, as the court's sole remedy. Another remedy should just be to dismiss the foreclosure case filed in equity.

720. Florida's Third DCA opinions support the proposition that there is a *litigation privilege*, that constructively permits BANA and BONYM to obtain final judgments of foreclosure, notwithstanding homeowner proof of lack of candor, frauds perpetrated by plaintiffs in foreclosure prosecutions, or racketeering counterclaims homeowners attempt to litigate.

**No Litigation Privilege: Racketeering Violations in the Ninth Circuit-**

721. Almost 20 years ago, the Dupont chemical company got sued across the country in state and federal court because their product destroyed crops they were meant to protect.

722. After years of fraud on the court, Dupont admitted knowing the product destroyed crops, setting off a wave of fraud on the court motions.

723. A group of farmers in Hawaii went a step further and sued Dupont

under the RICO Act alleging Dupont and its lawyers were a distinct RICO enterprise and that systemic fraud on the court constituted mail fraud, wire fraud and obstruction of justice. *Living Designs v. E. I. Dupont De Nemours and Company,* 431 F.3d 353 (9th Cir. 2005).

724. The 9th Circuit Court of Appeal reversed a dismissal of the RICO action finding there is no "litigation privilege" for a criminal enterprise, Dupont and its lawyers, to commit RICO, and even removed the trial judge who granted DuPont's litigation privilege argument to preserve the appearance of justice.

## THE JULIE NICOLAS CASE

725. On May 13, 2019, BONYM electronically filed a Verified Amended Complaint against Julie Nicolas ("Nicolas") in the Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida, in Case No.: 2018-037059-CA-01, styled: The Bank of New York Mellon, F/K/A The Bank of New York as Trustee for Registered Holders of CWABS, Inc., Asset-Backed Certificates, Series 2006-23, Plaintiff, vs. Julie Nicolas, et al. ("Nicolas Complaint")[Exhibit 41]

**Operative Julie Nicolas Documents-**

726. On October 11, 2006, Julie Nicolas signed an "Adjustable Rate Note" payable to Popular Mortgage Corp. ("Popular Mortgage") in the amount of $202,500.00, initially accruing interest annually at the rate of 8.9%, that was

immediately thereafter, purchased by Countrywide. ("Nicolas Note")[Exhibit 41, PDF pps. 12-16]

727. Class Plaintiffs aver that the Nicolas Note is another classical example of a predatory lending note commonly used at that time and representing a violation of the Fair Housing Act within the four corners of the Note, for Nicolas who is in a protected class. [Exhibit 41, PDF pps. 12-16]

728. The Nicolas Note for $202,500 entered at 8.5% interest on October 11, 2006 for 30 years, was to automatically convert to an adjustable rate Note on November 1, 2008, with an interest cap set at 15.9%, but not more than 10.4% on the very first change date, and subject to further increases every six months, subject to the cap. [Exhibit 41, PDF pps. 12-13]

729. The way that the Nicolas' Note was structured, Rodriguez's principal and interest payment could have almost doubled in a two year period from 8.5% to 15.9%.

730. Class Plaintiffs allege that the Nicolas' Note *ab initio* represented a planned foreclosure from the day it was written and that Defendant BANA had an obligation, pursuant to the Fair Housing Act, to modify Nicolas' mortgage loan, so as not to make it a predatory loan in violation of the Fair Housing Act, for Nicolas who is in a protected class.

731. Class Plaintiff Nicolas, a Haitian American single mother working as a full time nurse, had the ability to resume mortgage payments, after she missed several mortgage payments, because her employer temporarily withheld Nicolas' salary during an audit.

732. Nicolas never lost employment and eventually received all of her back pay and continued working for the same employer. In the interim however, BANA filed a foreclosure action against Nicolas, and then, repeatedly and wrongfully denied Nicolas a loan modification, as it foreclosed on Nicolas' home.

733. The Nicolas note was subsequently endorsed as follows on p. 4 of 4:

"PAY TO THE ORDER OF:

Countrywide Bank, N.A.

WITHOUT RECOURSE:

POPULAR MORTGAGE CORP."

*/s/ Alina Balum*
By: Alina Balum,
Its: Executive Vice President." [Exhibit 41, PDF p. 15]

734. The Nicolas Note, was subsequently endorsed as follows, all contained in one signature stamp placement beneath Julie Nicolas' original signature:

| "Pay to the order of: | Pay to the order of: |
|---|---|
| Countrywide Home Loans, Inc. | _____ |
| Without Recourse | Without Recourse |
| Countrywide Bank, N.A. | Countrywide Home Loans, Inc. |

By:   *Laurie Meder*            By:   *Michelle Sjolander*
      Laurie Meder, SVP               Michelle Sjolander SVP"

[Exhibit 41, PDF p. 15]

735. The Nicolas Countrywide endorsements are false, fraudulent or forged, as entered by BANA employees, agents or third party contractors, after CHL  #1's business operations ceased on and after July 1, 2008.

736. The endorsements were stamped by unnamed individuals pretending to be Laurie Meder and Michelle Sjolander, after CHL #1 ceased business operations and after Meder and Sjolander ceased employment by Countrywide.

737. The blank and undated endorsements are akin to backdated documents filed as official records, and are false and fraudulent for that additional reason.

738. The Nicolas Note does not allege any identifiable MERS involvement and MERS is not in the business of Note holding or ownership.

739. On October 11, 2006, Julie Nicolas signed a Mortgage, as Borrower ("Nicolas Mortgage"), where the named Lender was Popular Mortgage Corp. and the Mortgagee was Mortgage Electronic Registrations Systems, Inc. ("MERS"). [Exhibit 41, PDF pps.19-39]

740. The Nicolas Mortgage, filed on October 24, 2006 in the Miami Public Record as document CFN 2006R1142055, contains the following MERS and

227

Lender provisions, excerpted in pertinent part:

> "(C) "MERS" is Mortgage Electronic Registration Systems, Inc.
> MERS is a separate corporation that is acting solely as nominee for
> Lender and Lender's successors and assigns. *MERS is the mortgagee
> under this Security Instrument*. MERS is organized and existing under
> the laws of Delaware, and has an address and telephone number of
> P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

> (D) "Lender" is POPULAR MORTGAGE CORP." *Id.* [Italics
> added][Exhibit 41, PDF p. 19]

741. On July 18, 2011, a MERS  Nicolas Assignment, was  recorded  in the

Miami  Public  Record,  as  CFN 2011047680, BOOK 27758, and   PAGE 4342,

stating:

> "For Value Received, the undersigned holder of a Mortgage (herein
> "Assignor") whose address is 3300 SW 34th Avenue, Suite 101 Ocala,
> FL 34474 *does hereby grant, sell, assign, transfer and convey* unto
> THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW
> YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF
> THE CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES
> 2006-23 whose  address is 101 BARCLAY ST- 4W, NEW  YORK,
> NY 10286 *all beneficial interest under that certain Mortgage
> described below together with the note(s) and obligations therein
> described* and the money due and to become due thereon with interest
> and all rights accrued or to accrue under said  Mortgage.

> Original Lender:  POPULAR MORTGAGE CORP.
> Original Borrower(s):  JULIE NICOLAS, A SINGLE WOMAN
> Date of Mortgage: 10/11/2006
> Original Loan Amount: $202,500, 00
> Recorded in  Miami-Dade County, FL on: 10/24/2006, book OR
> 25035, page 2133 and instrument number 2006R1142055..
> ...
> MORTGAGE  ELECTRONIC  REGISTRATION  SYSTEMS, INC."

**228**

*Id.* [Italics added][Exhibit 40][Exhibit 41, PDF p. 40]

742. This MERS Nicolas assignment evidenced that BANA used MERS and went back to pretending the sale of mortgage notes in the public record, notwithstanding that it does not, and has never, owned a mortgage note to sell to any third party Assignee, which makes the entire assignment false or fraudulent, *per se.*

743. Additionally, the July 18, 2011 Nicolas MERS Assignment does not purport to be acting as Nominee for Lender, Popular Mortgage, but rather, as *"the undersigned holder of.."* the Nicolas mortgage (e.g. the actual Nicolas paper mortgage document) that is wholly false and fraudulent, because MERS is not in the business of owning or holding actual mortgages or notes as paper instruments from Lender Popular Mortgage Corp. or any other entity.

744. On May 29, 2019, BONYM electronically filed "Plaintiff's Motion For Summary Final Judgment Of Foreclosure" in Nicolas's Miami-Dade foreclosure Case No.: 2018-037059-CA-01, wherein BONYM used a pre-computer-formatted: "Affidavit of Indebtedness", prepared by an anonymous individual, and signed by Laura Hoyle, Carrington Mortgage Service, LLC ("Carrington" or "Hoyle"), as BONYM evidence supporting summary judgment. [Exhibit 42, PDF pps. 55-59]

745. Hoyle's Affidavit was *a fill in the blank computerized form*, it was not

229

independently prepared by Laura Hoyle, where the only new information typed into the pre-prosed form was::  the case-style; the Affiant's name; the Affiant's title; the amounts claimed owed, and the ending signature block. The rest of the Affidavit is contains rote declarations that were not authored by Laura Hoyle. [Exhibit 42, PDF pps. 55-59]

746. Hoyle's Affidavit, dated May 23, 2019, stated in pertinent part:

"5.    Mortgage Electronic Registration Systems, Inc., solely as nominee for Popular Mortgage Corp., assigned all of its rights to and interest in the Mortgage to Plaintiff by Assignment of Mortgage dated July 13, 2011 and recorded on July 18, 2011,  in Official Records Book 27758, Page 4342; of the Public Records of Miami-Dade County, Florida (the "Assignment")..
...
6.  *Plaintiff is now the proper owner of the Note, Mortgage and Loan Modification that are the subject of this action. As a result of a transfer of the interest in the Note, Mortgage, and Loan Modification, the Plaintiff has a valid enforceable interest in the Note, Mortgage, and Loan Modification, and the right to enforce the Note, Mortgage, and Loan Modification.*
...
9.  I have knowledge of the process Carrington used to verify the accuracy of the information and Transferred Records it received in connection with the purchase of the Note and the Mortgage.

10.  The Transferred Records have been integrated into Carrington's Records and *Carrington has independently confirmed the accuracy of the Transferred Records through its internal practices and procedures*.

11.  *The Transferred Records exhibit trustworthiness.*

12.  *Based on my knowledge of the Records, all of the records for this*

*loan were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by a person having knowledge of the matters contained in the Records.*

13.    *The Records were kept in the course of regularly conducted activities and were made as a regular practice in the course of regularly conducted activity.*

14.    The Records are the basis for the statements made herein." *Id.* [Italics added][Exhibit 42, PDF pps. 55-56]

747. Hoyle's Affidavit contains false, fraudulent and materially misleading statements of fact and was filed for the purpose of laying a predicate for the business records exception, incorporated records doctrine exception to hearsay, and perhaps, even as an Affidavit of ownership, so that BONYM could submit copies of original Countrywide business records, and instruments, as evidence for purposes of standing to foreclose in summary judgment against Nicolas.

748. Hoyle's Affidavit also implies that BONYM was not "the proper owner of the Note, Mortgage and Loan Modification" prior to the July 18, 2011 MERS Assignment to BONYM, *supra,* ¶6 Hoyle Affidavit.

749. Hoyle's Affidavit bought into the false proposition that MERS could Assign the Nicolas Note to BONYM that MERS neither owned or held as Nominee for Popular Mortgage, when that is definitely a false statement of a material fact.

750. Hoyle's Affidavit is false and fraudulent, because there is no way for Hoyle to "..independently confirm[] the accuracy of the Transferred Records.."

without personally being present when those records were created and maintained by all prior servicers, including Countrywide, BAC, and BANA related to the Nicolas mortgage file.

751. Hoyle's Affidavit is false and fraudulent, because she cannot declare under penalty of perjury that ANY Countrywide's original mortgage files or instruments were "..were made at or near the time of the occurrence  of the matters set forth by, or from information transmitted by a person having knowledge  of the matters contained in the Records", that "..Carrington has independently confirmed the accuracy of the Transferred Records..", or that "[t]he transferred records exhibit trustworthiness".

752. Ms. Hoyle was apparently unaware that the CWABS 2006-23 Trust, within which the Nicolas mortgage is contained, was also listed as Res, in the Maine State Retirement System Class Action Lawsuit that resulted in a $500 million dollar BANA settlement, *supra,* based upon incomplete, inaccurate, untrustworthy, and incredible, original Countrywide records and instruments, that were incorporated into Carrington's loan servicing records, per Ms. Hoyle, without exception. [Exhibit 14][Exhibit 15]

753. On August 26, 2020, BONYM electronically filed an "Amended Affidavit of Indebtedness" in Nicolas's Miami-Dade foreclosure Case No.:  2018-

037059-CA-01, signed by Elizabeth Gonzales, Carrington Mortgage Service, LLC ("Carrington" or "E. Gonzales"), dated August 20, 2020, as additional BONYM evidence supporting summary judgment .[Exhibit 43, PDF pps. 3-8]

754. Elizabeth. Gonzales' Affidavit Of Indebtedness, signed August 26, 2020, was the ***identical rote computer generated form***, containing exactly the same identical text, as the Affidavit of Indebtedness, previously signed by Laura Hoyle on May 23, 2019, except that the amount owed was updated. [Exhibit 43, PDF pps. 3-8]

755. Elizabeth Gonzales' Affidavit was false and fraudulent for the identical reasons why Laura Hoyle's Affidavit was false and fraudulent, *supra*, and represents an additional false and fraudulent Affidavit electronically filed in the Nicolas foreclosure case on August 26, 2020.

756. On October 29, 2020, via a Zoom Hearing conducted regarding BONYM's motion for summary judgment, the trial court granted BONYM's Motion For Summary Final Judgment in the amount of $401,667.48 and ordered the sale of the Nicolas homestead, and relying upon the truthfulness and veracity of facts stated in Laura Hoyle's Affidavit [Exhibit 42, PDF pps. 55-59] and Elizabeth Gonzales' Affidavit [Exhibit 43, PDF pps. 3-8] filed on behalf of Carrington Mortgage Service, LLC on behalf of BONYM.

**233**

757. As previously noted, Carrington Mortgage Services, LLC is also a third party document fixing company vendor hired by BANA, by and through CHL #2, and given Limited Power Of Attorney to fix pre-2008 Countrywide originated mortgage loan chain of title deficiencies by any means necessary in this District and nationally, *supra* ¶ 635.

758. Class Plaintiffs allege that courts of competent jurisdiction are required to lawfully quiet title regarding chain of title deficiencies effecting mortgage backed security-securitized trusts and/or mortgage loans purchased by Fannie Mae, and therefore, BANA by and through Countrywide cannot lawfully hire third party vendors to just "fix" deficiencies through after the fact self help.

## 759.  CLASS ACTION PREDICATE ACTS MATRIX-

| **False Pretense Filing-** | **Date Filed-** | **Where Filed-** |
|---|---|---|

**From the Nathan Earl Aiwohi Foreclosure Case:**

| 1.  Motion For Summary Judgment | June 25, 2018 | 5CC131000082 |
| 2.  BANA MERS Assignment | October 4, 2011 | HI Land Conveyances No. 2011-161429 |

**From the Toby Alamoana Keohokapu, Jr. Case:**

| 3. Motion for Summary Judgment | December 5, 2018 | 1CC121001026 |
| 4. MERS Note Assignment | January 19, 2012 | HI Land Conveyances |
| 5. Findings Of Fact, Conclusions | October 3, 2019 | HI Land Conveyances |

**From the Barbara Anita Baliguat Estate (Ebos) Foreclosure Case:**

| 6.  Complaint & Attachments | November 29, 2013 | 1CC131003138 |
| 7.  BANA MERS Assignment | June 1, 2012 | HI Land Conveyances No. T-8187212 |

**From The Susan DeShaw Foreclosure Case:**

| 8.  Complaint & Attachments | September 27, 2016 | 1CC161001821 |
| 9.  Motion For Summary Judgment | December 29, 2017 | 1CC161001821 |
| 10.  Motion For Summary Judgment | November 14, 2018 | 1CC161001821 |
| 11.  BANA Assignment | September 2, 2011 | HI Land Conveyances No. 2011-141243 |
| 12.  BONYM Assignment | November 25, 2015 | HI Land Conveyances No. A-58060922 |

**From the Thomas Johnson Foreclosure Case:**

| 13.  Complaint & Attachments | December 6, 2019 | 1CCV190002277 |

| | | |
|---|---|---|
| 14. Countrywide Assignment | February 13, 2019 | HI Land Conveyances No. T-10635257 |
| 15. Countrywide POA Meridian | February 13, 2019 | HI Land Conveyances No. T-10635258 |
| 16. Motion For Summary Judgment | June 30, 2022 | 1CCV190002277 |

**From the Maria K. Williams-James Case:**

| | | |
|---|---|---|
| 17. BANA MERS Assignment | August 18, 2010 | Miami Public Record CFN20100559548 |
| 18. BANA MERS Assignment | September 16, 2011 | Miami Public Record CFN 20110624074 |
| 19. Second Amended Complaint | July 18, 2019 | 2015-CA-018433 |
| 20. Motion For Summary Judgment | October 20, 2020 | 2015-CA-018433 |

**From the Lazara Rodriguez Case:**

| | | |
|---|---|---|
| 21. Amended Complaint | November 23, 2009 | 2009-CA-062378 |
| 22. MERS Amnet Assignment | August 24, 2009 | Miami Public Record CFN 2009R0613178 |

**From the Julie Nicolas Case:**

| | | |
|---|---|---|
| 23. BANA MERS Assignment | July 18, 2011 | Miami Public Record CFN 2011047680 |
| 24. Amended Complaint | May 13, 2019 | 2019-CA-037059 |
| 25. Motion For Summary Judgment | May 29, 2019 | 2019-CA-037059 |
| 26. Am. Affidavit Indebtedness | August 26, 2020 | 2019-CA-037059 |

## CLASS ACTION ALLEGATIONS
## RE: THE COUNTRYWIDE CLEANUP ENTERPRISE

760.  This action is brought on behalf of the following Classes, related to Plaintiffs' Aiwohi, Keohokapu, Baliguat, DeShaw, Johnson, Williams-James, Rodriguez, and Nicolas case facts:

761.  Classes 1 & 2 Countrywide (FHA) Class Member Certifications:

(1) All open and pending Countrywide originated, and Countrywide purchased,  mortgage foreclosure cases filed in the District of Hawaii and nationally, regarding pooled mortgages that were originally sold by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer, later assumed by BANA-BAC, as successor loan servicer, for protected classes within the meaning of the Fair Housing Act, sold as either:  reverse-amortization notes, interest only notes, maximum principal limit notes, or notes with interest rates exceeding 6.5%.

(2) All closed Countrywide originated, and Countrywide purchased, mortgage foreclosure cases filed in the District of Hawaii and nationally, resulting in final judgments of foreclosures for plaintiff in the prior two (2) years, regarding pooled mortgages that were originally sold by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer,  later assumed by BANA-BAC, as successor loan servicer, for protected classes within the meaning of the Fair Housing Act, as either:  reverse-amortization notes, interest only notes, maximum principal limit notes, or notes with interest rates exceeding 6.5%.

Classes 3 & 4 Countrywide RICO Class Member Certifications:

(3) All open and pending Countrywide originated, and Countrywide purchased,  mortgage foreclosure cases filed in the District of Hawaii and nationally, regarding pooled mortgages that were originally sold

237

by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer, later assumed by BANA-BAC, as successor loan servicer.

(4) All closed Countrywide originated, and Countrywide purchased, mortgage foreclosure cases filed in the District of Hawaii and nationally, resulting in final judgments of foreclosures for plaintiff in the prior four (4) years, regarding pooled mortgages that were originally sold by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer, later assumed by BANA-BAC, as successor loan servicer, in which MERS Mortgage Note Assignments were filed in land conveyance records purporting to convey mortgage note ownership or beneficial note interests to any listed Assignees.

Classes 5 & 6 Countrywide RICO (MERS Assignments) Class Member Certifications:

(5) All open and pending Countrywide originated, and Countrywide purchased, mortgage foreclosure cases filed in the District of Hawaii and nationally, regarding pooled mortgages that were originally sold by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer, later assumed by BANA-BAC, as successor loan servicer, in which MERS, as Nominee, Assignments were filed in land conveyance records purporting to convey mortgage note ownership or beneficial note interest, to any listed Assignee.

(6) All closed Countrywide originated, and Countrywide purchased, mortgage foreclosure cases filed in the District of Hawaii and nationally, resulting in final judgments of foreclosures for plaintiff in the prior four (4) years regarding pooled mortgages that were originally sold by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer, later assumed by BANA-BAC, as successor loan servicer, in which MERS, as Nominee, Assignments were filed in land conveyance records purporting to convey mortgage note ownership or beneficial note interest, to any listed Assignee.

Classes 7 & 8 Countrywide RICO (MERS Note Holder Assignments) Class Member Certifications:

(7) All open and pending Countrywide originated, and Countrywide purchased, mortgage foreclosure cases filed in the District of Hawaii and nationally, regarding pooled mortgages that were originally sold by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer, later assumed by BANA-BAC, as successor loan servicer, in which MERS, as Note Holder ("Assignor"), Assignments were filed in land conveyance records purporting to convey mortgage note ownership or beneficial note interest, to any listed Assignee.

(8) All closed Countrywide originated, and Countrywide purchased, mortgage foreclosure cases filed in the District of Hawaii and nationally, resulting in final judgments of foreclosures for plaintiff in the prior four (4) years, regarding pooled mortgages that were originally sold by Countrywide to investment funds later securitized into mortgage backed security trusts appointing Countrywide as original mortgage loan servicer, later assumed by BANA-BAC, as successor loan servicer, in which MERS, as Note Holder ("Assignor"), Assignments were filed in land conveyance records purporting to convey mortgage note ownership or beneficial note interest, to any listed Assignee.

762. Plaintiffs allege that the aforementioned classes are so numerous that joinder of all members of the class is impractical.

763. Upon information and belief, tens of thousands, if not hundreds of thousands, of effected Class Members exist at any given moment in time.

764. Plaintiffs and Class Members will not be asserting private causes of action for racketeering damages and equitable relief, but instead, will be asserting one common cause of action on behalf of the entire Class for damages, prospective

injunctive relief, attorneys fees and costs.

765. There are questions of law or fact common to each Class Member, which common issues predominate over any issues involving only individual Class Members.

766. The common factual and/or legal issues common to each Class Member are substantially similar in all material respects, as identified in the Aiwohi, Keohokapu, Baliguat, DeShaw, Johnson, Williams-James, Rodriguez, and Nicolas state foreclosure case allegations, that also comprise those predicate acts delineated in the Predicate Acts Matrix hereto.

767. Plaintiffs have no interests antagonistic to the named Classes, and Defendants have no defenses unique to Class Plaintiffs.

768. Plaintiffs' claims are typical of those of the Class Members for time periods in which Countrywide sold mortgages to mortgage backed securities trusts, as evidence by the operative time periods that Countrywide operated as a mortgage loan originator, on or about 2004 through and including 2008.

769. All claims are based on the same facts and legal theories for each Class Member, respectively.

770. Any defenses raised by Defendants against Plaintiffs, would also be typical defenses raised against all Class Members, respectively.

771. Plaintiffs will fairly and adequately protect the interests of the Class.

772. Plaintiffs have retained experienced unlawful foreclosure counsel and intend to retain experienced class action co-counsel prior to Class Certifications made by this Court in this case.

773. Neither Plaintiffs or retained counsel have any interests that might cause them not to vigorously pursue this action.

774. Certification of the Class under Rule 23(b)(3) Fed. R. Civ. P. is appropriate, because the questions of law or fact common to Class Members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

775. Certification of classes under Rule 23(b)(1)(b) Fed. R. Civ. P. is also appropriate, because adjudications with respect to any individual Class Member, respectively, as a practical matter, would be dispositive of the interests of the other members.

776. Plaintiffs and putative Class Member's claims are not *moot* by virtue of any individual state judicial order of foreclosure made during the pendency of this suit, as the representative of putative Class Members going forward is not seeking reversal of any state court judgment, but is merely seeking financial damages,

prospective injunctive relief, attorneys fees and costs herein, related to active, pending and anticipated foreclosure actions.

777. Not only are Plaintiff's claims capable of repetition into perpetuity while avoiding judicial review, but any determination of *mootness* for any individual Class Member by this Court during the pendency of this action would ensure that Defendants' unlawful foreclosure practices and procedures remained unfettered into perpetuity.

### CLAIM 1 -  CLASS ACTION RACKETEERING CLAIM

**18 U.S.C. §§ 1962(c),
18 U.S.C. §§ 1964 (a) and (c),
and 18 U.S.C. §§ 1341 and 1343**

**RE:  THE COUNTRYWIDE CLEANUP ENTERPRISE
CLASS MEMBER CERTIFICATIONS 1-6**

**DEFENDANT, BANA and DEFENDANT, BONYM**

**[COLLECTIVELY  "DEFENDANTS"]**

778.   Class Plaintiffs adopt and reallege allegations made in paragraphs 1-777 above, including sub-parts, as though fully set forth herein.

779. Class Plaintiffs adopt and reallege Exhibits 1-43, and sub-parts, and incorporate them into this Claim by specific reference, as those Exhibits referenced in the body of this Complaint relate to specific factual allegations made.

780. Claim 1 is a Class Action racketeering claim for all Class Plaintiffs, on

behalf of themselves and others so similarly situated in this District and nationally, on the basis of the racketeering predicate acts delineated in the Predicate Acts Matric hereto, brought pursuant to 18 U.S.C.§ 1962(c).

781. Claim 1 incorporates all Class Member Certifications 1-8 requested.

782. Defendants are employed by or associated with the Countrywide Loan Cleanup Enterprise, an association-in-fact, although not a combined legal entity, composed of Defendants, Bank Trustees, MERS, Mortgage Backed Security Trusts, loan servicing entities, and document fixing entities.

783. The Countrywide Loan Cleanup Enterprise is composed of the main entities utilized by Defendants for Class Plaintiffs' foreclosures filed and being prosecuted at the state level, together with others known and unknown.

784. The Countrywide Loan Cleanup Enterprise is engaged in activities, or conduct activities which affect, interstate or foreign commerce, *inter alia*, through frequent use interstate wire communications, United States mail, and through electronic filings in Hawaii Circuit Court foreclosure cases, effecting multiple districts interstate.

785. Defendant, BANA operated or managed CFC and CHL, that are or were both wholly owned subsidiaries of BANA for all times material hereto, and the acts and omissions complained of regarding Defendant, CHL were authorized

by its parent CFC and/or Defendant BANA, with actual or apparent authority to do so.

786. Defendants operated or managed the affairs of the Enterprise, by embedding false, fraudulent and forged documents into Countrywide originated, or purchased, mortgage loan files and negotiable instruments that Defendants serviced for Trustee Enterprise Members, on or before 2014.

787. Defendants operated or managed the affairs of trustee and mortgage loan servicer Enterprise Members by causing them to knowingly utilize Defendants' false, fraudulent and forged mortgage assignments and mortgage notes in order to file, prosecute and successfully foreclose upon Countrywide mortgagors, including Class Plaintiffs, using the business records exception to the hearsay rule, the incorporated records doctrine, and/or ownership Affidavits.

788. Defendants operated or managed the affairs of trustee and mortgage loan servicer Enterprise Members by causing them to falsely claim through Affidavits filed with trial courts, the credibility, accuracy, and trustworthiness of business records and instruments serviced by Defendants, in order to file, prosecute, and successfully foreclose upon Countrywide mortgagors, including Class Plaintiffs, using the business records exception to the hearsay rule, the incorporated records doctrine, and/or ownership Affidavits.

789. Defendants managed the affairs of MERS by causing MERS to file false and fraudulent mortgage assignments in land conveyance records for the purpose of falsely evidencing mortgage transactions that never occurred, including sham mortgage note assignments, also causing service providers to file false and fraudulent Affidavits with trial courts based thereon.

790. Defendant, BANA managed the affairs of the Mortgage Backed Security Trusts for Class Plaintiffs by acting as Master Servicer of those mortgage loans for Enterprise Member Trustees, at the same time that those same trustees, could or should, have sued Defendant, BANA for repurchase of toxic loans, and/or loans not properly securitized, that were pooled into those trusts.

791. Defendants are still effectively controlling, Enterprise Members, because other Enterprise Members continue to rely upon Defendant, BANA, to unlawfully fix chain of title deficiencies and/or to file false or fraudulent prior servicer Affidavits and/or to utilize Defendant, BANA's third party document fixing vendors to do the same, without which, they cannot file, prosecute, or successfully foreclose upon Countrywide Mortgagors, including Class Plaintiffs.

792. Defendants' control over other Enterprise Members is remarkable; other Enterprise Members cannot file, prosecute, or foreclose upon Countrywide originated mortgages at this point, using their current foreclosure methodology,

245

without use of Defendants' false, fraudulent and forged documents, mortgage assignments, and mortgage notes, while simultaneously hailing the credibility, accuracy and trustworthiness of the same.

793. Defendants have conducted the affairs of the Enterprise through a pattern of racketeering activity as delineated in the Predicate Acts Matrix related to Class Plaintiffs' state court foreclosure cases, as defined by 18 U.S.C. § 1962, 18 U.S.C. § 1964, and 18 U.S.C. §§ 1341, 1343.

794. Defendants have also conducted the affairs of the Enterprise through the collection of unlawful debts, regarding the same activity delineated in the Predicate Acts Matrix related to Class Plaintiffs' state court foreclosure cases.

795. Defendants have also conducted the affairs of the Enterprise through by engaging in clear violations of the Fair Housing Act, regarding unlawful mortgage lending and mortgage loan servicing activities, specifically related to Class Plaintiffs, Aiwohi, Baliguat, Johnson, Keohokapu, Williams-James, Rodriguez and Nicolas.

796. Class Plaintiffs allege that Defendants have injured their property interests by reason of the substantive racketeering predicate acts delineated in the Predicate Acts Matrix, including the loss or imminent loss of their initial investments in their homes and their homes.

797. Class Plaintiffs allege that Defendants unlawful activities have caused trial courts to take property from them, or where such taking is imminent, falsely manifesting reliance upon the truth, credibility, accuracy, and trustworthiness of Affidavits, mortgage assignments and note endorsements filed or caused to be filed by Defendants in their state foreclosure cases in this District and nationally.

798. Class Plaintiffs allege that Defendants unlawful activities have caused, or will imminently cause, the taking of their properties, using trial court judges as innocent instrumentalities, in this District and nationally.

799. Class Plaintiffs claim that the racketeering statutes should be liberally construed to effect their remedial purposes, considering that Defendants file, cause to be filed, or materially participate in foreclosure actions filed against Class Plaintiffs as actions sounding in equity.

800. But for Defendants' racketeering activity, delineated in the Predicate Acts Matric hereto, Class Plaintiffs' injuries would not have been resulted, because plaintiffs would not have standing to lawfully file, prosecute, or obtain final judgments of foreclosure.

801. Defendants' predicate acts have also proximately caused Class Plaintiffs' injuries, because Defendants' initial false, fraudulent and forged mortgage assignments, and forged note endorsements, have caused  Enterprise

Members to file false and fraudulent Affidavits with trial courts based thereon, regarding credibility, accuracy, and trustworthiness of those records and instruments, known to be incredible, inaccurate and untrustworthy.

802. Defendants' predicate acts have also proximately caused Class Plaintiffs' injuries by abusing rules of evidence related to the business records exception to the hearsay rule, and the incorporated records doctrine, based upon trial court reliance upon the truthfulness and veracity of Affidavits filed by Enterprise Member Trustees and Loan Servicers, knowing said Affidavits and declarations therein to be false and fraudulent.

803. Defendants' predicate acts have also proximately caused Class Plaintiffs' injuries by causing Enterprise Member Trustees and Loan Servicers to omit facts from Affidavits filed that would be material and relevant to a trial court's determination whether business records, mortgage assignments note endorsements, and declarations filed, were credible, accurate, trustworthy and truthful.

804. Defendants caused and will cause, unwitting trial court judges in this District and nationally, to manifest reliance upon the credibility, accuracy, and trustworthiness of Defendants prior servicing records, mortgage assignments, note endorsements, and mortgage servicing Affidavits, falsely and fraudulently

declaring the same to be credible, accurate, trustworthy, and truthful, in order to grant final judgments of foreclosure.

805. Class Plaintiffs allege that thousands of trial court  judges  nationally, including the trial court judges for Class Plaintiffs, manifested reliance on Defendants' material false statements of facts, material omissions of facts, and fraudulent misrepresentations of fact, as contained within,  pleading allegations, oaths, verifications, sworn statements, sworn interrogatory answers, and/or sworn deposition testimony, and/or sworn trial testimony, to grant foreclosure plaintiff's final judgment of foreclosure, based upon said manifestation of reliance.

806. Class Plaintiffs allege that thousands of trial court judges nationally manifested reliance upon false and fraudulent MERS mortgage and note assignments, standing alone, as recorded in land conveyance record repositories for the purposes of finding plaintiff standing to foreclose and granting final judgment of foreclosure, because  a lawful  assignment of a mortgage and note together is one authorized means by which a trial court judge may find standing to foreclose, *per se*.

807. Class Plaintiffs allege that the continued use of sham MERS mortgage note assignments constitutes an ongoing bright line scheme to defraud, effecting tens of thousands of active and pending foreclosure cases, as trial court judges

continue to manifest reliance upon those sham assignments.

808. Class Plaintiffs allege that Defendants' filed or caused to be filed prior loan servicer Affidavits with trial courts, where the allegations of mail fraud or wire fraud are also based upon material omissions, and for which Class Plaintiffs are not required to show manifestation of reliance by trial courts.

809. Defendants and Enterprise Members all shared the common purpose of obtaining money and property by any and all means necessary, regardless of whether those means are lawful or unlawful.

810. Defendants and Enterprise Member Trustees and Loan Servicers all share the common purpose of mitigation of financial losses caused from lawsuits for breaches of fiduciary duties owed to Certificateholders, at the same time that many current mortgage assignments evidence historical breaches of fiduciary duties owed to those same Certificateholders.

811. Defendants and Enterprise Members all share the common purpose of filing, prosecuting and foreclosing upon Countrywide Mortgagors to obtain money or property any and all means necessary, regardless that they are all involved with perpetrating frauds on the court, through lack of candor, and through continued use of false and fraudulent Affidavits filed.

812. Defendants and Enterprise Members all share the common purpose of

"fixing" chain of title deficiencies by any means possible, including *leap-frogging* chain of title owners without lawful authority, so that other Enterprise Members can unlawfully foreclose upon Countrywide Mortgagors.

813. Defendants and Enterprise Members all share the common purpose of materially omitting false statements of material fact to trial courts, that are relevant to a trial court's determination of whether business records and mortgage instruments are credible, reliable and trustworthy for entry into evidence for purposes of considering summary judgment for plaintiff; considering related factual predicates necessary for the business records exception to the hearsay rule and/or the incorporated records doctrine and/or for purposes of an Affidavit of ownership.

814. Defendants and Enterprise Members all share the common purpose of going forward with their present Defendants' schemes to defraud into perpetuity, without being caught, to continue to obtain money and property from Countrywide mortgagors by any means necessary.

815. Defendants and Enterprise Members all share the common purpose of utilizing public land conveyance records repositories, in this District and nationally, to records false and fraudulent mortgage note assignments, documenting alleged transfers and sales transactions that never occurred, and

Limited Powers Of Attorney authorizing third party document fixing companies to engage in unlawful chain of title fixing activities as self help, in order to falsely convince a trial court judge, that an Enterprise Member has standing to foreclose, to prosecute, and to foreclose upon Class Plaintiffs.

816. Defendants and Enterprise Members function as a continuing unit, and have for years, both in this District and nationally.

817. Enterprise Members, especially Member Trustees and Loan Servicers will continue on with Defendants into perpetuity as a continuing unit.

818. The Enterprise has shown longevity sufficient to achieve all of the common purposes alleged by Class Plaintiffs, and there is no indication that those common purposes will cease any time soon, without judicial involvement now.

819. Defendants continue to regurgitate the same false, fraudulent and forged papers for all new foreclosure cases filed regarding Countrywide originated loans, regardless of who the Plaintiff is, in this District and nationally.

820. Defendants also use other Enterprise Member's Agents and Attorneys, and as a result thereof, gain an appearance of legitimacy to perpetrate more, and less easily discoverable, racketeering violations than Defendants could perpetrate by their own means, especially by using the blackballed name "Countrywide" as a prior loan servicer.

821. The Enterprise alleged in this Class Action Complaint is particular to certain entities involved fostering the predicate acts delineated in the Predicate Acts Matrix for Class Plaintiffs named, however, at the core of Class Defendants' Enterprise all Members shares the common purpose of obtaining money or property related to Countrywide originated mortgage loans, pooled and sold to private investment funds, Ginnie Mae, Fannie Mae, or Freddie Mac, that were later securitized and sold as mortgage back security investments to Certificateholders.

822. Class Plaintiffs, on behalf of themselves and others so similarly situated, have requested Class Certifications based upon Countrywide originated loan trigger points, because all Countrywide originated mortgage loans, serviced by CHL #1, then BANA-BAC, then BANA from 2004-on or about 2014, constitute the entire population of Countrywide loans effected by Defendants' schemes to defraud Countrywide originated mortgagees in this District and nationally.

## CLAIM 1 CLASS PLAINTIFF REQUESTS FOR DAMAGES, INJUNCTIVE RELIEF AND EQUITABLE RELIEF

823. Class Plaintiffs, on behalf of themselves and others so similarly situated, are requesting treble damages for all financial damages, directly and proximately caused from Defendants' affirmative acts and material omissions, pursuant to 18 U.S.C. § 1964 (c).

824. Class Plaintiffs are also  requesting exemplary damages in the form of punitive damages from Defendants.

825. Class Plaintiffs are also requesting immediate equitable relief, pursuant to 18 U.S.C. § 1964 (a), to wit:

A.)  To prevent and restrain further violations of 18 U.S.C. § 1962(c) by issuing appropriate Orders to Defendants;

B.)  Ordering Defendants to divest themselves of any interest, direct or indirect, in the Countrywide Cleanup Enterprise immediately;

C.)  Imposing reasonable restrictions on Defendants future associations with the Countrywide Cleanup Enterprise members and activities;

D.)  Prohibiting Defendants from engaging in the same types of unlawful conduct that the Enterprise engaged in, the activities of which affect interstate or foreign commerce;

E.)  Ordering dissolution of the Countrywide Loan Cleanup Enterprise, making due provisions for the rights of innocent persons;

F.)  Ordering that a full disclosure statement be filed with trial courts, regarding all pending and future foreclosure actions filed in this District and nationally, filed as a result of an default alleged from any Countrywide originated mortgage, so that trial court judges can better determine the credibility, reliability

and trustworthiness of loan servicer declarations made, mortgage files, mortgage assignments, mortgage notes and endorsements thereto, and propriety of prior servicer business records; and

G.)   Ordering that Defendants' MERS mortgage note assignments filed in public land conveyance repositories nationally be canceled, or otherwise vacated, with follow up reporting requirements monitored by this Court.

826.   Additionally, for individual Class Plaintiffs, Aiwohi, Baliguat, Johnson, Keohokapu, Williams-James, Rodriguez and Nicolas, the Fair Housing Act, 42 U.S.C. § 3613(c) delineates additional relief that this Court may grant, to the extent that Claim 1 Predicate Acts also represent FHA violations for FHA Class Plaintiffs, to wit:

"(1) In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

(2) In a civil action under subsection (a) of this section, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs.." *Id.*

827. Class Plaintiffs on behalf of themselves and others similarly situated, are requesting reasonable attorneys fees, litigation costs and expenses, pursuant to

18 U.S.C. § 1964 (c).

828. Class Plaintiffs are also requesting all other injunctive and equitable relief permitted by law, and as this Court deems proper and just, both during the pendency of this litigation and at the conclusion of this litigation, pursuant to this Court's inherent authority to provide equitable relief requested.

## CLAIM 2

### CLASS ACTION FAIR HOUSING ACT CLAIM
### 42 U.S.C. §§ 3604(b), 3605(a)

### CLASS CERTIFICATIONS 1-2

### DEFENDANT, BANA, and DEFENDANT, BONYM

### [COLLECTIVELY "DEFENDANTS"]

829. Class Plaintiffs adopt and reallege allegations made in paragraphs 1-777 above, including sub-parts, as though fully set forth herein.

830. Class Plaintiffs adopt and reallege Exhibits 1-43, and sub-parts, and incorporate them into this Claim by specific reference, as those Exhibits referenced in the body of this Complaint relate to specific factual allegations made.

831. Claim 2 is a FHA Class Action claim, 42 U.S.C. § 3601, et seq., brought on behalf of FHA Class Members, and others so similarly situated, for Class Certifications 1-2.

832. Claim 2 is for FHA violations alleged for these Cass Plaintiffs, that are

also FHA Class Plaintiffs for purposes of Claim 2: Nathan Aiwohi, Toby Keohokapu, Barbara Anita Baliguat (by Darlene Ebos), Maria K. Williams-James, Ana Lazara Rodriguez, and Julie Nicolas; that are brought pursuant to 42 U.S.C. §§ 42 U.S.C. § 3602(i), 3604(a)(b), 3605(a), 3613(a)(1)(A), and 3613(c)(1), for separate Class Certifications related to all FHA violations alleged. ("FHA Class Plaintiffs")

833. FHA Class Plaintiffs allege that their original mortgage notes evidence discriminatory and/or predatory loan practices within the four corners of those Notes, in violation of the FHA, as to FHA Class Plaintiffs.

834. Defendant, BANA's loan servicing acts, policies, practices and procedures used, violate the Fair Housing Act as:

a. Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a);

b. Discrimination on the basis of race and national origin in refusing to negotiate for loan modifications in good faith, or otherwise make unavailable, or deny a loan modification, in violation of 42 U.S.C. § 3604(a); and

c. Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, or in the provision of services, in

violation of 42 U.S.C. § 3604(b).

835. Defendant, BONYM's loan servicing acts, policies, practices and procedures, violate the Fair Housing Act as:

a. Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a);

b. Discrimination on the basis of race and national origin in refusing to negotiate for loan modifications in good faith, or otherwise make unavailable, or deny a loan modification, in violation of 42 U.S.C. § 3604(a).

c. Discrimination on the basis of race and national origin in the terms, conditions, or privileges, in the provision of services, in violation of 42 U.S.C. § 3604(b).

836. Defendants' policies or practices are not justified by business necessity or legitimate business interests.

837. Defendants' policies and practices are continuing.

838. Defendant, BANA's acts and material omissions discriminated against a protected class, in the terms, conditions, or privileges of sale or rental of a dwelling, because of race, color, religion, sex, familial status, or national origin, by selling discriminatory and predatory mortgage notes to protected class members,

by and through its wholly owned subsidiary Countrywide, within the meaning of the Fair Housing Act, as either: reverse-amortization notes, interest only notes, maximum principal limit notes, or notes with interest rates exceeding 6.5%.

839. Defendant BANA's, and Defendant, BONYM's, acts and material omissions discriminated against a protected class, in *the provision of services provided* in connection with the sale of a dwelling, because of race, color, religion, sex, familial status, or national origin, by adopting a foreclosure methodology requiring Defendants to utilize forged, false or fraudulent mortgage note endorsements in blank unlawfully, in order to falsely allege proper standing to foreclose, to prosecute the foreclosure case, and to obtain a final judgment of foreclosure based thereon.

840. Defendant BANA's, and Defendant, BONYM's, acts and material omissions discriminated against a protected class, in the provision of services provided in connection with the sale of a dwelling, because of race, color, religion, sex, familial status, or national origin, by adopting a foreclosure methodology requiring Defendants to unlawfully utilize false or fraudulent mortgage note assignments, as filed in the public record in this District and nationally, in order to falsely allege proper standing to foreclose, to prosecute the foreclosure case, and to obtain a final judgment of foreclosure based thereon.

841. Defendant BANA's, and Defendant, BONYM's, acts and material omissions discriminated against a protected class, in the provision of services provided in connection with the sale of a dwelling, because of race, color, religion, sex, familial status, or national origin, by adopting a foreclosure methodology requiring Defendants to unlawfully utilize false or fraudulent Affidavits in support of the credibility, accuracy and trustworthiness of prior loan servicer mortgage loan records, including aforesaid forged note endorsements in blank, and aforesaid false or fraudulent mortgage note assignments, in order to falsely allege proper standing to foreclose, to prosecute the foreclosure case, and to obtain a final judgment of foreclosure based thereon.

842. Defendants acts and material omissions were wilful, with knowledge, and proximately caused damages to FHA Class Plaintiffs, for all times material hereto.

843. FHA Class Plaintiffs and putative Class Members are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and as a direct and proximate result of Defendants' unlawful discriminatory conduct, as hereinabove described, have sustained damages.

844. Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and

costs.

845. FHA Class Plaintiffs allege systemic FHA violations by Defendants for originating or purchasing, and servicing Countrywide loans for protected classes of individuals that constitute discriminatory and predatory loans within the four corners of those mortgage notes signed by putative FHA Class Members.

846. FHA Class Plaintiffs further allege systemic FHA violations by Defendants for failure to meaningfully engage and/or grant Countrywide mortgagors, such as FHA Class Plaintiff, Julie Nicolas, with loan modifications requested, opting instead to foreclose on discriminatory and predatory mortgage loans made, to obtain money or property, in violation of the Fair Housing Act, solely on the basis or race or national origin.

847. FHA Class Plaintiff, Julie Nicolas applied for loan modifications several times, and otherwise qualified for said loan modification requested, however, Defendants refused to modify the terms of Nicolas' predatory discriminatory mortgage note on the basis of race, opting instead to foreclose on the property where Nicolas' only missed a few mortgage payments, as a result of a temporary problem with her full time employer being under audit, prior to attempting to resume paying her mortgage.

848. FHA Class Plaintiffs further allege that the discriminatory and

predatory lending and servicing practices of Defendants for FHA protected classes, including FHA Class Plaintiffs, has caused a higher percentage foreclosure rate in this District and nationally for FHA protected classes that others.

849. FHA Class Plaintiffs further allege that other acts and omissions alleged by all Class Plaintiffs related to forged note endorsements, false and fraudulent mortgage assignments, and the filing of false and fraudulent Affidavits with trial courts attesting to the accuracy, truthfulness, and trustworthiness of business records and incorporated records, are also activities engaged by Defendants that are specifically prohibited by the Fair Housing Act.

850. Operative documents evidencing discriminatory and predatory lending and loan servicing practices by Defendants, regarding FHA Class Plaintiffs, Aiwohi, Keohokapu, Baliguat (by Ebos), Williams-James, Rodriguez, and Nicolas, are those same documents referenced in the Predicate Acts Matric hereto, as delineated in each of their individualized statements of facts, respectively.

851. Defendants' knowingly and intentionally discriminated against FHA Class Plaintiffs, while committing those specific acts and omissions, as delineated in each of their individual case allegations sections.

### CLAIM 2 FHA CLASS PLAINTIFFS' REQUEST FOR DAMAGES, INJUNCTIVE RELIEF AND EQUITABLE RELIEF

852. For FHA Class Plaintiffs, the Fair Housing Act, 42 U.S.C. § 3613(c)

delineates relief that this Court may grant:

> "(1) In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

> (2) In a civil action under subsection (a) of this section, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs.." *Id.*

853.   FHA Class Plaintiffs are requesting all relief permitted by law, including, actual and punitive damages, and all other equitable and injunctive relief that this Court deems proper and just, both during the pendency of this litigation and at the conclusion of this litigation, pursuant to 42 U.S.C. § 3613(c), and this Court's inherent authority to provide such relief requested.

854. FHA Class Plaintiffs on behalf of themselves and others similarly situated, are requesting reasonable attorneys fees, litigation costs and expenses., pursuant to 42 U.S.C. § 3613(c).

---

DATED: July 19, 2022.

/s/ Bruce Jacobs

_____

BRUCE JACOBS
(Pro Hac Vice Application Pending)


/s/ Frederick J. Arensmeyer

_____

FREDERICK J. ARENSMEYER


Attorneys for Class Plaintiffs, Nathan Earl
Aiwohi, Toby Alamoana Keohokapu, Jr.,
Darlene K. Ebos, as the successive Personal
Representative of The Estate of Barbara
Anita Baliguat, Susan DeShaw, Thomas
Johnson, Maria K. Williams- James, Lazara
Rodriguez, and Julie Nicolas